UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,

v.                          CASE No. 8:07-CV-1279-T-30TGW

FTN PROMOTIONS, INC., etc.,
et. al.,

        Defendants.
_____:


## REPORT AND RECOMMENDATION

In this case, the Federal Trade Commission ("FTC") seeks a preliminary injunction (Doc. 1), requesting that the defendants, who are nine businesses and six individuals, be enjoined from violating §5(a) of the FTC Act, 15 U.S.C. 45(a), and various provisions of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. The defendants are either involved in, or connected with, a telemarketing business that sells memberships to discount buyers and travel clubs, as well as telecommunications services.

There is overwhelming evidence that, in past years, the telemarketing business engaged in illegal and deceptive practices. In

connection with the motion for preliminary injunction, the defendants argue that, in recent months, they have changed their practices to conform to the law. However, evidence from 2007 demonstrates continued violations. Accordingly, I recommend that a preliminary injunction be entered.

However, it does not seem to me that at this point – which is an early stage of the case – the telemarketing business should be completely shut down. Consequently, consideration has been given to a modified, and less extensive, telemarketing business that could be operated under the oversight of the receiver who has previously been appointed in this case. Having received submissions from the parties and the receiver, and having held a hearing on the matter, I recommend that a preliminary injunction be entered that limits the telemarketing business to a plan of operation that has been agreed upon by the telemarketing defendants and the receiver (but not fully agreed to by the FTC). Significantly, the defendants do not object to the entry of such a preliminary injunction.

I.

In this case, the FTC challenges a large-scale telemarketing operation that employed hundreds of telemarketers and, according to the

FTC's estimate, brought in tens, if not hundreds, of millions of dollars (Doc. 7, p. 1). The FTC has presented evidence showing that the telemarketing scheme had several features that permitted the telemarketing defendants to charge a consumer's checking account for products that the consumer had not affirmatively decided to purchase. In view of the fact that there were hundreds of telemarketers and that the operation existed for several years, there obviously were variations in the approach used during the telephone solicitations. However, the practices to be described were used frequently.

In the first place, the scheme involves what the FTC calls "negative option" offers (id.). This means that, if a consumer agrees to receive some materials about a product or service, the consumer must affirmatively communicate to the pertinent defendant that he does not want that product or service (id., pp. 2-3). Otherwise, the consumer is charged for the product or service.

This feature is made particularly pernicious by another aspect of the scheme: The telemarketers strive by deceptive means to obtain the consumer's checking account numbers. The telemarketers lead the consumers to believe that they are associated with the consumers' banks and that the

consumers are being given free gifts for being valued customers at their banks (id., p. 6). At other times, telemarketers misrepresented to the consumers that they were being called as a result of a purchase they had made from some affiliated businesses (id., p. 7).

After the telemarketers had obtained checking account numbers from the consumers, they attempted to sell products or services to the consumers. However, the telemarketers focused the sales pitch on the free gifts rather than on the products or services being sold (id., p. 2). Notably, while the free gifts were not worthless, they sound much better than they are (see id., pp. 24-27).

Since the telemarketer's emphasis is on the free gifts, some consumers do not even realize that they are also being signed up for products or services, in addition to the free gifts (id., p. 2). At other times, consumers sign up for a free trial period for a membership in a buyers, or travel, club in order to obtain the free gifts (id., pp. 2-3, 10).

The primary product offered by the telemarketers is called "Variety." That product has a fourteen-day trial period in which customers are offered a membership in a third-party on-line shopping site at which they

would "receive discounts up to 50% on travel needs, 40% off movie tickets, discount dining certificates, and a low price guarantee on thousands of everyday products" (Doc. 54-2, p. 11).  The membership package also includes airline vouchers redeemable up to $400 and gasoline vouchers redeemable up to $100 (id.).  Customers can keep the free vouchers even if they cancel their membership with Variety.  If the membership is not canceled, the activation fee for the program is $40.[1]  The first month's cost is $19.95 for a total cost of $279 for twelve months (id., p. 12).

When a consumer accepts the free trial period for Variety, he is then offered a seven-day trial period with Credit Life (id.).  Credit Life provides access to a third-party on-line shopping site, with a credit limit of $2,500.  The credit line includes 75% financing for a total of ten months with no interest.  If not cancelled, the enrollment fee is $149,[2] and the monthly membership fee is $9.95 for a total cost for twelve months of $268 (id.).

---

[1]The receiver's report states the initial cost for the Variety program as both $40 and $60 (Doc. 54-2, pp. 12, 15).

[2]The receiver's report states the initial cost for Credit Life as both $149 and $159 (Doc. 54-2, pp. 12, 16).

A consumer, whether or not he accepts the Credit Life option, is also offered a special bonus of a twenty-one day trial period in Freedom Ring (id.).  Freedom Ring is an unlimited domestic long distance calling service with voice mail (id.).  The first month's charge is $49.95 with a total cost for twelve months of $599 (id.).

Another primary product is Travel Life Go Direct, which has a fourteen-day trial period (id., p. 13).  This product offers discounts up to 50% on travel needs and hospitality benefits that are generally only available to travel professionals (id.).  The package also includes vouchers redeemable up to $400 in airline tickets and two free nights of hotel accommodations, which a customer can keep even upon cancellation of the package (id.).  The cost of this package includes a $40 activation fee and a $19.95 monthly fee for a total cost of $279 for twelve months (id.).

If a consumer accepts the Travel Life Go Direct package, then the telemarketer offers the consumer  as a "new VIP member," a seven-day trial period with Florida Direct that involves five vacation nights at two Florida resorts (id.).  The vacation requires that the customer attend a time-share presentation from the resort.  The cost is a one-time charge of $149 (id.).

Even if the customer does not accept the Travel Life Go Direct membership, the telemarketer is to offer the customer a special bonus of a twenty-one day trial period in Lucid Communications.  Lucid is an unlimited domestic long distance calling service with voice mail (id.).  Lucid is almost identical to Freedom Ring, which is offered with the Variety products (id.).  The monthly cost is $49.95 for a total cost for twelve months of $599 (id., p. 14).

Generally, telemarketers informed consumers that the free trial period would begin to run when they received the program materials in the mail (Doc. 7, p. 3).  However, the time period actually began much sooner, usually about the date of the sales call instead of upon the consumer's receipt of the program materials (Doc. 1, p. 13; Doc. 7, pp. 3, 21).  Therefore, consumers may have had only a day or two to cancel the programs, and sometimes the trial period had expired prior to receipt of the programs' welcome packages in the mail (Doc. 1, p. 13; Doc. 7, pp. 3, 21, 28-29).  There were even times when the consumers never received the packages (Doc. 7, pp. 3, 28).

Moreover, consumers could not cancel prior to receiving the mailings because the telemarketers did not give them the telephone numbers to call in order to cancel the programs (Doc. 1, p. 13; Doc. 7, p. 3).  In addition, consumers have complained that, when they did obtain the telephone numbers for cancellation, their requests for cancellation were strongly resisted, or met with various hurdles.  Further, some consumers were charged for programs that they had cancelled (Doc. 1, p. 17; Doc. 7, pp. 29-30).

Also, it was at the end of the phone call when the telemarketers attempted to sell the additional products, a tactic which is referred to as "upsales."  For example, with respect to the Variety program, Credit Life and Freedom Ring are the upsale products.  The telemarketers mentioned these products quickly and some consumers did not even realize that they had agreed to sign up for the additional programs (Doc. 1, pp. 14-16; Doc. 7, pp. 3, 20-21).

Furthermore, the upsale products added a substantial complication to a cancellation of the programs before the end of the trial period.  Thus, each program was mailed in a separate welcome package, which at times appeared to be unsolicited promotional or sales material, so

that consumers ended up throwing it away instead of reading it (Doc. 1, pp. 16-17; Doc. 7, p. 3). Moreover, each welcome package for each program contained a different name, return address, telephone number and length of trial period (Doc. 1, pp. 15-16; Doc. 7, p. 3).[3] A consumer had to call each of the three different telephone numbers to cancel each program (Doc. 1, p. 17; Doc. 7, p. 22). Often, consumers did not realize that each different telephone number had to be called in order to cancel each program (Doc. 1, p. 17). Therefore, consumers were still charged for the non-cancelled programs.

Another negative aspect of the telemarketing operation was the practice of the telemarketers to speak very fast. Thus, the receiver reported that he listened to approximately one hundred recordings of telemarketing calls and stated that, "[w]ith very few exceptions, the telemarketers spoke so quickly that it was difficult to understand in a meaningful way what was being offered and what was expected of the consumer" (Doc. 54-2, p. 6).

The FTC also alleges that the telemarketers made misrepresentations to the consumers, such as when the consumer's checking

---

[3]Interestingly, each phone number rang in the same room at defendant Suntasia's business location (Doc. 7, pp. 3-4, 30).

account would first be charged (Doc. 7, pp. 21-22).  Most likely, some misrepresentations have been made.  However, even putting aside the issue of misrepresentations, the combination of the improper practices discussed above clearly and convincingly demonstrates that the telemarketing scheme caused consumers to pay from their checking accounts for products and services that the consumers had not affirmatively agreed to purchase.

The FTC asserts, in addition, that the organizers have employed a variety of business entities, with changing names, to hide this operation from law enforcement (id., p. 37).  There is plausibility in that assertion in light of the somewhat mind-numbing list of defendants.  The defendant companies are FTN Promotions, Inc., Guardian Marketing Services Corp., Strategia Marketing, LLC, Co-Compliance, LLC, JPW Consultants, Inc., Travel Agents Direct, LLC, Agent's Travel Network, Inc., Bay Pines Travel, Inc., and Suntasia Properties, Inc.  The individual defendants, Bryon W. Wolf, Roy A. Eliasson, Alfred H. Wolf, Donald L. Booth, Jeffrey P. Wolf and John Louis Smith II, hold various positions with the companies.[4]

--------

[4]According to the FTC, Bryon W. Wolf and Roy A. Eliasson own FTN, Guardian, Strategia, Co-Compliance, Bay Pines and Suntasia Properties (Doc. 7, p. 36).  Bryon Wolf is the CEO and/or president, and Roy Eliasson is the vice president, of these companies (id.).  Alfred H. Wolf is Bryon Wolf's father and is an officer or owner of FTN, Strategia,

The telemarketing companies, FTN Promotions, Inc., Guardian Marketing Services, Corp., Strategia Marketing, LLC, Co-Compliance, LLC, and Suntasia Properties, Inc., operate from the same location and share employees and business practices (id., pp. 35-36).[5] More specifically, FTN conducts its telemarketing sales under the business name of Suntasia (id., p. 37). Guardian conducts all the customer service functions (id.). According to the FTC, FTN moved its operations to the new Strategia entity and Guardian's operations have been moved to Co-Compliance (id.). Suntasia Properties owns the property where the companies operate (id.). Bay Pines is the agency used by the companies for booking travel for the travel products (id., pp. 37-38). JPW Consultants, Travel Agents Direct, and Agent's Travel provide to the telemarketing companies the products that are sold to consumers (id., p. 38; Doc. 54-2, pp. 11, 13).[6]   Suntasia's principals also

_____

Bay Pines and Suntasia Properties (id.). Donald L. Booth is the general counsel for FTN, Guardian, Strategia and Co-Compliance (id.). Jeffrey P. Wolf, Bryon Wolf's brother, is the incorporator and sole officer of JPW Consultants (Doc. 1, p. 7; Doc. 7, p. 38). John Louis Smith II is the sole owner of Travel Agents Direct (Doc. 7, p. 39).

[5]These companies are located at 8751 Ulmerton Road, Largo, Florida 33771 (Doc. 1, pp. 3-4).

[6]JPW Consultant's products are two buyers clubs that were formerly known as Distinct Advantage and Freedom Gold and now are known as Variety and Credit Life (Doc. 7, pp. 38-39; see also Doc. 54-2, pp. 15, 16). Agent's Travel and Travel Agents

control Bay Pines, JPW Consultants, Agent's Travel Network, and Travel Agents Direct (Doc. 7, pp. 36, 38).[7]

On July 23, 2007, the FTC filed this lawsuit asserting various claims, including violations of §5(a) of the FTC Act and provisions of the TSR (Doc. 1).  The plaintiff requested the entry of a temporary restraining order against the defendants to stop their telemarketing practices (Doc. 6).  On that same date, a temporary restraining order was entered with an expiration date of August 2, 2007  (Doc. 10).

Under the TRO, the defendants are prohibited from various activities, including violating provisions of the TSR, making further misrepresentations regarding their affiliation with prospective customers' banks, and failing to disclose material terms and conditions relating to any offers of any goods or services.  The defendants also have to maintain their business records and are not to create any new business venture without first

---

Direct provide the discount travel programs (Doc. 7, p. 39).

[7]Suntasia's principals purchased a travel agency in St. Petersburg and Bay Pines has operated there since April 2006 (Doc. 7, p. 37).   JPW Consultants, Agent's Travel Network, and Travel Agents Direct apparently have no separate business location since their principal offices are either mail drops or a residence (id., p. 38).  JPW Consultants is located at Jeffrey P. Wolf's residence in Plantation, Florida  (Doc. 1, p. 4; Doc. 7, p. 38).

notifying the FTC with specified information.  The defendants' assets have also been frozen, and they were to provide to the FTC completed financial statements.  A temporary receiver was appointed to take control of the defendants' operations.[8]

The FTC also moved for a preliminary injunction and that matter was referred to me for a report and recommendation (Doc. 29).  After requested continuances, a hearing was conducted on the motion for preliminary injunction on August 24, 2007.  At that hearing, the parties confirmed that the TRO would remain in effect until the court ruled on the motion for preliminary injunction.

Also at the hearing, when it became apparent that I was going to recommend the entry of a preliminary injunction, the telemarketing defendants requested an opportunity to submit a plan to engage in a modified telemarketing operation.  The request was granted, with the FTC given the right to respond to the proposed plan and the receiver thereafter permitted to

---

[8]The receiver has suspended all business activities, including a call center located in India (Doc. 54-2, p. 1).  A few employees were allowed to remain working to aid the receiver's duties and to help the defendants obtain the needed information in order to defend the lawsuit (id.).

comment on the two submissions.  A hearing was subsequently held with respect to the proposed plan.

By the time of the hearing, the telemarketing defendants and the receiver had essentially agreed on a plan, although some details remained to be worked out.  The FTC had some significant objections to the agreement between the telemarketing defendants and the receiver.  One objection was based on the view that, in violation of the TSR, the consumers did not expressly verify that they had agreed to try a product or service.  The FTC argued that, as a consequence, the plan should require an affirmative opt in notice for each of the three proposed categories of consumers, rather than the types of opt out notices proposed for consumers who have been paying for their membership for more than a year, or for between five months and one year.  Because this objection presented a potentially large obstacle to a final agreement on the plan, the parties, as well as the receiver, were given a brief period of time to submit memoranda on that issue.  Following submission of those memoranda, I entered an Order stating that an opt in notice was not required to be part of the plan (Doc. 126).  Thereafter, the parties and the receiver conducted further negotiations, with the result that a plan with

additional modifications has been agreed to by the telemarketing defendants and the  receiver, but with some disagreement by the FTC (Docs. 156, 156-2).

According to counsel for the defendants, the FTC has only two stated objections regarding the second amended plan of operation: "the FTC continues to object to any plan that contemplates new telemarketing  by these defendants and also objects to the opt out notice procedures authorized under the proposed plan" (Doc. 156, p. 2).  After receiving the amended plan on November 26, 2007, I entered an Order providing that any objections to the plan had to be submitted by December 12, 2007 (Doc. 157).  No additional objections were voiced.

## II.

A.  Section 13(b) of the FTC Act gives a court the authority to grant the FTC a permanent injunction.  15 U.S.C. 53(b).  As an incident to that authority, a court may also enter a preliminary injunction in favor of the FTC. Federal Trade Commission v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984).  Moreover, a court may also grant ancillary relief, including freezing assets and appointing a receiver.  Id.

Prior to issuing a preliminary injunction, a court must "(1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities." Federal Trade Commission v. University Health, Inc., 938 F.2d 1206, 1217 (11th Cir. 1991). However, unlike private litigants, the FTC need not prove irreparable harm. Id. at 1218. Of course, under the express terms of the statute, the entry of a preliminary injunction must be in the public interest. 15 U.S.C. 53(b).

B. Section 5(a) of the FTC Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. 45(a)(1). The FTC, therefore, in order to establish liability for such practices must demonstrate that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." Federal Trade Commission v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003). The FTC need not prove individual reliance of each purchasing consumer prior to obtaining equitable relief. McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000). Rather, there is a presumption of actual reliance by consumers "once the FTC has

proved that the defendant made material misrepresentations, that they were

widely disseminated, and that consumers purchased the defendant's product."

Id. (internal citations omitted).

Further, the FTC has promulgated in its TSR specific

prohibitions of deceptive telemarketing acts and practices.  16 C.F.R. 310.3.

TSR 310.3(a)(1)(vii), 16 C.F.R. 310.3(a)(1)(vii), states that,

before a customer pays for goods or services, the telemarketer must disclose,

in a clear and conspicuous manner:

> (vii)  If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s).

TSR 310.3(a)(2)(iv), (vii) prohibits telemarketers from (16

C.F.R. 310.3(a)(2)):

> (2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following information:
>
> . . .

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

. . .

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity....

The TSR also requires telemarketers "to disclose truthfully, promptly, and in a clear and conspicuous manner ... [t]hat the purpose of the call is to sell goods or services ..." and "[t]he nature of the goods or services." 16 C.F.R. 310.4(d)(2), (3).

TSR provisions 310.3(a)(3) and 310.4(a)(6) relate to the authorization required prior to a customer's bank account being deducted.

It is also a violation of the TSR for a telemarketer to receive "for consideration, unencrypted consumer account numbers for use in telemarketing." 16 C.F.R. 310.4(a)(5).

III.

The FTC has made a strong showing of likelihood of success on the merits. Indeed, its submission of voluminous materials could rightly be called "overkill." This report and recommendation need not be unduly burdened with a detailed summary of all the evidence. After all, the court has

-18-

considered the initial submission and concluded that it supported temporary injunctive relief.  The additional evidence that has been submitted merely confirms this court's conclusion.

More significantly, at the most recent hearing, the defendant companies, in order to expedite matters, did not object to the entry of a preliminary injunction, with an asset freeze and receivership, that incorporates a plan of operation that has been agreed to by these defendants and the receiver.[9]   Under these circumstances, the focus of this report and recommendation will be upon the proposed plan, and the FTC's objections to it.

The second amended plan of operations, as agreed upon by the telemarketing defendants and the receiver, provides for continued oversight and decision-making authority by the receiver over all aspects of the

---

[9]Three individual defendants, Booth, Alfred H. Wolf and Jeffrey P. Wolf, do object to the entry of a preliminary injunction with an asset freeze against them.  However, at the latest hearing, counsel for those defendants did not dispute that a showing has been made that would support a preliminary injunction against the defendant companies.  Their position is that, accepting that such a showing has been made, the evidence is insufficient to demonstrate their complicity in the telemarketing scheme.  In light of their position, it is not necessary to detail the evidence against the defendant companies in order to resolve their contentions.   Their arguments will be addressed in a separate report and recommendation.

companies' operations (Doc. 156, Ex. A, p. 1).  This authority extends to such matters as the scope of telemarketing activities; the substance of telemarketing scripts, other marketing materials, and compliance procedures; and whether to reduce or terminate business activities in the event they are no longer economically viable (id.).[10]

The plan incorporates numerous improvements to the defendants' products, marketing materials, cancellation procedures and compliance measures.  Notably, all improvements are to be implemented at the discretion of the receiver and with notice to the FTC (id.).

The products marketed will initially be limited to three: Variety, Credit Life, and Freedom Ring (id., p. 2).  Variety will be the primary telemarketing offer, and Credit Life and Freedom Ring will be the upsale products.  These programs will be enhanced with some additional benefits, as well as allowing a minimum of fourteen days (the free trial period) for cancellation before the customer will be billed (id.).

---

[10]The receiver also has discretion to retain the individual defendants in their current positions and pay them reasonable salaries, provided that any funds released by the FTC for living expenses and attorneys' fees are reduced by those amounts (Doc. 156, Ex. A, p. 1).

The telemarketing scripts are to be revised "to include disclosure of (a) all material terms and conditions of the offer(s), (b) all terms and conditions required pursuant to the [TSR], ( c) the fact that the Company is not affiliated with the consumer's bank, and (d) all information necessary to evidence the consumer's express verifiable authorization to charge the consumer's checking account" (id., pp. 2-3).   The script revisions will also "ensure that the terms, conditions and restrictions of any free gifts or premium incentives offered to consumers are accurately described" (id.,  p. 3).   An example given is the elimination of references to "$100 in gasoline vouchers," unless it is also clearly disclosed that this consists of four $25 vouchers that can only be redeemed at a rate of one per month (id.).   The scripts will also disclose any mail-in requirements for vouchers.   No scripts, rebuttals or FAQ's [frequently asked questions] will be used unless they have been fully approved by the receiver, and all modifications to previously approved scripts must likewise be approved, with notice to the FTC (id.).   In addition, sales agents will be required to read the scripts verbatim "in a normal volume and cadence" (id.).

Further, the plan calls for increased training and stricter monitoring of sales agents, at the sole discretion of the receiver (id., pp. 3-4). The receiver will have access to all sales recordings and may "kick out" sales at will (id., p. 4). Access to live calls and recordings will also be given to the FTC for monitoring purposes (id.).

To ensure that new customers receive their full trial period before being billed, procedures will be adopted to ensure that welcome kits are mailed within forty-eight hours following the sale (id.). In the event that a welcome kit is mailed after the forty-eight hour period, the customer's trial period and billing date will be extended day-for-day. The cancellation mechanism will be improved by allowing customers to cancel all of the defendant companies' programs through a single telephone number, which will be provided to consumers at the time of the sales call (id.). At the time of cancellation, customer service agents will be required to advise consumers of all other programs in which they are enrolled, including free trials. Consumers will also be entitled to a refund for any reason for a period of sixty days following the sales date, and these refund requests may be made over the phone (id., p. 5).

The plan of continued operation provides for a detailed notice procedure to all existing customers before the resumption of billing will be considered (id.).  After this notice period is concluded, the receiver "shall evaluate whether the existing customer base will generate sufficient revenue to support the commencement of new marketing activities" (id., p. 8).  Based on the receiver's estimate of the defendants' economic viability, the receiver may then direct the defendants to commence billing of existing customers, or begin new marketing activities (id.).

All existing customers will receive a separate notice for each program they are enrolled in, which will detail the terms and conditions of participation and provide an opportunity for consumers to cancel their membership (id., p. 5).  The existing customer base will be divided into three groups for notice purposes: (1) members who were enrolled on or before July 31, 2006, will receive a single "Opt Out Notice"; (2) members enrolled between August 1, 2006, and January 31, 2007, or who have contacted the company during their membership term, will receive two "Opt Out Notices"; and (3) members enrolled on or after February 1, 2007, with no other contact with the company, will be required to affirmatively "Opt In" before any

billing can be resumed (id., pp. 5-7).  The receiver will determine whether the nature of the consumer's contact with the company is sufficient to demonstrate the consumer's knowledge and awareness of their membership, and thus whether they fall into category two or three above  (id.).

There was a concern that consumers would simply discard the Opt Out Notices without reading them.  Consequently, the plan was modified so that the consumers will receive postcards about seven to ten days prior to the notices alerting them to the notices (see Doc. 156, Ex. D, p. 10).

Consumers who receive a single Opt Out Notice and wish to cancel their membership may either return a voucher by mail that indicates their decision to cancel their membership, or call a toll free number provided on the notice.  The right to cancel may be exercised at any time, but consumers will be advised that billing will be resumed (subject to the receiver's discretion) thirty days after the postmark date of the notice (Doc. 156, Ex. A, pp. 5-6).  Consumers in the Double Opt Out Notice category will receive two notices spaced twenty days apart, and thus will have two opportunities to cancel their membership (id., pp. 6-7).  Those consumers who receive the Opt In Notice cannot be billed unless they mail the voucher or call

the company and indicate their decision to continue membership (id., p. 7).

The content of all notices "shall be subject to the approval of the Receiver"

(id.).

Funds generated from resumed billing of existing customers will

be subject to the asset freeze, but may be used by the receiver to fund

operation of the business and pay receivership expenses (id., p. 8).  Funds

received from new marketing activities will not be subject to the freeze, but

will still be available to the receiver, at his sole discretion, to pay business and

receivership expenses (id.).  The plan further authorizes the receiver to

terminate operations of the defendant companies at any time, subject to

fourteen days notice to the defendants, and reserving the right of the

defendants to petition the court for a hearing on the matter (id., p. 9).

The FTC asserts two objections to this plan of operation: (1) a

general objection to any new telemarketing activities by the defendants, and

(2) a more specific objection to the use of Opt Out Notices (Doc. 156, p. 2).

Notably, the receiver, who has worked with the telemarketing defendants to

develop a reasonable and legitimate plan of operation, does not share those

objections.

In objecting to all further telemarketing activity, the FTC is essentially asking at this early stage for full relief. The goal of the preliminary injunction in this case is to halt continued violations by the defendants pending trial. In this regard, the plan of operation that is to be implemented contains numerous safeguards to prevent further misrepresentations and improper sales practices. The scripts have been changed significantly and are to be read in a slower manner, sales agents will receive further training, and compliance measures have been increased. Most importantly, business activities will be closely monitored by the receiver, who has complete discretion to reject scripts, monitor sales calls, sanction employees, and shut down the entire operation. As an added precaution, the FTC will have the ability to monitor sales calls, and will receive notice of any changes in the scripts or products.

Telemarketing is not an illegal enterprise, and in this case it provides employment for a significant number of people. In addition, although the benefits of the defendants' programs have been questioned, there are evidently satisfied customers who have been using the defendants' products for some time. Under these circumstances, the defendants should not

be prohibited from all telemarketing activity due to a concern that they will resume improper practices.  The receiver's close oversight provides a strong assurance that they will not.

The FTC also argued against the resumption of telemarketing activities on the ground that an unsuccessful operation would result in less money being available to compensate victims of the defendants' activities. This is a speculative concern that does not warrant prohibiting the defendants from engaging in a more limited operation.  The defendants contemplate that, instead of hundreds of telemarketers, it would employ two shifts of twenty-four telemarketers and that the weekly expenses for the operation would be about $42,349 (Doc. 103-5, p. 2).  This would not constitute a substantial depletion of the defendants' assets.  Further, the defendants obviously think that the new operation will make money, so that there would be more money available for restitution.  If this does not turn out to be the case, the receiver is authorized, and prepared, to shut down the operation.

Moreover, the FTC's objection seems to contemplate that every consumer who has been charged for a membership will be entitled to full restitution.  However, the defendants have filed an affidavit stating that at the

time the TRO was entered, Strategia had 93,950 customers enrolled for memberships, that approximately 21,084 customers had been enrolled for more than one year, and that another 26,055 customers had been enrolled for five months to one year (Doc. 103-4, pp. 1-2). Thus, more than half of Strategia's customers had been members for an extended period of time, and it is appropriate to assume that many, if not most, were satisfied with their memberships. It is certainly questionable at this point whether such customers would be entitled to restitution. Consequently, the FTC seems to substantially overstate the need to conserve the defendants' assets for the purpose of restitution.

Under these circumstances, the FTC's concern about the depletion of the defendants' assets does not justify a prohibition against the resumption of telemarketing activities.

The FTC, as indicated, also raises an objection to the use of Opt Out Notices for customers who have been members for more than five months. At the conclusion of the most recent hearing, the FTC asserted that such notices would not be legal. As a result of that assertion, memoranda were requested on the issue of whether a preliminary injunction could legally

include a provision that permitted members to be debited following a failure to respond to a notice advising that charges would be resumed unless the member cancelled his or her membership.

The FTC's position is premised upon its showing that the defendant telemarketers had violated TSR 310.3(a) which requires "express verifiable authorization" before recurring debits can be made to consumers' accounts (Doc. 123, p. 5). In this respect, the FTC argues that there was not express oral authorization for the debits in light of the evidence that the telemarketers spoke rapidly when obtaining authorization from the consumers (id., p. 6). While this appears true to a great extent, it is not necessarily true in all cases. In any event, regardless of any other violation, the defendant telemarketers seemingly violated the TSR as to the categories of consumers who are to receive Opt Out Notices because they failed to provide the consumers with a telephone number for customer inquiry, as the rule requires. See 16 C.F.R. 310.3(a)(3)(ii)(F).

However, while the FTC has shown that the TSR has been violated, it has not shown that the violation precludes the use of Opt Out Notices. The FTC's memorandum seemed to focus essentially on the

argument that Opt Out Notices should not be used, and not that they cannot legally be used (see Doc. 123, pp. 2, 5, 12).  In other words, the FTC made no meaningful showing that the use of Opt Out Notices would be illegal.

In contrast, the telemarketing defendants demonstrated that, even accepting that the TSR had been violated, the court may validly use Opt Out Notices as part of the plan of operation incorporated in a preliminary injunction.  The defendants persuasively argue that there is nothing about a violation of the TSR that limits the court's broad equitable powers to fashion flexibly preliminary injunctive relief (Doc. 124, pp. 8-11).  In particular, the defendants point to the Supreme Court's statement that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982).  That principle obviously applies to a regulation such as the TSR.

The defendants point out also that the FTC Act provides the federal courts with authority "to grant such relief as the court finds necessary."  15 U.S.C. 57b(b).  Thus, the court has discretion to determine

what final relief is warranted.  A fortiori, it has such discretion to decide what preliminary relief is appropriate.

      The defendants note further that implicit in the FTC's contention is the notion that the defendants' contractual relationships with its customers are void ab initio and thus are a nullity (Doc. 124, pp. 3, 11-12).  This would mean that, even though customers had paid membership dues for more than a year and had exercised their memberships to receive benefits, they would be entitled to the return of all of their money.  The FTC has clearly failed to show that the law compels at this preliminary stage such a seemingly unreasonable result.

      On this point, the defendants argue that the FTC Act, as indicated, affords a federal court discretion to fashion remedies for violations of the law.  They contrast this with statutes such as the Securities Exchange Act of 1934 and the Investment Advisors Act, which contain provisions rendering void certain contracts made in violation of those laws.  See 15 U.S.C. 78cc(b), 80b-15(b).  The difference between this type of provision and the FTC Act underscores that a violation of the FTC Act or its regulations does not automatically render a contract void.

Consequently, a violation of the TSR does not make a nullity of a telemarketing contractual relationship that has been in existence for over five months.  The line of reasoning that implies that it does, therefore, does not provide a basis for concluding that the law prohibits the resumption of the relationship following the sending of an Opt Out Notice.  Moreover, the FTC has not set forth any other viable ground in support of its contention that the use of an Opt Out Notice to a customer that has had a membership for five months or more would be illegal.

As indicated previously, it appears that the focus of the FTC's objection to the Opt Out Notices was not that the authorization of such notices in the preliminary injunction would be illegal, but that it would be unwarranted.  Importantly, the receiver concluded otherwise.

The plan, as explained above, breaks down the notices into three categories.  One category deals with consumers who enrolled between February 1, 2007, and July 25, 2007, the date the receiver took possession of the operation (Doc. 28, p. 3).  These members will receive notices advising them that they need to state affirmatively in response that they wish to

continue their membership (Doc. 156-2, Ex. A, p. 8).  There is no objection to this type of notice.

With respect to members who enrolled between August 1, 2006, and January 31, 2007, they will receive two notices advising them that, unless they cancel their membership, charges to their bank account will resume.  The second notice will be sent twenty days after the first if no response has been received (id., p. 7).  With each notice, the member will be given a cancellation voucher to return and a toll free telephone number to call for cancellation.

This notification procedure seems reasonable to me.  The notices in this category are being sent to people who have had their bank accounts charged for at least five months.  On its face, this circumstance alone would appear to show that the consumers had accepted their memberships.

Moreover, while the telephone solicitations to these customers failed to comply with the TSR and in many instances were confusing, the customers were sent "welcome packages," which advised them of the programs in which they were enrolled, the charges for the programs, and the telephone number to call to cancel the programs (Doc. 7, pp. 23-24).  The welcome packages, followed by at least five months of bank charges, most

likely alerted virtually all of the approximately 26,000 customers in this category to their memberships and the charges for the memberships.

With respect to those customers who were aware of their memberships and the charges for them, there is every reason to think that they will respond to two clear and specific notices, preceded by a post card alerting them to the forthcoming notices, if they do not want to be charged for their memberships.[11]   Importantly, the procedures for cancelling memberships require nothing more than a return of a cancellation statement in a stamped self-addressed envelope or a toll free telephone call.

However, I am aware that there are exceptional circumstances where there was a significant delay in a customer becoming aware of her membership, such as a woman who spent six months of the year at a different residence and who had a somewhat dormant bank account that she did not frequently check.  There may also be a few customers who, because of illness or some other impediment, cannot respond promptly to the notices.

---

[11]Notably, a separate notice will be sent for each program in which the individual is enrolled.  Therefore, if a person in this category is enrolled in three different programs, he or she will receive six notices.

Nevertheless, I fully expect in these types of exceptional circumstances that the member will be permitted to cancel the membership belatedly, and that refund requests will be honored.  In the first place, the defendants are being closely monitored, and they have adopted a conciliatory attitude.  In all events, the ultimate control and decision-making authority reside with the receiver.  I am confident that the receiver, who has no financial stake in the operation, will handle belated requests for cancellation and refunds with a spirit of leniency and generosity.

In sum, the Double Opt Out Notice provision for those customers who have paid for memberships for more than five months is reasonable. While other plans also may be reasonable, this particular plan has been agreed to by the receiver.  In light of that circumstance, there is no reason to reject it.

The receiver has been deeply involved with the defendants' operation since he assumed control on July 25, 2007.  I was impressed by the thoroughness and objectivity of the receiver's initial report (see Doc. 54-2), as well as by subsequent submissions.  While I am fairly well-versed concerning the facts of this case, the receiver's knowledge of the details is clearly much greater.  Moreover, he would have a much better insight into the

operations of the defendants.  In addition, he was intimately involved for several weeks in the negotiations of the proposed plan of operation.  Under these circumstances, it is appropriate to give deference to the receiver's considered judgment that Opt Out Notices are sufficient for those customers who have been enrolled as members from August 1, 2006, through January 31, 2007.  See Quilling v. Trade Partners, Inc., 2006 WL 1134227 at *1 (W.D. Mich. 2006).  The FTC has not put forth any cogent reason for second-guessing his conclusion.

The third category of customers are those who have been members since on or before July 31, 2006.  In other words, people in this category had been members for virtually a year or more.

As to this category of approximately 21,000 customers, it is reasonable to conclude that, not only were they aware of their memberships, but they were sufficiently satisfied with them to continue them for an extended period of time.  In my excursion into the voluminous record, I do not recall seeing any complaint regarding confusion or lack of notice from someone who had been a member for a year or more.  Moreover, the FTC in its memorandum objecting to the Opt Out Notices has not pointed to any.  In

other words, unlike the prior category, there were no apparent exceptions in this category; the customers were knowingly and willingly being charged for their memberships.

In light of the customers' seeming lack of objection to their memberships, a single Opt Out Notice to people in this category is reasonable. Thus, the absence of any objection for a year or more strongly indicates that the customers would not object to the resumption of bank debits following the interruption of service. Of course, if customers have changed their mind in the meantime, they can cancel their memberships through the simple cancellation options.

There certainly does not appear to be any justification for requiring an Opt In Notice for people in this category. In effect, they have already opted in.

Furthermore, there is not even justification for requiring two Opt Out Notices for this category. In the category that provided for such notices (a category that included people who had been charged as few as five or six times), there were conceivably some people who never became aware that their bank accounts were being charged. Accordingly, it was reasonable to

take greater steps to notify those customers.  Arguably, a single notice would have been reasonable for that category, but the negotiations resulted in an agreement for two Opt Out Notices.  That agreement, however, does not support the conclusion that a Double Opt Out Notice requirement is warranted for customers that had been enrolled, and charged, for a year or more.  Such an extended membership clearly evidences that the customers knew about their memberships and agreed to be charged for them.

Further, it is appropriate to add that the single notice will be preceded by a postcard alerting the customers that a notice will be forthcoming.  In other words, it is not exactly a single notice.

Moreover, the receiver has agreed to a single Opt Out Notice for this category.  For the reasons previously explained, deference should be given to the receiver's judgment on this matter also.

Therefore, the court should reject the FTC's contention that an Opt In Notice should be required before bank charges are resumed to all prior customers .

IV.

The defendant companies have agreed to the entry of a preliminary injunction which incorporates the Second Amended Plan of Operations (Doc. 156).  The receiver agrees to that plan as well.  The FTC, however, has two objections: (1) The defendants should not be permitted to engage in any further telemarketing operations; and (2) any resumption of charges to existing customers should only take place upon responses to Opt In Notices.  For the reasons stated above, those objections should be rejected.  Accordingly, I recommend that a preliminary injunction be entered that incorporates the Second Amended Plan of Operations, which, among other things, continues the receivership and the asset freeze.

Respectfully submitted,

DATED:  DEC. 21, 2007

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of

its service shall bar an aggrieved party from attacking the factual findings

on appeal.  28 U.S.C. 636(b)(1).