UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | Civ. No. 8:07-CV-1279-T-30TGW |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FTN PROMOTIONS, INC., a Florida ) | |
| corporation, dba Suntasia Inc., Suntasia ) | |
| Marketing, Inc., and Capital Vacations, *et al.*, ) | |
| ) | |
| Defendants. ) | |

DECLARATION OF DOUGLAS M. McKENNEY (PX 68)
PURSUANT TO 28 U.S.C. § 1746
FILED IN SUPPORT OF PLAINTIFF FEDERAL TRADE COMMISSION'S
OBJECTIONS TO THE DECEMBER 21, 2007 REPORT AND
RECOMMENDATION OF MAGISTRATE JUDGE THOMAS G. WILSON

I, Douglas M. McKenney, hereby declare as follows:

1.      My name is Douglas M. McKenney.  I am a United States citizen over

eighteen years of age.  I am an investigator with the Federal Trade Commission

("Commission" or "FTC"), a position that I have held for approximately one year.  Prior to

becoming an investigator, I was a paralegal specialist with the FTC for approximately two

years.  My business address is Federal Trade Commission, Midwest Region, 55 West

Monroe Street, Suite 1825, Chicago, Illinois 60603.  I am the same Douglas M. McKenney

who previously signed two declarations in the case *FTC v. FTN Promotions, Inc., et al.*, No.

8:07-cv-1279-T-30TGW (M.D. Fla.), which were filed with the Plaintiff's Motion for

Temporary Restraining Order as Plaintiff's Exhibit ("PX") 2 and with Plaintiff's Supplemental Memorandum in Support of Its Motion for a Preliminary Injunction as PX 63.

2.    As I have previously stated, on July 25, 2007, I was present when representatives of the court-appointed Temporary Receiver, Robb Evans & Associates LLC, took possession and control of the business premises of defendants located at 8751 Ulmerton Road, Largo, Florida 33771, pursuant to the Court's *Ex Parte* Temporary Restraining Order with Asset Freeze and the Appointment of a Temporary Receiver ("TRO") dated July 23, 2007. After the Temporary Receiver's representatives secured the premises, they permitted FTC personnel to enter the premises for the purpose of inspecting and copying the books and records of the Receivership Defendants.

3.    During the course of the FTC's investigation in this case, FTC personnel requested and obtained consumer complaints against defendants and their related entities that were filed with various city, county, and state agencies, as well as with the Better Business Bureau ("BBB"). I provided a summary of these complaints in my first declaration. *See* PX 2 at ¶¶ 48-51 [Doc. 13]. I have since reviewed the BBB complaints against defendants to identify those complaints where it is evident from the face of the complaint that defendants charged the consumer without authorization for at least five consecutive months. Attached hereto as **McKenney Att. A** are true and correct copies of fourteen complaints in which consumers complain that defendants debited their bank accounts without authorization for at least five months. Most of these consumers complain that they either canceled defendants' programs yet defendants subsequently charged them for many months without their

2

knowledge, or that they never received any materials from defendants and did not notice the

unauthorized withdrawals until months after defendants' initial telemarketing call. One

consumer who complained of being charged for 22 months without her authorization

explained that she had assumed her husband was withdrawing the money because

defendants' electronic checks had his name on them, and she only recently discovered that he

had not authorized any charges. (McKenney Att. A at 19.) Another consumer reports that

defendants' company name did not show up on his bank statements, and if it had he "might

have canceled this service and stopped their withdrawal[s]." (*Id.* at 21.) None of these

consumers report ever having used defendants' services.

4.     The FTC copied a limited sample of consumer complaint files that were

found in boxes in defendants' Records Room labeled "Customer Letters" dating from

November 2006 to March 2007. (See PX 63 ¶¶ 11-15 [Doc. 60-2] for an explanation of

defendants' Records Room and the various other locations on defendants' premises where

FTC personnel found consumer complaints.) FTC personnel has reviewed these complaint

files. Attached hereto as **McKenney Att. B** are true and correct copies of seventeen

consumer files found in the Records Room in which consumers complained to defendants

about unauthorized withdrawals from consumers' checking accounts that went on for at least

five months. One consumer whose account defendants debited for approximately one year

without her authorization explained how defendants' $49.95 monthly charge went

undetected: "My husband thought [defendants' charge] was the phone bill being paid."

(McKenney Att. B at 62.) Another consumer, an 85-year-old woman, complained that

defendants debited $49.95 from her account every month for eighteen months without her authorization after she had canceled her membership. (*Id.* at 93.) Again, there is no indication from these consumer files that the consumers ever used defendants' services.

5.      Attached hereto as **McKenney Att. C** is a true and correct copy of a consumer complaint file found in a Legal Assistant's file cabinet in a folder labeled "Attorney General of Florida."[1] In his complaint against Distinct Advantage and Freedom Gold, this consumer states: "I have been charged $20 a month for over a year now thinking it was an internet svc charge that was coming out of my account." (McKenney Att. C at 5.)

6.      The Receiver also has provided the FTC with a copy of the consumer letters defendants have received since the Receiver took control of defendants' operations on July 25, 2007. I have reviewed those letters, and attached as **McKenney Att. D** are true and correct copies of five letters from four consumers (one of whom wrote separate letters to Freedom Gold and Distinct Advantage, two of defendants' programs) complaining that defendants debited their accounts without authorization for a period of at least five months. One consumer, in a letter dated July 24, 2007, wrote: "You have been assessing $19.95 from my checking account . . . since the end of 2006. I do not recognize your company and do not use any of your services. Further, at the time that this automatic draft commenced I was in a nursing home having suffered from a series of strokes." (McKenney Att. D at 5.) According to the attorney for another consumer, defendants automatically debited the consumer's account from January 2006 through May 2007 before the consumer discovered defendants'

---

[1]      FTC personnel were permitted to review consumer complaint files in this file cabinet only after the Receiver's General Counsel had reviewed the files for any privileged materials.

4

unauthorized debits. (*Id.* at 9.)

7.      Attached hereto as **McKenney Att. E** are true and copy of five invoices from CMC Aquisition Corporation to Bryon Wolf that were found by FTC staff in the Executive Reception area outside of the office of defendants' president Bryon Wolf. The invoices are dated 5/11/07, 5/18/07, 5/31/07, 6/15/07, and 6/29/07. Based upon the descriptions found on the invoices, they appear to be for products that consumers purchased from Credit Life, one of defendants' buyer's club programs. The detail section of each invoice lists the consumers who purchased products from Credit Life as well as the products they purchased. On two out of the five invoices, Bryon Wolf is shown as making purchases through the Credit Life program, and on a third invoice he is apparently returning three items he previously purchased from Credit Life – including a dozen roses. (McKenney Att. E at 3.) Purchase activity for most of April 2007 – which appears to be reflected in the invoice dated 5/18/07 – shows that a total of nine consumers (including Wolf) made purchases through Credit Life. (*Id.* at 5-7) In the invoices attached, no more than nine consumers ever made purchases from Credit Life in the applicable billing period.

8.      Attached hereto as **McKenney Att. F** is a true and correct copy of a letter dated October 17, 2006, from Donald Booth to Erin B. Leahy, Assistant Attorney General in the Ohio Attorney General's Office, that was found in defendants' Records Room. In this letter, Mr. Booth acknowledges that defendants "frequently find that customers do not always cancel and request a refund the day they enroll in one of our client's programs. Some customers take a week to request a refund and others take a few months or years."

(McKenney Att. F at 1.)

9.    Attached hereto as **McKenney Att. G** is a true and correct copy of

excerpts from a report dated December 20, 2006, entitled "Projections" that was found in

Bryon Wolf's office.  McKenney Att. G includes the table of contents for the report, the

addendums page, as well as the addendum "Membership Life Cycle Conservation and

Attrition Management," which states, in part: "In the past it has been the practice of the

company to avoid additional offers and limit the communication with active paying

members.  There has been a concern that additional contacts and offers made to enhance the

membership may in turn generate additional cancellations and therefore create an increase in

attrition." (McKenney Att. G at 3.)  The entire report is 146 pages long.

10.    At the FTC's request, the Receiver provided the FTC with refund

data for those consumers whom defendants issued refunds in excess of $250 from 6/1/2006

through 3/22/2007.  According to the information provided by the Receiver, defendants

refunded 1,806 consumers more than $250 during this time frame.  I have examined the

refund data the Receiver provided to the FTC, and have concluded that 83 of the 1,806

consumers received refunds in excess of $500 during the same time frame.  The data

provided by the Receiver is contained in a spreadsheet that is over 100 pages long and thus

has not been appended to this declaration.

11.    Attached hereto as **McKenney Att. H** is a true and correct copy of a

declaration from Professor Robert J. Meyer, Gayfryd Steinberg Professor of Marketing and

Chairman of the Marketing Department, Wharton School of Business, University of

6

Pennsylvania, filed in *Faloney v. Wachovia Bank, N.A.*, Case No. 07 CV 1455 JP (E.D. Pa.

filed Dec. 27, 2007). In his declaration, Professor Meyer discusses defendants'

telemarketing scheme, as well as other allegedly similar schemes. According to Professor

Meyer, defendants' use of bank drafts may have "worked to deceive consumers that, in fact,

they were purchasing anything at all." (McKenney Att. H at ¶ 35.) He reports that "because

of the unusual nature of the transaction, consumers may not have been accustomed to

looking to their checking account summaries for evidence of purchases – something more

traditionally found on credit-card transactions. If the name of the debit was sufficiently

ambiguous, such charges may well go overlooked or attributed to a routine and legitimate

bank service fee." (*Id.*)

　　　12.　　Attached hereto as **McKenney Att. I** is a true and correct copy of a

declaration from Barbara Blake, former investigator, State of Iowa, Office of the Attorney

General, also filed in *Faloney v. Wachovia Bank, N.A.*, Case No. 07 CV 1455 JP (E.D. Pa.

filed Dec. 27, 2007). Ms. Blake, who investigated telemarketing fraud during her sixteen-

year tenure with the Consumer Protection Division of the Iowa Attorney General, states: "In

my experience, consumers who continue to allow fraudulent operators to make automatic

withdrawals – monthly or otherwise – from their bank accounts cannot be assumed to be

satisfied customers. In fact, in my experience, no inference of satisfaction should be drawn

from customers in this situation who are repeatedly charged, may not know they are being

charged or may have simply given up in attempts to obtain refunds or stop the withdrawals."

(McKenney Att. I at ¶ 25.) Ms. Blake continues in her statement to recount an investigation

7

in which a survey done by the Iowa Attorney General's office revealed overwhelmingly "that just because consumers had been debited for many months in a row, it did not mean they were satisfied customers." (*Id.* at ¶ 26.)

13.    Attached hereto as **McKenney Att. J** is a true and correct copy of a declaration from Ann Stahl, an investigator with the FTC's Western Region - Los Angeles, filed in *FTC v. Universal Premium Services, Inc.*, et al., Case No. CV06-0849 SJO (Opx) (C.D. Cal. filed Jan. 15, 2007).  In that case, defendants argued that certain consumers should be presumed to be satisfied customers since defendants had been debiting their checking accounts for many months, and sometimes over a year. (McKenney Att. J at ¶ 103.) To test this assumption, Investigator Stahl interviewed a sampling of consumers whose accounts defendants had debited for two years or longer.  Not one of the consumers Investigator Stahl spoke with said that they had agreed to pay for the programs for which their checking accounts had been debited. (*Id.* at ¶ 106.) Most also were not aware that the defendants had been regularly debiting money from their accounts. (*Id.* at ¶¶ 108-10.)

I declare, under penalty of perjury, that the foregoing statement is true and correct.

Executed on January _9_, 2008

DOUGLAS M. McKENNEY

8