

**Donald L. Booth, General Counsel**
Florida Authorized House Counsel #14794
Texas Bar #02846500

Charles A. Holland
Financial Investigator
Office of the Attorney General
Tampa Economic Crime Division
Concourse Center 4
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Tampa, Florida 33607-1795

January 9, 2007

RE:    Randy Stockton
       Our File No: 8701▓▓▓▓

Dear Mr. Holland:

Guardian Marketing Services Corp. is a telemarketing service company doing, among other things, customer service for companies in the telemarketing industry. This is the case with Mr. Stockton. As a part of our customer service policy, this office handles customer service complaints that reach the level of a written complaint to a third party.

While a review of the account, records of conversation with customer service representatives and the digital verification record, seems to support the sale; we've requested a refund from Distinct Advantage and Freedom Gold. Enclosed in Mr. Stockton's copy of this letter is a reimbursement check from Freedom Gold in the amount of $149.00 and a reimbursement check from Distinct Advantage in the amount of $179.65, per his request.

Mr. Stockton's telephone number, obtained from his complaint, is on the company's Do Not Call list. Additionally, he can register his home or mobile telephone number on the National Do Not Call list by visiting ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Unless Guardian Marketing Services Corp. hears further on this matter, it will be considered resolved. Should you have any questions or require anything further, please do not hesitate to contact the undersigned.

Very Truly Yours,

Donald L. Booth
General Counsel

Check No.'s: 8417316, 8417564

▓▓▓▓▓▓▓▓▓▓▓▓, Largo, Florida 3377▓ • E-mail ▓▓▓▓▓▓▓▓▓▓▓▓▓▓.com
Ph: 727▓▓▓▓  • Fax: 727▓▓▓▓

**McKenney Att. C**
**Page 1 of 5**



ver 5.07

# GUARDIAN
## MARKETING SERVICES
™

## *Customer Information*

| Home Phone | Full Name | First Name | Last Name |
|---|---|---|---|
| 870▮▮▮ | RANDY STOCKTON | RANDY | STOCKTON |

| Address | City | State | Postal Code |
|---|---|---|---|
| ▮▮▮▮ | MARION | AR | 72364-2331 |

| Date Joined | Vender ID | Dialer | Bank Routing Number | Account Number |
|---|---|---|---|---|
| 05-24-06 | DAD | D | ▮▮▮▮ | ▮▮▮▮ |

Resub Date

GR Date

Request Info Change

### *Recordings*

| Original Call | Available | ☎ |
|---|---|---|
| Resub Call | No Resub | ☎ |
| GR Call | No GR Sale | ☎ |

FTN046171



*ver 5.07*

# GUARDIAN
## MARKETING SERVICES ™

### *Customer Payments*

| Status | Due Date | Due Amt | Rec Date | Amt Paid | Phone | Product |
|--------|----------|---------|----------|----------|-------|---------|
| F | 06-07-06 | $149.00 | 06-19-06 | $149.00 | 870 | Freedom Gold |
| F | 06-14-06 | $59.95 | 06-26-06 | $59.95 | 870 | Distinct Advantage |
| Non Active | 07-07-06 | $9.95 | | $0.00 | 870 | Freedom Gold |
| F | 07-14-06 | $19.95 | 07-26-06 | $19.95 | 870 | Distinct Advantage |
| F | 08-13-06 | $19.95 | 08-24-06 | $19.95 | 870 | Distinct Advantage |
| F | 09-12-06 | $19.95 | 09-22-06 | $19.95 | 870 | Distinct Advantage |
| F | 10-12-06 | $19.95 | 10-24-06 | $19.95 | 870 | Distinct Advantage |
| F | 11-11-06 | $19.95 | 11-22-06 | $19.95 | 870 | Distinct Advantage |
| F | 12-11-06 | $19.95 | 12-21-06 | $19.95 | 870 | Distinct Advantage |
| Non Active | 01-10-07 | $19.95 | | $0.00 | 870 | Distinct Advantage |



19.95
x 6
$119.70
+59.95
$179.65
149.00
$328.65

**McKenney Att. C**
Page 3 of 5

  


**OFFICE OF THE ATTORNEY GENERAL**
Tampa Economic Crime Division

**BILL MCCOLLUM**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

Concourse Center 4

Tampa, Florida 33607-1795
Telephone (813) ████ SunCom████
Fax (813) ████ SunCom████

January 8, 2007

RECEIVED
JAN - 8 2007

## VIA FACSIMILE TO:

Name:    Guardian Marketing Services
         ATTN: Donald L. Booth, General Counsel
Fax #:   (727) ████████
Subject: Request For Assistance
Pages:   8, including cover

Comments:

Mr. Booth,

The following individuals have filed complaints with this office pertaining to marketing practices of Suntasia:

- Randy Stockton        870 ████████
- Glenice J. Reed

Please review the attached complaint(s) filed with this office by the above-identified individual(s) and, if appropriate, make full refunds.

Also, please furnish this office documentation of your inquiry and action(s) taken.

Thanking you for your assistance, I remain

Respectfully,

*Charles A. Holland*

CHARLES A. HOLLAND
Financial Investigator

McKenney Att. C
Page 4 of 5

JAN-08-2007  09:06       FL ATTORNEY GENERAL                                    P.02

### Received Via Internet Contact Form

**Category: Solicitation**                                                    **Status: Assigned**
                                                                              **Public Record**

Business or Person Referenced: FTN Promotions

**Information for FTN Promotions**

|                |   |
|----------------|---|
| Address:       |   |
| City:          |   |
| State:         |   |
| Zip:           |   |
| County:        |   |
| Phone:         |   |
| Website:       |   |

**Users Questions/Comments**
Suntasia Marketing

Largo, FL 33771
Tel#: 727-▓▓▓▓▓▓ or 1-800-▓▓▓▓▓▓▓

I received a call from these folks, high pressure sales, and was coaxed into agreeing to try the service for 30 days. I was to rec'v a pkg which I never got and canceled. I have been charged $20.00 a month for over a year now thinking it was an internet svc charge that was coming out of my account. I know it probably isn't possible but I would like to get my $240.00 back or have this buisness shut down as they are a total sham. Please advise me what my options are, thanks.

Randy Stockton

This information can be sent to the referenced party.

**Assigned To**

|                |                                                     |
|----------------|-----------------------------------------------------|
| Section:       | Economic Crime Tampa                                |
| Coordinator:   | Koral Bowman, Barbara McNeill, Lucretia Sarge       |
| Assigned to:   | Koral Bowman, Barbara McNeill, Lucretia Sarge       |

| Date | Assigned | Due | Reply | Filed |
|------|----------|-----|-------|-------|
| 01/05/2007 03:51 PM | 01/05/2007 | 01/12/2007 | | |

Subject: Phone scam

**Received From**        **Randy Stockton**

|                |                      |
|----------------|----------------------|
| Address:       | ▓▓▓▓▓▓               |
|                | Marion, AR 72364     |
| Phone:         | (901) ▓▓▓▓▓▓         |
| Email Address: | ▓▓▓▓▓▓▓.com          |

Is the author 60 or older? ○ Yes ● No

**General comments and related documents**

**Modification History**

|                |                                                    |
|----------------|----------------------------------------------------|
| Created:       | 01/05/2007 03:51:16 PM .. Internet Contact         |
| Last Edited:   | 01/05/2007 04:15:58 PM .. Amanda Morse             |

>>>> 01/05/2007  04:15: PM Amanda Morse
Subject changed from Received to Assigned.  Status changed from Received to Assigned.  Section changed from Citizen Services to Economic Crime Tampa.  Coordinator changed from Kym Oswald-Korte to Koral Bowman; Barbara McNeill; Lucretia Sarge. Assignment changed from blank to Koral Bowman; Barbara McNeill; Lucretia Sarge.

FTN046174

Candida Hernandez
███████████
Newark NJ 07205

Freedom Rings
Customer Service Department
█████████████
Seminole Fl 33776

Monday, August 06, 2007

RE: Cancellation number 807CA2NO

To Whom It May Concern:

I am writing as requested during our last telephone conversation. I was billed without my consent in an automatic debit for $49.95 since February of 2007; the total debit to date is $299.70. As of this writing I am requesting that my checking account be credited the full amount upon receipt of this request to prevent further action.

If you have any questions or concerns please contact me at 973-█████████. The account to be credited is Bank of America routing number ████████ account number ████████. If a credit is not possible please mail me a check to the above address.

Your immediate attention is greatly appreciated.

Cordially yours,

*Candida Hernandez*

Candida Hernandez

McKenney  Att. D
Page  1 of 9

00033

Freedom Ring
Seminole, FL . 33776

Candida Hernandez
Newark, N.J. 07105

McKenney  Att.  D
Page  2 of 9

July 24, 2007

FreedomGld
Customer Service Dep't.

Largo, FL  33771

To Whom It May Concern:

You have been assessing $9.95 from my checking account at JP Morgan Chase Bank
since the end of 2006.  I do not recognize your company and do not use any of your
services.  Further, at the time that this automatic draft commenced I was in a nursing
home having suffered from a series of strokes.

I have reviewed my accounts since recovering and have no records of any kind reflecting
your company.  Consider this letter as immediate cancellation of the automatic draft from
my account.  I further request that you refund any previous payments to me immediately.
If there is no response I will refer this matter to both my attorney and the States Attorney
for the State of Illinois.

Thank you!

Sincerely,

*Maria Kessman*
Maria Kessman

CC : D. WELLS, ATTY AT LAW

McKenney  Att.  D
Page   3 of 9

02464

02465



PALATINE IL 600
28 JUL 2007 PM 3 L

0080 8711435448-38

USA First-Class

Plato Center, IL 60128-8254

NODURFT
FINANCIAL GROUP, INC.
The Implementation
Of Sound Financial
Strategies

FREEDOM GOLD
CUSTOMER SERVICE DEPT.

LARGO, FL 33771

33771435448

July 24, 2007

Distinct Advantage
Customer Service Dep't.

Largo, FL  33771

To Whom It May Concern:

You have been assessing $19.95 from my checking account at JP Morgan Chase Bank
since the end of 2006. I do not recognize your company and do not use any of your
services. Further, at the time that this automatic draft commenced I was in a nursing
home having suffered from a series of strokes.

I have reviewed my accounts since recovering and have no records of any kind reflecting
your company. Consider this letter as immediate cancellation of the automatic draft from
my account. I further request that you refund any previous payments to me immediately.
If there is no response I will refer this matter to both my attorney and the States Attorney
for the State of Illinois.

Thank you!

Sincerely,

*Maria Kessman*

Maria Kessman

CC: D. WELLS  ATTORNEY AT LAW

02467



Katherine Dierker
~~████████████~~
Arnold, Mo 63010
314-~~████████~~

To whom it may concern,

I am writing demanding that I get **ALL** of my money back. This comapany has taken over $200.00 out of my checking account since September 2006. This is rediculous and I obviously did not intend to purchase anything from this company seeing as I have **NEVER** purchased anything on-line in my life! This is your first and final notice to repay my account before I contact the Better Business Bureau and my attorney. I will file suit for money stolen and damages. You have 30 days within reciept of this letter to get back to me before I proceed. And if I see one more payment come out of my account I will immediately call the police and contact the media to let them know of this scam.

Katherine Dierker

I was also just made aware that your company gave my bank information to another comapany scamming me out of $50.00 a month. This is a very serious crime and I will see to it that this campany makes this right to me and anyone else who has fallen victim of this scam.

**McKenney Att. D**
Page 7 of 9

02579

02680



U.S. POSTAGE
CHESTERFIELD, MO
63005
JUL 25 07
AMOUNT
$5.21
00062123-13

33771

0000

CERTIFIED MAIL

7007 0220 0002 7430 1746

Distinct Advantage

Largo FL 33771

33771336644 CORP.

RETURN RECEIPT
REQUESTED

McKenney  Att. D
Page  8 of 9

Law Offices Of
# STEWART J. BERGER, P.C.



| | | |
|---|---|---|
| STEWART J. BERGER | Philadelphia, Pennsylvania 19111-3983 | CELL (215) ████ |
| JAY B. OPPENHEIM | ██████.com | FAX (215) ████ |
| | 215-███ | |

July 18, 2007

Freedom Gold
████████
Largo, FL 33791

     **RE:**   Donna Ann Oppenheim
          ████████
          Philadelphia, PA 19126
          Cancellation No. M07FG0C9

TO WHOM IT MAY CONCERN:

     I am writing this letter on behalf of my sister and client, Donna Ann Oppenheim.

     On January 4th, 2006, your firm withdrew $149.00 from my sister's Citizens Bank checking account. Thereafter, from at least March 6th, 2006 thru May 30, 2007, your firm continued to make withdrawals from her account at the rate of $9.95 per month, for a total of at least another $149.25. Thus, the total amount withdrawn was at least $298.25.

     My sister has no recollection or idea as to what the payments were for. A telephone call to your company indicated that they may have been for some kind of buying service. However, my sister never received anything in the mail and never used the service ever.

     Under the circumstances, we are hereby requesting that the $298.25 be refunded to her. Her address is as set forth above.

     If you have any questions, please do not hesitate to contact me.

          Very truly yours,

          *Jay B Oppenheim*

          JAY B. OPPENHEIM

JBO/bg
cc:   Donna Ann Oppenheim
      Surah A. Oppenheim

**McKenney  Att.  D**
**Page   9 of 9**

02600

CMC Acquisition Corporation
D/B/A Capitol Marketing Concepts
696 1st Avenue North, Suite 400
St. Petersburg    FL    33701-3610

Invoice Number: **SI0008286**

Invoice Date: 05/11/07

**Remit To:**
P.O. Box 88632 Dept A
Chicago, IL 60680-1632

Bill To: Membership Services, LLC
Bryon Wolf
8751 Ulmerton Rd
Largo, FL  33771
USA

**Customer ID:**  3704
**P.O. Number:**
**Program:**     3519    Suntasia/Credit Life

---

Attn:   Bryon Wolf

**Due Date:**    06/10/07
**Terms:**       Net 30 Days

| Item/Description | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Invoicing for Merchandise Redemption | 1 | 2,002.00 | 2,002.00 |
| Credit | 1 | -627.00 | -627.00 |

| | |
|---|---|
| Subtotal: | 1,375.00 |
| Invoice Discount: | 0.00 |
| Tax: | 0.00 |
| **Total Amount:** | **1,375.00** |

*D/B/A Capitol Marketing Concepts   St. Petersburg, FL 33701-3610  (727)895-8151*

**McKenney  Att.  E**
Page   1 of 18

FTN045137

DATE: 04/25/2007

| ORDER NUMBER | ORDER DATE | ITEM | QTY | TOTAL ITEM POINTS | | |
|---|---|---|---|---|---|---|
| **PARTICIPANT INFO: 10568 KAAPUNI, JOZINA** | | | | | | |
| 493791 | 03/28/2007 | GATE-002-Gateway Value-Packed Desktop | 1 | 1,089.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 1,089.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 1,089.00 |
| **PARTICIPANT INFO: 16227 LANE, PIPER** | | | | | | |
| 493525 | 03/27/2007 | GOGO-001-TomTom ONE GPS Navigation | 1 | 429.00 | | |
| | 03/27/2007 | VICT-3301-Victorinox Bunker Shoe Bag | 1 | 22.00 | | |
| | | ** ORDER TOTAL ** | | | 2 | 451.00 |
| | | ** PARTICIPANT TOTAL ** | | | 2 | 451.00 |
| **PARTICIPANT INFO: 19079 HUNTER, KEYNAN J** | | | | | | |
| 493821 | 03/28/2007 | 526001-Elite Brands Digital Camera | 1 | 33.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 33.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 33.00 |
| **PARTICIPANT INFO: 5 FRITZ, RYAN** | | | | | | |
| 495337 | 04/06/2007 | GOGO-001-TomTom ONE GPS Navigation | 1 | 429.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 429.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 429.00 |

**** *MERIDIAN SOURCED CAT* ****

** *POINT TOTAL* **    5    2,002.00
** *DOLLAR TOTAL* **        $2,002.00
( 1 point = $1.000000 )

**** *REPORT TOTALS* ****

** *POINT TOTAL* **    5    2,002.00
** *DOLLAR TOTAL* **        $2,002.00
( 1 point = $1.000000 )

McKenney  Att.  E
Page   2 of 18

FTN045138

**MERIDIAN SOURCED CAT- CLIENT BILLING DETAIL CREDITS REPORT**
**ACCOUNTING PROGRAM NUMBER:**

| PARTICIPANT NUMBER/NAME | ORDER NUMBER | ITEM NUMBER ITEM DESCRIPTION | CREDIT QTY | TOTAL ITEM CREDITS |
|---|---|---|---|---|
| 6 WOLF, BRYON | | BASS-7201 Bass Pro Dogwood Canyon Combo | 1 | 230.00 |
| 6 WOLF, BRYON | 482634 | CALL-8306 Callaway HX Tour Golf Balls | 1 | 135.00 |
| 6 WOLF, BRYON | | WICH-0003 Dozen Red Roses | 1 | 262.00 |
| | | *TOTAL CREDIT POINTS* | 3 | 627.00 |
| | | *TOTAL CREDIT DOLLARS* | | *$627.00* |
| | | *( 1 POINT =    1.000000 )* | | |

*** GRAND TOTAL DOLLARS*                           $627.00

FTN045139



049.J82032069
$00.390
05/11/2007
Mailed From 63042
US POSTAGE

neopost

33771 36832 PC005

951 Hornet Drive
Hazelwood, MO 63042-2309

2758-012A-11/2003

McKenney   Att.  E
Page   4 of 18

CMC Acquisition Corporation
D/B/A Capitol Marketing Concepts
696 1st Avenue North, Suite 400
St. Petersburg    FL    33701-3610

Invoice Number: **SI0008322**

Invoice Date: 05/18/07

**Remit To:**
P.O. Box 88632 Dept A
Chicago, IL 60680-1632

Bill To: Membership Services, LLC
Bryon Wolf
8751 Ulmerton Rd
Largo, FL 33771
USA

Customer ID:  3704
P.O. Number:
Program:      3519    Suntasia/Credit Life

Attn:   Bryon Wolf

Due Date:    06/17/07
Terms:       Net 30 Days

| Item/Description | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Invoicing for Merchandise Redemption | 1 | 1,766.00 | 1,766.00 |
| Credits | 1 | -1,089.00 | -1,089.00 |

|  |  |
|---|---|
| Subtotal: | 677.00 |
| Invoice Discount: | 0.00 |
| Tax: | 0.00 |
| **Total Amount:** | **677.00** |

*D/B/A Capitol Marketing Concepts   St. Petersburg, FL 33701-3610   (727)895-8151*

McKenney   Att.  E
Page  5 of 18

FTN045141

SUNTASIA MARKETING
CREDIT LIFE
MERIDIAN SOURCED CAT - CLIENT BILLING DETAIL DEBITS REPORT
ACCOUNTING PROGRAM NUMBER: 3519

DATE: 05/11/2007
Page 1 of 2

Case 8-07-cv-01279-JSM-TGW    Document 174-5    Filed 01/09/2008    Page 20 of 94

| ORDER NUMBER | ORDER DATE | ITEM | QTY | TOTAL ITEM POINTS | | |
|---|---|---|---|---|---|---|
| PARTICIPANT INFO: 17632 SANCHEZ, ELIZABETH | | | | | | |
| 495297 | 04/05/2007 | 546013-Deskjet Color Ink-Jet Printer | 1 | 72.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 72.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 72.00 |
| PARTICIPANT INFO: 17917 MARIN, LATISHA A | | | | | | |
| 498547 | 04/24/2007 | SONY-009-Sony MiniDVHandycam® Camcorder | 1 | 453.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 453.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 453.00 |
| PARTICIPANT INFO: 21502 IZEMAN, JEROME L | | | | | | |
| 495301 | 04/05/2007 | 117192-Digital Music Speaker System | 1 | 299.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 299.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 299.00 |
| PARTICIPANT INFO: 24442 PASCALE, MATTHEW | | | | | | |
| 495287 | 04/05/2007 | 116148-Coby DVD Player | 1 | 54.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 54.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 54.00 |
| PARTICIPANT INFO: 26495 MCCALL, SHANA | | | | | | |
| 496280 | 04/11/2007 | 127281-Perfect-Heat Hair Straightener | 1 | 32.00 | | |
| | 04/11/2007 | 167079-Crystal Tennis Bracelet | 1 | 34.00 | | |
| | | ** ORDER TOTAL ** | | | 2 | 66.00 |
| | | ** PARTICIPANT TOTAL ** | | | 2 | 66.00 |
| PARTICIPANT INFO: 28398 JOHNSON, JENNIFER | | | | | | |
| 495626 | 04/08/2007 | DOONEY-08-Dooney & Bourke Bucket Bag | 1 | 156.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 156.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 156.00 |
| PARTICIPANT INFO: 35557 APPERLEY, KIMBERLY | | | | | | |
| 498448 | 04/24/2007 | SONY-005-Sony Cyber-shot® 7 MP Digital | 1 | 255.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 255.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 255.00 |
| PARTICIPANT INFO: 35847 CHARLES, JEVONNE | | | | | | |
| 498592 | 04/24/2007 | SONY-005-Sony Cyber-shot® 7 MP Digital | 1 | 255.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 255.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 255.00 |

FTN045142

**SUNTASIA MARKETING**
**CREDIT LIFE**
**MERIDIAN SOURCED CAT - CLIENT BILLING DETAIL DEBITS REPORT**
**ACCOUNTING PROGRAM NUMBER: 3519**

DATE: 05/11/2007

| ORDER NUMBER | ORDER DATE | ITEM | QTY | TOTAL ITEM POINTS | | |
|---|---|---|---|---|---|---|
| PARTICIPANT INFO:  6 WOLF, BRYON | | | | | | |
| 495162 | 04/05/2007 | 117004-Broadband Telephone System | 1 | 156.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 156.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 156.00 |
| | | **** MERIDIAN SOURCED CAT **** | | | | |
| | | ** POINT TOTAL ** | 10 | 1,766.00 | | |
| | | ** DOLLAR TOTAL ** | | $1,766.00 | | |
| | | ( 1 point = $1.000000 ) | | | | |

**** REPORT TOTALS ****
** POINT TOTAL **   10   1,766.00
** DOLLAR TOTAL **   $1,766.00
( 1 point = $1.000000 )

McKenney  Att.  E
Page   7 of 18

FTN045143

SUNTASIA MARKETING
CREDIT LIFE
MERIDIAN SOURCED CAT- CLIENT BILLING DETAIL CREDITS REPORT
ACCOUNTING PROGRAM NUMBER:

| PARTICIPANT NUMBER/NAME | ORDER NUMBER | ITEM NUMBER ITEM DESCRIPTION | CREDIT QTY | TOTAL ITEM CREDITS |
|---|---|---|---|---|
| 10568 KAAPUNI, JOZINA | | GATE-002 | 1 | 1,089.00 |
| | 493791 | Gateway Value-Packed Desktop | | |
| | | *TOTAL CREDIT POINTS* | 1 | 1,089.00 |
| | | *TOTAL CREDIT DOLLARS* | | $1,089.00 |
| | | *( 1 POINT =      1.000000 )* | | |

*** GRAND TOTAL DOLLARS**          $1,089.00

FTN045144



049.J82032069
$ 00.4 10
05/18/2007
Mailed From 63042
US POSTAGE

neopost

RECEIVED
MAY 2 2 2007

951 Hornet Drive
Hazelwood, MO 63042-2309

2758-012A-11/2003

FTN045145

CMC Acquisition Corporation
D/B/A Capitol Marketing Concepts
696 1st Avenue North, Suite 400
St. Petersburg     FL     33701-3610

Invoice Number: **SI0008383**

Invoice Date:  05/31/07

**Remit To:**
P.O. Box 88632 Dept A
Chicago, IL 60680-1632

**Bill To:** Membership Services, LLC
Bryon Wolf
8751 Ulmerton Rd
Largo, FL 33771
USA

**Customer ID:**  3704
**P.O. Number:**
**Program:**     3519    Suntasia/Credit Life

| | |
|---|---|
| **Due Date:** | 06/30/07 |
| **Attn:**  Bryon Wolf | **Terms:**    Net 30 Days |

| Item/Description | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Invoicing for Merchandise Redemption | | | 2,761.00 |

| | |
|---|---|
| Subtotal: | 2,761.00 |
| Invoice Discount: | 0.00 |
| Tax: | 0.00 |
| **Total Amount:** | **2,761.00** |

*D/B/A Capitol Marketing Concepts   St. Petersburg, FL 33701-3610  (727)895-8151*     McKenney  Att. E
Page   10 of 18

FTN045146

SUNTASIA MARKETING
CREDIT LIFE
MERIDIAN SOURCED CAT - CLIENT BILLING DETAIL DEBITS REPORT
ACCOUNTING PROGRAM NUMBER: 3519

DATE: 05/29/2007
Page 1 of 1

Case 8:07-cv-01279-JSM-TGW    Document 174-5    Filed 01/09/2008    Page 25 of 94

| ORDER NUMBER | ORDER DATE | ITEM | QTY | TOTAL ITEM POINTS | | |
|---|---|---|---|---|---|---|
| **PARTICIPANT INFO:  21502 IZEMAN, JEROME L** | | | | | | |
| 498968 | 04/26/2007 | 117069-Slim-4000 Stereo System | 1 | 351.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 351.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 351.00 |
| **PARTICIPANT INFO:  38107 ANDRUS, JAMES** | | | | | | |
| 499350 | 04/28/2007 | 196098-Wenger Alps Mummy Bag | 1 | 68.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 68.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 68.00 |
| **PARTICIPANT INFO:  38403 JOY, VICTORIA** | | | | | | |
| 500737 | 05/06/2007 | 183116-Samsonite Annapolis 5-Pc Set | 1 | 320.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 320.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 320.00 |
| **PARTICIPANT INFO:  41079 HICKS, JASMINE** | | | | | | |
| 499571 | 04/30/2007 | COMP-009-Compaq Celeron 440 Notebook | 1 | 1,276.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 1,276.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 1,276.00 |
| **PARTICIPANT INFO:  41663 WALKER, DARCY** | | | | | | |
| 500198 | 05/02/2007 | 117156-7" Portable DVD Player | 1 | 136.00 | | |
| | 05/02/2007 | PWR-0250-10 Mega Pixel Digital Video Camera | 1 | 138.00 | | |
| | | ** ORDER TOTAL ** | | | 2 | 274.00 |
| | | ** PARTICIPANT TOTAL ** | | | 2 | 274.00 |
| **PARTICIPANT INFO:  48362 LUNGU, MARQUITA** | | | | | | |
| 501950 | 05/11/2007 | 126144-Super-Capacity Electric Dryer | 1 | 472.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 472.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 472.00 |
| | | **** MERIDIAN SOURCED CAT **** | | | | |
| | | ** POINT TOTAL ** | 7 | 2,761.00 | | |
| | | ** DOLLAR TOTAL ** | | $2,761.00 | | |
| | | ( 1 point = $1.000000 ) | | | | |

**** REPORT TOTALS ****

|  | | | | | | |
|---|---|---|---|---|---|---|
| | | ** POINT TOTAL ** | 7 | 2,761.00 | | |
| | | ** DOLLAR TOTAL ** | | $2,761.00 | | |
| | | ( 1 point = $1.000000 ) | | | | |



049.J82032069
$ 00.4 10
06/08/2007
Mailed From 63042
US POSTAGE

neoPost℠

RECEIVED
JUN 1 2 2007

3G7713G832 R006

951 Hornet Drive
Hazelwood, MO 63042-2309

2758-012A-11/2003

McKenney  Att. E
Page  12 of 18

CMC Acquisition Corporation
D/B/A Capitol Marketing Concepts
696 1st Avenue North, Suite 400
St. Petersburg     FL     33701-3610

Invoice Number: **SI0008438**

Invoice Date: 06/15/07

**Remit To:**
P.O. Box 88632 Dept A
Chicago, IL 60680-1632

**Bill To:** Membership Services, LLC
Bryon Wolf
8751 Ulmerton Rd
Largo, FL  33771
USA

**Customer ID:** 3704
**P.O. Number:**
**Program:**     3519     Suntasia/Credit Life

---

**Attn:**     Bryon Wolf

**Due Date:**     07/15/07
**Terms:**     Net 30 Days

| Item/Description | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Invoicing for Merchandise Redemption | | | 690.00 |

| | |
|---|---|
| Subtotal: | 690.00 |
| Invoice Discount: | 0.00 |
| Tax: | 0.00 |
| **Total Amount:** | **690.00** |

*D/B/A Capitol Marketing Concepts  St. Petersburg, FL 33701-3610  (727)895-8151*

McKenney  Att.  E

FTN045151

SUNTASIA MARKETING
CREDIT LIFE
MERIDIAN SOURCED CAT - CLIENT BILLING DETAIL DEBITS REPORT
ACCOUNTING PROGRAM NUMBER: 3519

DATE: 06/08/2007
Page 1 of 1

Case 8:07-cv-01279-JSM-TGW    Document 174-5    Filed 01/09/2008    Page 28 of 94

| ORDER NUMBER | ORDER DATE | ITEM | QTY | TOTAL ITEM POINTS | | |
|---|---|---|---|---|---|---|
| **PARTICIPANT INFO:  48640 BROWN, L** | | | | | | |
| 502900 | 05/17/2007 | PWR-0193-8" Widescreen Portable DVD Player | 1 | 178.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 178.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 178.00 |
| **PARTICIPANT INFO:  49764 VANCE, CYNTHIA** | | | | | | |
| 502679 | 05/16/2007 | 185016-Fisher-Price Aquarium | 1 | 37.00 | | |
| | 05/16/2007 | 187042-American Idol DVD Game | 1 | 43.00 | | |
| | 05/16/2007 | 197488-Summertime Play Center | 1 | 194.00 | | |
| | 05/16/2007 | PWR-0236-Barbie Digital Camera | 1 | 43.00 | | |
| | | ** ORDER TOTAL ** | | | 4 | 317.00 |
| | | ** PARTICIPANT TOTAL ** | | | 4 | 317.00 |
| **PARTICIPANT INFO:  54148 STEVENSON, DELORES** | | | | | | |
| 503226 | 05/18/2007 | 117220-Infinity-80 QD Camera | 3 | 195.00 | | |
| | | ** ORDER TOTAL ** | | | 3 | 195.00 |
| | | ** PARTICIPANT TOTAL ** | | | 3 | 195.00 |
| | | **** MERIDIAN SOURCED CAT  **** | | | | |
| | | ** POINT TOTAL ** | | | 8 | 690.00 |
| | | ** DOLLAR TOTAL ** | | | | $690.00 |
| | | ( 1 point = $1.000000 ) | | | | |

| | | **** REPORT TOTALS  **** | | | | |
|---|---|---|---|---|---|---|
| | | ** POINT TOTAL ** | | | 8 | 690.00 |
| | | ** DOLLAR TOTAL ** | | | | $690.00 |
| | | ( 1 point = $1.000000 ) | | | | |



049J82032069

$00.4 10

06/15/2007
Mailed From  63042
US POSTAGE

neopost℠

RECEIVED

JUN : 8 2007

951 Hornet Drive
Hazelwood, MO 63042-2309

2758-012A-11/2003

McKenney  Att.  E
Page  15 of 18

FTN045153

Page: 1

CMC Acquisition Corporation
D/B/A Capitol Marketing Concepts
696 1st Avenue North, Suite 400
St. Petersburg    FL    33701-3610

Invoice Number: **SIO008501**

Invoice Date: 06/29/07

Remit To:
P.O. Box 88632 Dept A
Chicago, IL 60680-1632

**Bill To:** Membership Services, LLC
Bryon Wolf
8751 Ulmerton Rd
Largo, FL 33771
USA

Customer ID: 3704
P.O. Number:
Program:    3519    Suntasia/Credit Life

Due Date:    07/29/07
**Attn:**    Bryon Wolf
Terms:    Net 30 Days

| Item/Description | Quantity | Unit Price | Total Price |
| --- | --- | --- | --- |
| Invoicing for Merchandise Redemption | 1 | 847.00 | 847.00 |

| | |
| --- | --- |
| Subtotal: | 847.00 |
| Invoice Discount: | 0.00 |
| Tax: | 0.00 |
| **Total Amount:** | **847.00** |

*D/B/A Capitol Marketing Concepts*   **St. Petersburg, FL 33701-3610   (727)895-8151**

**McKenney  Att. E**
**Page  16 of 18**

FTN045170

**SUNTASIA MARKETING**
**CREDIT LIFE**

**MERIDIAN SOURCED CAT - CLIENT BILLING DETAIL DEBITS REPORT**
**ACCOUNTING PROGRAM NUMBER: 3519**

| ORDER NUMBER | ORDER DATE | ITEM | QTY | TOTAL ITEM POINTS | | |
|---|---|---|---|---|---|---|
| **PARTICIPANT INFO: 28398 JOHNSON, JENNIFER** | | | | | | |
| 505416 | 05/30/2007 | 167145-It Flap Wristlet | 2 | 100.00 | | |
| | | ** ORDER TOTAL ** | | | 2 | 100.00 |
| | | ** PARTICIPANT TOTAL ** | | | 2 | 100.00 |
| **PARTICIPANT INFO: 56665 JUSTUS, RANDY** | | | | | | |
| 505439 | 05/30/2007 | 147022-Cottonwood-11 Family Dome Tent | 1 | 154.00 | | |
| | 05/30/2007 | 156067-Side-Discharge Push Mower | 1 | 303.00 | | |
| | 05/30/2007 | 157003-Thermos Grill2Go Advantage | 1 | 260.00 | | |
| | | ** ORDER TOTAL ** | | | 3 | 717.00 |
| | | ** PARTICIPANT TOTAL ** | | | 3 | 717.00 |
| **PARTICIPANT INFO: 6 WOLF, BRYON** | | | | | | |
| 502914 | 05/17/2007 | 526057-Char-Broil 3-Pc BBQ Tool Set | 1 | 30.00 | | |
| | | ** ORDER TOTAL ** | | | 1 | 30.00 |
| | | ** PARTICIPANT TOTAL ** | | | 1 | 30.00 |
| | | **** MERIDIAN SOURCED CAT **** | | | | |
| | | ** POINT TOTAL ** | 6 | 847.00 | | |
| | | ** DOLLAR TOTAL ** | | $847.00 | | |
| | | ( 1 point = $1.000000 ) | | | | |

**** REPORT TOTALS ****

| | | | QTY | POINTS | | |
|---|---|---|---|---|---|---|
| | | ** POINT TOTAL ** | 6 | 847.00 | | |
| | | ** DOLLAR TOTAL ** | | $847.00 | | |
| | | ( 1 point = $1.000000 ) | | | | |

FTN045171



049.382032069
$ 00.4 10
07/05/2007
Mailed From 63042
US POSTAGE

neopost℠

33771+3632 R006

**CAPITOL**
*MARKETING CONCEPTS*
*Capitol Ideas for Successful Promotions*
One Capitol Center • Suite 400
St. Petersburg, Florida 33701-3610

**McKenney  Att. E**
Page  18 of 18

FTN045172



**GUARDIAN**
MARKETING SERVICES
™

Donald L. Booth, General Counsel
Florida Authorized House Counsel #47784
Texas Bar #02646500

October 17, 2006

Erin B. Leahy
Assistant Attorney General
Consumer Protection Section
Ohio Attorney General's Office
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

     Re: Ohio Complaints

Dear Ms. Leahy:

Thank you for your email dated October 12, 2006 to our outside counsel, Robby Birnbaum at Greenspoon Marder. I have looked into the two complaints you sent. Included in this email are our response letters to the customers for your review.

It is important to note that both of these calls were made before the Ohio Attorney General's office notified our company of any deficiency. We frequently find that customers do not always cancel and request a refund the day they enroll in one of our client's programs. Some customers take a week to request a refund and others take a few months or years. Ms. Walters is a great example of a customer who waited a longer period of time to request a refund. The call to Ms. Walters took place on June 29, 2005. Her request for a refund comes over a year later. Suntasia had a valid Ohio telemarketing license at the time this call was made, clearly not in violation of Ohio's laws. I have attached a copy of part of our customer database that indicates the date in which Suntasia called Ms. Walters.

Similarly, some customers do not remember when they received a call from Suntasia and instead, associate the date of withdrawal as the transaction date. Mr. Aritey is a great example of such a customer. The call to Mr. Aritey took place on July 19, 2006. As you know, your deficiency letter was written on July 31, 2006 and not received until August 1, 2006, thirteen days after Suntasia called Mr. Aritey. Although his account

8751 Ulmerton Road, Largo, Florida 33771 • Email: o@guardian-marketing.com
Ph: 727.471.0292 • Fax: 727. 1.0255

McKenney Att. F
Page 1 of 2

FTN009756

was not debited until August 2, 2006, Suntasia still called before being notified of any deficiency in its renewal application. For your records, I have attached part of our customer records that indicate the date in which Mr. Aritey was called.

We take your allegation of us violating laws very seriously, Ms. Leahy. The moment we received your deficiency letter, we immediately ceased all calling to the state of Ohio. We understand that you may encounter businesses in the telemarketing industry that would have continued calling. However, we are not one of them. We believe we have been working with your office to the best of our ability to resolve all complaints and deficiencies. Therefore, despite your allegations, these sales were made under our previous licenses, before we received any deficiency letter, and not in violation of any laws.


If there is anything else I may provide you with, please do not hesitate to contact me. We would like to resolve this matter as swiftly and amicably as possible.

Very Truly Yours,

Donald L. Booth
General Counsel

FTN009757

# Projections

December 20, 2006

# Table of Contents

**Prelude**      2007 Projection overview

**Section 1**    Projected 2007 Accrual Basis

**Section 2**    Projected 2007 Cash Basis

**Section 3**    Weekly Income/Loss with Consolidated Initiatives

**Section 4**    2007 Roll-Out Expansion Schedule

**Section 5**    52 Week Proforma Projections by Campaign
  a)    Cold Call Offshore Expansion
  b)    Cold Call Domestic Expansion
  c)    Full Data Ach Expansion
  d)    Citibank Full Data Affinity Expansion

**Section 6**    2007 Weekly Impact by Initiative

**Section 7**    Key Variables of Projections

**Section 8**    Expansion Alternatives

**Addendums**   Membership Life Cycle Conservation and Attrition Management
               Compliance Plan

McKenney  Att.  G
Page  1 of 3



# Addendums

i.      **Membership Life Cycle Conservation and Attrition Management**

ii.     **Compliance Plan**

**McKenney  Att.  G**
Page   2 of 3

## Membership Life Cycle Conservation and Attrition Management

● The intent of this document is to outline the thoughts management has towards the conservation of the membership life cycle and techniques that can help propose the extension of active paying members. In the past it has been the practice of the company to avoid additional offers and limit the communication with active paying members. There has been a concern that additional contacts and offers made to enhance the membership may in turn generate additional cancellations and therefore create an increase in attrition.    After further review and analysis of the customer usage patterns and historical attrition trends, management believes the lifecycle can be extended if the company can increase the customer's usage of product benefits. The company utilizes premiums as an inducement to prospects for accepting a trial membership. These premiums include free gasoline vouchers, airfare rebate vouchers, free long distance and on-line product catalog rebate vouchers. The prospects are very responsive to these premiums and the company feels the premium is sometimes the only reason prospects have accepted trial membership offers. Historical attrition reports also indicate the highest cancellation period of the customer lifecycle is the period immediately following the activation fee and before the second month payment. This period in some cases makes up for almost 50% of the lifecycle attrition.   The prospect is entitled to keep the initial premium regardless of there continued participation. If the prospects have shown responsiveness to the initial premium, it is believed there can be a positive impact by offering continued premiums throughout the membership term and strategically providing them at peak attrition periods. The usage of the premium incentives are extremely low but provide the prospect with a high perceived value that will promote an increased value of the membership.

● The following example premiums can be added during the term of the prospects membership and can only be utilized while their membership is active.  This technique will enable the member to accrue membership value by receiving additional benefit premiums during their term but will void or expire upon cancellation. This will posture a save tool when the member calls customer service to request cancellation. The member is more likely to remain a member if they know they can use the accrued premiums acquired during their term and cancel after they have utilized their earned premiums. This in turn will re-up the member into another month that may extend their lifecycle by additional terms.

**Buyers Club**          Dinner Vouchers and Free Movie Vouchers

**On-Line Catalog**    Product Vouchers, $25, $50 & $100

**Travel Club**          Free Hotel Night, 1 Day Rental Car, Cruise Cabin Upgrades

**Vacation**             Reservation promotion

**Long Distance**       Free Calling Cards for Friends and Family $25, $50, $100

Depending on the success of these added incentives, these added benefits could also be provided in the initial membership trial mailing but only become active or usable when the subscriber reaches a specified term. The means of communication with the active members can vary. This can be direct mail, voice broadcast messaging, e-mail or telemarketing. The customer portfolios will need to be sorted by lifecycle and create an A – B split for various testing purposes and tracked accordingly. The A group will become the constant and the B group will receive a premium benefit. This testing can become complex and the actuary results will indicate what premiums to offer and when to offer them for the best impact. It is strongly recommended to contract a consulting company that has industry experience with product retention and attrition analysis or hire an individual that can manage these ongoing efforts. The company could use additional product development experience as well as usage promotion.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY FALONEY, | : | CIVIL ACTION |
| JAMES M. AND ANITRA WHITT, | : | |
| on behalf of themselves and | : | |
| all others similarly situated, | : | No.: 07 CV 1455 JP |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| WACHOVIA BANK, N.A. | : | |
| Defendant | : | JURY TRIAL DEMANDED |
| | : | |
| | : | |

**DECLARATION OF PROFESSOR ROBERT J. MEYER, GAYFRYD
STEINBERG PROFESSOR OF MARKETING AND CHAIRMAN OF THE
MARKETING DEPARTMENT, WHARTON SCHOOL OF BUSINESS,
UNIVERSITY OF PENNSYLVANIA,
SUBMITTED BY PLAINTIFFS IN SUPPORT OF THEIR MOTION FOR
CERTIFICATION OF THIS ACTION AS A CLASS ACTION**

Howard I. Langer
Judah I. Labovitz
John Grogan
Irv Ackelsberg
Edward Diver
LANGER & GROGAN, P.C.
1717 Arch Street
Suite 4130
Philadelphia, PA 19103
215-320-5660

Attorneys for Plaintiff and the Class

DECLARATION OF ROBERT J. MEYER, PH.D.

REGARDING CLASS CERTIFICATION

## 1. INTRODUCTION

1. I am the Gayfryd Steinberg Professor of Marketing and Chair of the Marketing
   Department at the Wharton School of Business of the University of Pennsylvania. I am
   also co-director of the Wharton Center for Risk and Decision Processes. Attached as
   Exhibit A is My Curriculum Vitae.

2. I have been an academic for twenty-eight years, and before arriving at Wharton in 1990 I
   held professorships at Carnegie-Mellon University and the University of California, Los
   Angeles. I have also been a visiting scholar at the University of Sydney, Australia, and
   the University of Tokyo, Japan.

3. I have had and/or currently maintain positions on the review boards of a number of major
   journals in marketing. I was previously co-editor of *Marketing Letters*, and was and
   associate editor for *Marketing Science* and the *Journal of Consumer Research*

4. My research focuses on the study of consumer decision making. I have published fifty-
   nine articles on this topic, with forty-one appearing in major peer-refereed journals.

5. My particular focus is on how consumers form inferences about product value given
   limited information, and biases that arise when consumer make market choices.

McKenney Att. H
Page  2 of 43

6. In preparing this declaration, I have examined a number of documents produced in the FTC actions against Suntasia (Federal Trade Commission vs. FTN Promotions, Inc.; Civ. No. 8:07:1279 (M.D. Fla. 2007) and Universal (Federal Trade Commission vs. Universal Premium Services, et al., Civ. No. 2:06-cv-00849, CC: D.Ca. 2006). I have also examined telemarketing scripts for Advantage America, GSI Grant Services, and Your Choice.

7. Based on my analysis of these materials I have reached the following conclusions:

- The activities undertaken by the firms did not constitute marketing as that term is professionally defined and practiced.

- The primary goal of the activities was to gain access to consumer bank-account information and charge those accounts.

- No consumer made fully aware of the features of the goods and services being described would voluntarily consent to such charges.

- The sales scripts reveal a common architecture designed to mislead consumers in order to exploit well-understood biases in decision making.

- These conclusions can be documented by evidence common to the class.

In the sections below, I elaborate the basis of this opinion. The discussion is partitioned into three phases. I first elaborate on my opinion that the activities undertaken by the class of telemarketing firms do not constitute marketing, but rather were focused on eliciting and exploiting bank-account information. I then provide an overview of the approach used by the firms and describe the common architecture that characterized the various scripts. I then discuss the psychological mechanisms behind the scripts, and how they were effective in deceiving

McKenney Att. H
Page 3 of 43

2

consumers into permitting charges to their bank accounts for goods and services that either had no value or whose value was incommensurate with their costs.

## II. WHY THESE ACTIVITIES WERE NOT MARKETING

8.  Marketing is a process by which firms create joint value for themselves and their customers. It is this broad, collaborative, definition of the field that characterizes how marketing is practiced in major businesses around the world, and how it is taught in major business schools. To illustrate, this notion is captured in the formal definition of marketing that is provided by the American Marketing Association:

    *Marketing is an organizational function and a set of processes for creating, communicating and delivering value to customers and for managing customer relationships in ways that benefit the organization and its stakeholders (American Marketing Association, 2004; http://www.marketingpower.com/mg-dictionary-view1862.php).*

9.  A firm engaged in marketing is thus not merely involved in the act of selling, but rather seeks to create and communicate goods and/or services that provide real value to its customers and which, in turn, help foster long-term relationships.

10. When viewed in light of this definition, the collection of sales tactics used by the telemarketing firms in this case do not constitute marketing. No services were being offered that held significant material value, no attempt was made to communicate information about the services in such a way that would have allowed informed choices, and the firms displayed no visible evidence of conducting business in a way that would have built or nurtured long-term relationships with consumers.

**McKenney Att. H**
Page   4 of 43

11. In contrast, the practices describe enterprises whose primary goal was to mislead consumers into providing bank account information, and then to use that information to engineer charges from their accounts.

12. The firms achieved this goal by exploiting a series of widely-documented psychological weaknesses of consumers. Customers were misled to believe that they were agreeing to a costless and riskless opportunity to evaluate the services of a legitimate business, but the truth was quite different. Key information was withheld from consumers that, had it been disclosed, would have deterred consumers from providing their bank account information.

### III. THE STRUCTURE OF THE SCRIPTS

13. Although the scripts and products varied in wording and the specific services being sold, they displayed a common architecture that was comprised of four essential parts:

- An opening that implied that a previous relationship existed between the firm and the consumer and/or that indicated that an offer of substantial positive value would follow that posed no financial risk;

- An attempt to obtain bank account information;

- A fragmentary description of a complex and unfamiliar service whose value was not fully revealed and could not be assessed in the course of the call; and

- A pitch designed to convince consumers that they were only agreeing to *evaluate*, not buy, a good or service, or, in the case of the government grant schemes, that they were accepting a grant that came with a riskless money-back

McKenney  Att.  H
Page   5 of 43

4

guarantee.

14. In addition, the scripts common to Universal and Suntasia also included a pitch designed to persuade consumers to purchase additional unfamiliar services using the same tactics as (2) and (3); i.e., fragmentary descriptions designed to create uncertainty about value, followed by a script designed to foster beliefs that they were merely acquiring options to purchase, options that could easily be revoked.

15. I conclude that these aspects of the scripts—from the opening pitch to the nature of the services themselves—formed a carefully-crafted scheme for generating revenue by fostering and then exploiting ignorance: maximizing the number of customers being lured in to the sales scheme on the front end, and then minimizing the number of customers who had the knowledge or ability to withdraw from it on the back end.

16. Each aspect of the script played a clear-cut role in achieving this goal. The opening implication of a previous relationship and enticing offers were designed to lower the mental barriers that consumers would have had to providing bank account information, and foster optimistic beliefs about both the value of the services and their ability to evaluate them in the course of a trial period, or, in the case of the grant programs, to foster optimism that the consumer would actually receive the grant that was promised. The conditions of the trial period and the requirements for termination were then designed to serve as a barrier that made termination difficult once the true limited value

McKenney  Att.  H
Page   6 of 43

5

of the services became apparent.

## IV. HOW AND WHY THE SCHEMES WORKED

17. The scripts were designed to lure consumers into revealing bank account information and then agreeing to unwanted charges by exploiting a number of well-documented biases in consumer decision making.  In particular, the scheme worked by:

- Creating an optimism bias that caused consumers to selectively process the information provided by the telemarketer in a favorable (or trusting) light;

- Exploiting the natural desire of consumers to defer choices when there is uncertainty about the best course of action;

- Exploiting a tendency of consumers to overestimate their future ability to evaluate and terminate the services within the review period;

- Exploiting preferences for defaults by using a payment mechanism that made payment the status-quo option when consumers were either still uncertain about or did not have time to assess the value of the services they agreed to try; and

- Using an unfamiliar payment mechanism.

Each of these biases will be described and illustrated in turn.

## V. THE OPTIMISM BIAS

18. The opening of the scripts were designed to overcome any natural resistance consumers may have to being approached by telemarketer by using of two psychological

instruments:

McKenney  Att.  H
Page   7 of 43

6

- Creating trust by implying (wrongfully) that the telemarketer had some form of prior relationship with the customer, either through his or her bank, an affiliated merchant, or because the telemarketer had pre-existing knowledge of the customer (such as indicating that the customer's name had come from a list of individuals who qualified for a grant); and

- Promising a set of free goods or services, or other attractive (and false) "carrots."

19.  To illustrate the false creation of trust, in Suntasia's "Agent's Travel Network" script dated 4-22-05, the telemarketer creates the illusion of a pre-existing relationship by claiming that he or she is calling "in regards to your bank account." Likewise, the "Freedom Gold" script (dated 11-18-04) opens with the telemarketer claiming to be calling from the "credit processing center" where the customer has been "approved." Likewise, the Universal Customer Reward Network Script opens by informing the household that they had been "selected" to receive a shopping spree, and that they were speaking to a "promotional consultant" who offered both his or her name and "representative ID#." The "Advantage America," GSI, and Your Choice grant scripts create the illusion of a prior relationship by asserting that the role of the caller was to "speed up the processing of your grant"—implying they were calling about a grant the customer had already earned.

20. To illustrate the offer of a false lure, Suntasia's "Freedom Gold" script opened with an offer of $100 in free "gas coupons."  In fact, no such coupons were ever made available; what was offered was an opportunity to achieve *up to* $100 in rebates for cash purchases

in $10 increments, which required consumers to first pay for gas, then mail in receipts to the firm, then receive a check for $10 along with a form that allowed them to submit for another $10 rebate—a laborious process that the firms knew few, if any, consumers would perform. This structure of the "free offer" was never revealed to consumers in the course of the script.

21. Likewise, Universal's Consumer Reward Network promised consumers a "$500 Shopping Spree"—an offer that would have fostered images of an opportunity to acquire $500 worth of goods for free. What was actually being offered, however, was something far less than that, an opportunity to earn small rebates in a manner identical to Suntasia's "gas coupon" lure. In particular, consumers were merely given monthly opportunities to achieve rebate checks of $20 by purchasing products at a certain set of stores, filling out a rebate form, mailing it in with a sales receipt, and including a stamped, self-addressed envelope. Far from being a "$500 shopping spree," it was a costly process of earning small rebates that the firm knew few consumers would have the time or resources to pursue. Advantage America offered an almost identical lure by promising "$500 in free groceries"—an offer much later qualified to be "$500 in coupons."

22. Finally, all of the grant scripts lured customers by suggesting that merely by listening to the call they could receive government grants worth thousands of dollars. The GSI script, for example, misleadingly informs the customer that their name had come from a "list of individuals who qualify for a New Federal Government Grant up to $8,000."

McKenney  Att.  H
Page  9 of 43

8

23. These misleading and false appeals were designed to achieve two psychological goals. The first was to gain a foot hold in persuasion; the suggestion of a personal relationship and offer of something-for-nothing would have given consumers a motivation to continue to listen to the telemarketer. The second goal was more subtle, and ultimately more damaging; by suggesting a positive goal to consumers (earn a free reward offered by a trusted source), the opening phrasing would have worked to foster a positive bias in how customers processed and interpreted *all subsequent* information provided by the telemarketer. Specifically, the customer would have a motivation to both assume that the telemarketer was not being deceptive in his or her claims and adopt optimistic beliefs about all aspects of the transaction—both the value of the service and the ease with which it could be canceled.

24. The basis of this conclusion is the large literature on biases in human inference, which has repeatedly laid credence to the adage that people tend to "hear what they hope to hear" when processing information. The academic term for this is confirmatory or *goal-motivated* reasoning (e.g., Kunda 1990; Weinstein 1980; Meyer, Zhao, and Han 2007).

25. Given the goal of obtaining free airline and gas vouchers, consumers would have been motivated to selectively process information in a way that most easily rationalized their attainment—such as by believing that the services were legitimate and of real value, and/or that the cost of termination would have been small. In short, once a consumer adopted a belief that the lures were real, he or she would have been hooked; the process

of both gaining account information and getting the consumers to agree to debits would have been comparatively easy.

## V. EXPLOITING PREFERENCES FOR DEFERRAL

26. One of the most robust findings in studies of consumer decision making is that when consumers are presented with an array of product or services where the best option is uncertain, there is a strong desire to defer the choice (e.g., Tversky and Shafir 1992). In most cases such instincts are rational; deferral allows more time for a thoughtful analysis of the decision problem and/or allows other options to emerge that are superior to the ones currently being considered (Meyer 1992). In other cases the appeal lies simply in a preference for making errors of omission rather than commission; in most consumer contexts decisions *not* to buy a product are more easily reversible than decisions *to* buy (Dhar 1997; Samuelson and Zeckhauser 1988)

27. Given the fast pace of the sales presentation and the superficial description of the services being offered, it is unlikely that consumers would voluntarily agree to a full purchase on the spot. Hence, the telemarketers hook consumers by offering them something that sounds like the best of both worlds: a promise of free gifts, or, in the case of the grant schemes, a promise of grant money, merely if they would agree to proceed with the transaction. Moreover, the transaction was consistently characterized as riskless. The Suntasia and Universal scripts refer to it as a "free trial" period, while the grant schemes offer a money-back guarantee, in both cases implying that the act of canceling the transaction would essentially be costless in time and/or effort.

McKenney Att. H
Page 11 of 43

28. In the case of Suntasia and Universal, once the consumer agreed to one free trial, it would then become a straightforward matter to up-sell them to additional free trials, as was the case here. In such cases consumers would not have thought that they were committing to buy anything, and were simply agreeing to review a bundle of services rather than just one—a bundle that would be just as easy to cancel as the initial one was described to be.

29. The fact that consumers were merely agreeing to evaluate the services without knowing their attributes or value is evidenced by the extraordinarily high success rate of up-sells. The Suntasia receiver's report, for example, documents up-sell success rates of 87-93%, while the Universal receiver's report documents up-sell rates of 60-80%--numbers that are inconsistent with thoughtful consideration of these products by consumers. These numbers are outstandingly high when one considers that they imply that consumers, cold-called, purchased expensive products or services well over half the time. I know of no similar rate of sales success, which indicates to me that these were not genuine sales at all.

30. Finally, offering the option to defer also exploited another well-known bias in decision making, the tendency to underweight future transaction costs relative to benefits when planning future decisions (e.g., Trope and Lieberman 2003; Wilson and Gilbert 2003).

## VI. EXPLOITING DEFAULTS

31. The payment mechanism used by the telemarketers was an unusual one. While the telemarketers explained to consumers the automatic debits were for their "convenience and safety" (e.g., CRN Script), the actual motivation was anything but that. The goal was

to extract unwanted charges by exploiting another well-known bias in consumer decision making alluded to above: the preference for default or status-quo courses of action given uncertainty (e.g.,  Johnson, Hershey, Meszaros, and Kunreuther 1993; Kahneman, Knetch, and Thaler 1991; Samuelson and Zeckhauser 1988).

32. Once the telemarketer had access to the consumer's bank account information and authorization, they were, in essence, holding the consumer's wallet hostage.  The longer it took for consumers to evaluate the products, the more difficult the firm made it for consumers to terminate the relationship, the more money they made; each week and month of delay meant more charges to the consumer.

33. Consistent with this, the firms set up significant barriers to cancellation.  The firms had extensive "save scripts" designed to discourage consumers from canceling. There were insufficient customer service representatives which made it difficult—if not impossible— for consumers to cancel.  In addition, as described below, the products themselves, to the extent anything was actually delivered, were designed to be sufficiently complex as to prohibit quick ascertainment that their value was incommensurate with their cost, or, in the case of the grant schemes, to falsely imply that the consumers were to be given thousands of dollars in grants.   I understand that in the Universal case, the Temporary Receiver found no inventory of any actual product at all.

34. Hence, by insuring an automatic debit the telemarketers essentially turned the tables on how transactions are normally conducted in a marketplace; whereas *not* buying a good or

service is normally the default action in markets, here buying is the default. This is a reversal that consumers would have had little experience dealing with, something that would likely have led to numerous cases of automatic purchases being made for services that they neither wanted or, possibly, even knew they were acquiring. The reversal also highlights an unfortunate paradox of the transaction: as noted above, consumers were drawn to the appeal of a "free trial" period or the promise of a money-back guarantee in the belief that it allowed them to avoid taking the overt action of purchasing the services—when in fact, it had just the opposite effect. By accepting the transaction they were implicitly making the decision to make purchasing the passive act, and not purchasing the effortful one.

35. In some cases the use of bank drafts may have also worked to deceive consumers that, in fact, they were purchasing anything at all. The reason is that because of the unusual nature of the transaction, consumers may not have been accustomed to looking to their checking account summaries for evidence of purchases—something more traditionally found on credit-card transactions. If the name of the debit was sufficiently ambiguous, such charges may well go overlooked or attributed to a routine and legitimate bank service fee.

## VII. THE SERVICES THEMSELVES

36. The design of the particular services being offered was integral to the telemarketing scheme. For the scheme to be successful in generating revenue, services would have to be offered to consumers that exhibited three features:

McKenney Att. H
Page 14 of 43

- Products or services drawn from categories likely to appeal to a broad cross-section of consumers (e.g., multi-product catalogs, call plans, travel programs, government grants);

- A promoted set of positive features that would foster beliefs that the service or program *might* have positive value; and

- Sufficient complexity that would make it difficult for consumers to establish the true value of the service either during the initial phone calls or, more critically, in the course of and after the free-trial period, in the event that anything was actually sent.

37. The truthfulness of the representation of the services would be irrelevant to scheme, as there was no interest in either insuring that customers were satisfied with the services after buying them or seeking repeat business with the customers. The goal was simply to create a vehicle to extract unwitting debits from their bank accounts.

38. A most egregious example was the grant programs, which promised thousands of dollars of grant money, yet all customers received was a book describing grant opportunities.

39. Another example is Suntasia's "Freedom Gold" program. In the sales script consumers were advised that the program was on an on-line catalog from which they could save "20-30%" on "150,000 items," using a "$5,000 credit limit." The program was further augmented by a "Distinct Advantage" service that provides things like a "double the money back guarantee," plus "70% discounted cruises and car rentals." The program was sufficiently expansive that it would be difficult to find a consumer for who it would

not hold some source of appeal; it offered discounts on seemingly all aspects of the consumer economy.

40. Similarly, Universal's "Health Network Unlimited" program was portrayed as an omnibus health program, and with a name designed to foster confusion with *Health Net*, a well-known, legitimate health-care insurance provider.

41. While the expansiveness and complexity of the program served to widen its appeal, it also served another function that was more central to the revenue mission of the telemarketer: it made it difficult to evaluate the true value of the program during and after the "free trial" period.

42. For example, consider Freedom Gold's claim that one could realize "20-30% savings" on consumer electronics. This aspect of the program appears to be available to the public without any monthly membership fee at the Freedom Gold website (http://www.freedomgold.com), where one quickly discovers that most of the items are either refurbished or surplus stock, and can be easily purchased elsewhere on the web for similar or lower prices. But the universality of this absence of value would be difficult to conclusively establish in a one week-period. In most cases a consumer who entered into the free trial with optimistic beliefs would not have enough information to reverse this belief before the membership fees were deducted from his or her accounts.

McKenney Att. H
Page   16 of 43

43. Even more difficult to evaluate would have been Universal's Health Network Unlimited. A consumer who agreed to "review" the program would receive in the mail a *fifty-one page* document that revealed HNU to be a complex maze of sub-programs, each having their own terms and requirements, each requiring registration. It would have been impossible for a consumer to fully assess the value of this program not just in the short "free review" time, but even weeks later after several months of charges would have built up.

44. There is clear evidence that the telemarketing firms *themselves* knew that the services held no value, and that no consumer would willingly agree to pay for them given full information at the time of the call, and would later terminate the sale as soon they discovered the nature of the products either in the course of or after the review period.

45. One line of evidence is the payment structure, in which there was a large up-front fee, particularly for the services offered as up-sells. While the exact fees varied over services, most featured monthly fees on the range of $19.95 to $49.95, but had "start up" fees ranging from $99.99 to $399.00 (e.g., Universal's Auto Gold had no monthly fee but a $399.00 start-up fee). Such a fee could not be justified based on any higher costs faced by the firm early rather than later in the sales relationship, hence could only have one motivation: a belief that the sales relationship would be a short one.

46. A second is the need to use an unusual--automatic draft-- mechanism for payment. Such an arrangement suggests that the firm believed that consumers would likely not voluntarily pay for the services after having seen them, hence by establishing payment as

the default option after the free trial period, they hoped to "snare" some consumer

accounts before they has a chance to cancel the relationship.

47. A third line of evidence is the need to use a high-pressure telemarketing scheme—a

practice that would not be used by any firm seeking repeat business from its customers.

Specifically, the scheme was one that overtly misled consumers about both the true value

of the "free gifts" being offered (such as describing the gas-refund coupons as "$100

vouchers") as well as the value of the services themselves.

48. As noted above, there was also systematic evidence that the firms consciously worked to

establish barriers to consumers seeking refunds. In addition to the "save scripts" used by

Universal and Suntasia described above, the firms erected physical barriers that made

contact by customers difficult. In the case of Universal, the toll-free lines set up to

handle consumer requests had only an 18% completion rate, and there was evidence that

telemarketing employees were discouraged from providing the firm's toll-free number to

customers. Finally, the Universal temporary receiver's report indicated that they were

"not aware of one instance where the receivership defendants disclosed their permanent

business locations or telephone numbers to consumers."

49. I further understand that the Receiver for PPC recently testified that after he took over

control of PPC's operations and all of the telephone lines and mail were redirected to his

office, he had no communication from any customer of any telemarketer seeking

instruction as to how to pay to continue the product or service allegedly sold to them by

McKenney  Att.  H
Page  18 of 43

the telemarketers. This further indicates to me that these were not genuine sales.

50. A final, and more direct, line of evidence is the extremely high rate of both bank draft stops and cancellations. The former is particularly noteworthy because these were decisions to abandon the services even before consumes had a chance to fully evaluate the purchases—a concession, essentially, that the purchase was a mistake.

Date: _____          _____
         December 21, 2007                    Robert J. Meyer

# References

Buehler, R., D. Griffin, M. Ross. 1994. Exploring the planning fallacy: Why people overestimate their task completion times. *Journal of Personality and Social Psychology.* **67** (3) 366-381.

Dhar, Ravi (1997), "Context and Task Effects in Choice Deferral", *Marketing Letters* Special Issue on the Time Course of Preferences, 8 (1).

Johnson, E. J., Hershey, J., Meszaros, J., & Kunreuther, H. 1993. Framing, Probability Distortions, and Insurance Decisions. *Journal of Risk and Uncertainty*, 7, pp. 35-51

Kahneman, D., Knetsch, J. L. & Thaler, R. H. 1991. Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias. *Journal of Economic Perspectives*, 5, 1, pp. 193-206

Kunda, Ziva. 1990. The case for motivated reasoning. *Psychological Bulletin.* **108** (3) 480-498.

Meyer, R.J. 1997, "The Effect of Set Composition on Stopping Behavior in a Finite Search Among Assortments", *Marketing Letters* Special Issue on the Time Course of Preferences, 8 (1).

Meyer, Robet, Shengui Zhao and Jin Han. 2007., "Biases in Valuation and Usage of Innovative Product Features", Marketing Science, in press.

Samuelson, W. & R. J. Zeckhauser. 1988. Status quo bias in decision making. *Journal of Risk and Uncertainty*, 1, pp. 7-59.

Trope, Yaacov, Nira Liberman. 2003. Temporal construal. *Psychological Review.* **110** (3) 403-421.

Tversky, Amos, and Eldar Shafir. 1992. "Choice Under Conflict: The Dynamics of Deferred Decisions", *Psychological Science*, 3 (November), 358-361

Weinstein, Neil D. 1980. Unrealistic optimism about future life events. *Journal of Personality and Social Psychology.* **39** (5) 806-820.

Wilson, Timothy D., Daniel T. Gilbert. 2003. Affective forecasting. Mark Zanna, ed. *Advances in Experimental Social Psychology*, Vol. 35. New York: Elsevier, 345-411.

McKenney  Att.  **H**
Page  20 of 43

# ROBERT J. MEYER

770 Jon M. Huntsman Hall
Marketing Department
Wharton School
University of Pennsylvania
Philadelphia, PA  19104-6371
Tel: (215) 898-1826
Email: meyerr@wharton.upenn.edu

1037 Great Springs Road
Bryn Mawr, PA 19010
Tel: (610) 525-0835

February 2007

## I.    ACADEMIC EXPERIENCE

### A.  Teaching positions

Gayfryd Steinberg Professor of Marketing, The Wharton School, University of PA, 1997-present

Professor, The Wharton School, 1992 – 1997

Associate Professor, The Wharton School, University of Pennsylvania, 1990 - 1992

Associate Professor, John E. Anderson Graduate School of Management, University of California, 1985 - 1990

Assistant Professor, John E. Anderson Graduate School of Management, University of California, 1982 - 1985

Assistant Professor, Graduate School of Industrial Administration, Carnegie-Mellon University, Pittsburgh, 1980 - 1982

Visiting Scholar, Faculty of Economics, University of Sydney, 1996.

Hakuhodo Visiting Scholar, Faculty of Economics, University of Tokyo, 1993.

Adjunct Professor, Graduate Group in Regional Science, University of Pennsylvania, 1992 - present

Visiting Associate Professor, The Wharton School, University of Pennsylvania, 1988 - 1989

Visiting Assistant Professor, College of Business Administration, The University of Iowa, 1979 - 1980

Lecturer, Department of Geography, The University of Iowa, 1977

### B.  Administrative positions

Chair, Wharton Marketing Department, 2006-

Vice Dean and Director, Wharton Doctoral Programs, 1999-2005

McKenney  Att.  H
Page  21 of 43

Co-director, Wharton Center for Risk and Decision Processes. 2005-
Chair, Wharton Marketing Doctoral Program, 1994-1996.
UCLA Marketing Area Doctoral Program Coordinator, 1989-1990
Chair, UCLA Marketing Academic Unit, 1987-1988

## II.   EDUCATIONAL BACKGROUND

### A.   Degrees

Ph. D., The University of Iowa, 1979, in Geography
M.S., Florida State University, 1975, in Geography
B.S., Florida State University, 1974, in Geography/Meteorology

### B.   Dissertation

Ph.D. Thesis: "A Behavioral Model of Choice Set Formation in Destination Choice."
Chair: Jordan J. Louviere

MS Thesis: "A Human Information Processing Model of Urban Shopping Behavior."

### C.   Courses Taught

#### 1.   Undergraduate Courses

Consumer Behavior (Carnegie-Mellon and University of Iowa)
Introduction to Statistics (Carnegie-Mellon and University of Iowa)
New Product Management (Wharton)
Senior Conference (Wharton)

#### 2.   Graduate Courses

Applied Multivariate Statistics (MBA/Ph.D.: Carnegie-Mellon)
Consumer Behavior (Carnegie-Mellon and University of Iowa)
Marketing Management (UCLA and Wharton)
Marketing Models (UCLA and Wharton)
Marketing Research (UCLA and Wharton)
Marketing Strategy (Wharton)
New Product Design and Forecasting (Carnegie-Mellon and UCLA)
Product Management (UCLA)
Quantitative Methods in Marketing (Ph.D.; UCLA; Wharton)
Special Topics in Marketing (Ph.D.; UCLA, Wharton)
Research Methods (Ph.D.; Wharton)

McKenney  Att.  H
Page   22 of 43

2

Advanced Study Projects (MBA; Wharton)

3.   Executive MBA Courses

Marketing Management (UCLA)
Marketing Strategy (Wharton)

4.   Executive Seminars

*UCLA Executive Programs (1984-91)*
Small Business Administration Program
Taiwanese Program
Medical Marketing Program
UCLA/MIT Venture Forum

*Aresti Executive Education Programs, The Wharton School(1991-present)*
Transforming Scanner Data Into Marketing Advantage
New Products Marketing
Building and Leveraging Brand Equity
Competitive Strategy
*AIMSE* Management Program
Marketing in a Newly-Deregulated Environment
Lucent Technologies
SII
Centecor Pharmaceuticals
Wyeth Pharmaceuticals
Cemex
Interbrew
Phillip Morris

*Companies, TradeAssociations*
Martin Aviation, Inc.,
Sanwa Bank, California,
Surise Medical Corp.,
Telenor N.V.

*International Seminars*
IBMEC, Brazil
UNSW Center for Retailing, Australia
Siam Cement, Thailand
Fujitsu, Japan
Deutsche Post, Germany

McKenney  Att. H
Page   23 of 43

5. Teaching Awards

Wharton Graduate Association Core Teaching Award, 1996

## III.  PUBLICATIONS AND RESEARCH

### A.  Publications

#### 1.  Articles Published in Refereed Journals

Louviere, J. and R. Meyer, "A Model for Residential Impression Formation," *Geographical Analysis*, 8 (4), 1976, 479-486.

Koutsopoulos, K., R. Meyer, and D. Henley, "Psychometric Modeling of Consumer Decisions in Primary Health Care," *Health Services Research*, 21, 1979, 427-447.

Meyer, R., I. Levin, and J. Louviere, and  "Functional Analysis of Mode Choice," *Transportation Research Record*, 673, 1979, 1-7.

Meyer, R., "A Descriptive Model of Constrained Residential Search," *Geographical Analysis*, 12 (1), 1980, 21-32.

Meyer, R., "A Behavioral Theory of Choice Set Formation Under Informational Constraint," *Transportation Research Record*, 750, 1980, 6-12.

Henley, D., I. Levin, J. Louviere, and R. Meyer, "Changes in Perceived Travel Cost and Time for the Work Trip During a Period of Increasing Gasoline Costs," *Transportation*, 10, 1981, 33-34.

Louviere, J. and R. Meyer, "A Composite Attitude-Behavior Model of Travel Decision-Making," *Transportation Research*, 14, 1981, 411-420.

Louviere, J., D. Henley, G. Woodworth, R. Meyer, I. Levin, J. Stoner, D. Curry, and D. Anderson, "Laboratory Simulation vs. Revealed Preference Methods for Estimating Travel Demand Model: An Empirical Comparison," *Transportation Research Record*, 794, 1981, 42-51.

Meyer, R., "A Model of Multiattribute Judgments Under Attribute Uncertainty and Information Constraint," *Journal of Marketing Research*, 19, 1982, 62-71.

McKenney  Att.  H
Page   24 of 43

4

Meyer, R. and T. Eagle, "Context-Induced Parameter Instability in a Disaggregate-Stochastic Model of Store Choice," *Journal of Marketing Research*, 19, 1982, 62-71.

Meyer, R., "A Descriptive Model of Consumer Information on Search Behavior," *Marketing Science*, 1 (1), 1982, 93-121.

Johnson, E. and R. Meyer, "Compensatory Models of Non-Compensatory Choice Processes: The Effect of Varying Context," *Journal of Consumer Research*, 11 (1), 1984, 528-541.

Pampel, F., I. Levin, J. Louviere, R. Meyer, and G. Rushton, "The Integration of Geographic, Social, and Economic Preferences in Retirement Decision Making," *Research on Aging*, (6) 2, 1984, 139-162.

Meyer, R. and A. Sathi, "A Multiattribute Model of Consumer Choice During Product Learning," *Marketing Science*, 4 (6), 1985, 41-61.

Phipps, A. and R. Meyer, "Normative versus Heuristic Models of Residential Choice Behavior," *Environment and Planning*, 17, 1985, 761-776.

Meyer, R., "The Learning of Multiattribute Judgment Policies," *Journal of Consumer Research*, 14 (September), 1987, 155-173.

Currim, I., R. Meyer, and N. Le, "Disaggregate Tree-Structured Modeling of Consumer Choice Data," *Journal of Marketing Research*, 25 (3), 1988, 253-265

(Reprinted in W. Henry, M. Menasco, and C. Takada (eds.), *New Product Development and Testing*, Lexington Books, MA, 1989, 263-286.)

Meyer R. and E. Johnson, "Information Overload and the Nonrobustness of Linear Models: A Comment on Keller and Staelin," *Journal of Consumer Research*, 15 (4), 1989, 498-503.

Johnson, E., R. Meyer, and S. Goshe, "When Choice Models Fail: Compensatory Models in Negatively-Correlated Environments," *Journal of Marketing Research*, 26 (3), 1989, 255-270 (Finalist, 1994 O'Dell Award for best article in *Journal of Marketing Research*, judged after five years).

Meyer, R. and J. Assuncao, "The Optimality of Consumer Stockpiling Decisions," *Marketing Science*, 9 (1), 1990.

McKenney  Att.  H
Page   25 of 43

Kahn, B. and R. Meyer, "Consumer Multiattribute Judgments under Attribute Weight Uncertainty," *Journal of Consumer Research*, 17 (March), 1991, 508-522.

Assuncao, J., and Meyer, R., "The Rational Effect of Price Promotions on Sales and Consumption," *Management Science*, 5 (May), 1993, 517-535

   *(Winner, 1994 Frank Bass Award for best article based on a doctoral dissertation).*

Kalwani, M., Meyer, R. J., and Morrison, D., "The Dirichlet-Multinomial as a Benchmark Chance Criterion for Some Discrete Choice Models," *Journal of Marketing Research*, 31 (February), 1994, 65-75.

Cripps, J. D., and Meyer, R. J., "Heuristics and Biases in Timing the Replacement of Durable Products," *Journal of Consumer Research*, 21 (2), 1994, 304-318.

Meyer, R. J., and Yong Shi, "Learning to Choose Among Inherently Risky Alternatives:  Intuitive Solutions to the Armed-Bandit Problem," *Management Science*, 41 (5), 1995, 817-834.

Hutchinson, W. and R. Meyer, "Dynamic Decision Making: Optimal Policies and Actual Behavior in Sequential Choice Problems," *Marketing Letters*, 5 (4), 1994, 369-382.

Meyer, R. J., and Johnson, E. J., "Empirical Generalizations in the Modeling of Consumer Choice," *Marketing Science*, 14 (3), 1995, 180-189.

Meyer, R.J., "The Effect of Set Composition on Stopping Behavior in a Finite Search Among Assortments", *Marketing Letters* Special Issue on the Time Course of Preferences, 8 (1) 1997

Meyer, R.J., and others, "Dynamic Influences on Individual Choice Behavior", *Marketing Letters*, 8(3), 1997, 349-360.

Miyuri, Shirai, and R.J. Meyer, "Learning and the Cognitive Algebra of Price Expectations", *Journal of Consumer Psychology*, 6(4), 1997, 365-388, .

Johnson, E. J. , R. J. Meyer, and B. Hardie., Watching Consumers Decide: Process measures add insight to choice modeling" *Marketing Research*, 9 (Winter) 1997, 32-37.

Louviere, J.J., ,Meyer, R.J., et. al., Combining Sources of Preference Data for Modeling Complex Decision Processes Combining Data, *Marketing Letters*

6

Special Issue on Choice Theory, Vol. 10, No.3 (August) 1999, 205-217.

Amaldoss, W., Meyer, R., Raju, J., and Rappaport, A., "Collaborating to Compete: A Game-Theoretical Model and Empirical Investigation of the Effect of Profit-Sharing Arrangement and Type of Alliance", *Marketing Science*, Vol. 19, No. 2 (Spring) 2000, 105-126

*(Winner, 2001 John Little Award for best 2000 Article in a Marketing INFORMS Journal, and Frank Bass Award for best article based on a doctoral dissertation.*

Banks, D., Meyer, R., and Hutchinson, J.W. "Reputation in Marketing Channels: Repeated-Transaction Bargaining with Two-Sided Uncertainty", *Marketing Science*, 21, No. 3 (Summer) 2002, 251-272.

Kunreuther, H., Meyer, R., Zeckhauser, R., et. al, "High-Stakes Decision Making Normative, Descriptive and Prescriptive Considerations", *Marketing Letters*, Vo. 13, No. 3 (August) 2002, 259-268.

Tülin Erdem, Kannan Srinivasan, Wilfred Amaldoss, Patrick Bajari, Hai Che, Teck Ho, Wes Hutchinson, Michael Katz, Michael Keane, Robert Meyer, and Peter Reiss, "Theory-Driven Choice Models", *Marketing Letters*, 16, 2005, 225-237.

Janakiraman, N., Meyer, R. and A. Morales "The Spillover of Surprise: the Effect of Positive and Negative Price Shocks on Cross-Category Purchasing Patterns", with, *Journal of Consumer Research*, 33, 2006, 361-369.

Louviere, Jordan J., and Robert J. Meyer, "Formal Choice Models of Informal Choices: What Choice Modeling Research Can (and Can't) learn from Behavioral Theory", *Review of Marketing Research*, Volume 4, 2007 (in press).

Zhao, Shengui, and Meyer, Robert , "Biases in Predicting Preference for the Whole Visual Patterns from Product Fragments", *Journal of Consumer Psychology*, in press.

## 2.  Articles Under Editorial Review

Zhao, Shenghui, Meyer, Robert J., and Han, Jin., "A Tale of Two Judgments: Biases in Prior Valuations and Subsequent Utilization of Novel Technological Product Attributes", under second review, *Marketing Science*.

Meyer, Robert J., and Shengui Zhao, "The Psychology of Intuitive Forecasts of New Product Utility", under second review, *Journal of Product and Innovation Management*

Johnson, Eric J., Hardie, Bruce, Meyer, Robert J., and Walsh, John, "Using Process Data to Model Unobserved Heterogeneity in Consumer Choice Data", under second review, *Journal of Consumer Research*

Meyer, Robert J., and Joao Assuncao, "Intuitive Product Maintenance", under review, *Management Science*

Meyer, Robert J., Tyagi, Rajeev, and John Walsh, "An Experimental Analysis of Dynamic Pricing in Markets with Uncertain Demand", under second review, *Journal of Product and Brand Management.*

3. **Articles Published in Books and Proceedings**

Louviere, J., D. Henley, R, Meyer, and L. Ostresh, "Travel Demand Segmentation: Some Theoretical Considerations Related to Behavioral Modeling," in P. R. Stopher and A. Meyburg (eds.), *Behavioral Travel Demand Models.* Lexington: D. C. Heath and Co., 1976, 256-270.

Meyer, R., "Modeling the Dynamics of Urban and Rural Migration: An Application to the Alabama Black Belt," *Proceedings of the Association of American Geographers*, 8, 1976, 47-49.

Meyer, R., "An Experimental Analysis of Student Apartment Selection Decisions Under Uncertainty," *Great Plains-Rocky Mountain Geographic Journal: Special Issue on Human Judgment and Spatial Behavior*, 6 (1), 1977, 30-38.

Meyer, R., "Consumer Information Search and Choice Behavior: Two Models and an Initial Empirical Test," in L. McAlister (ed.), *Research in Marketing*, 1982, 259-279.

Rushton, G., I. Levin, J. Louviere, F. Pampel, and R. Meyer, "Forecasting Migration Patterns of the Elderly From Experimentally-Derived Decision Functions," *Proceedings of the American Statistical Association*, 1980.

Meyer, R., "Multiattribute Parameter Shifting: An Approach to Modeling Context and Dominance Effects in Individual Choice Behavior," in J. Huber, ed., *The Effect of Item Similarity on Choice Probabilities*, Fuqua School of Business, Duke University, 1981, 62-104.

Meyer, R., "A Dynamic Multiattribute Model of Consumer Repeated Choice Behavior," in R. K. Srivastava and A. D. Shocker, eds., *Analytic Approaches to Product and Market Planning: The Second Conference*, Marketing Science Institute, 1981, 199-227.

Smith, T., A. Mitchell, and R. Meyer, "A Computational Process Model of Evaluation Based on the Cognitive Structuring of Episodic Knowledge," in A. Mitchell (ed.) *Advances in Consumer Research*, 9, 1982, 136-143.

Meyer, R., "On the Representation and Measurement of Consumer Choice Under Limited Information," in M. J. Houston and R. J. Lutz, eds., *1985 AMA Winter Educators' Conference: Marketing Communications - Theory and Practice*.

Meyer, R., "A Theory of the Inductive Learning of Multiattribute Preferences," in D. Brinberg and R. Lutz (ed.), *Methodological Advances in Consumer Research* (Springer-Verlag), 1989, 253-285.

Meyer, R., and L. Cooper, "A Longitudinal Choice Analysis of Consumer Response to a Product Innovation," in R. Golledge, and H. Timmermans (eds.), *Behavioral Modeling in Geography and Planning*, London: Crown-Helm, 1988, 424-450.

Kahn, B., and R. Meyer, "Modeling Customer Loyalty: A Customer-Based Source of Competitive Advantage," in G. Day, B. Weitz, and R. Wensley (eds.), *The Interface of Marketing and Strategy*, Greenwich, CT: JAI press, 1990, 231-54.

Meyer, R.J. and D. Banks , "Behavioral Theory and Naïve Strategic Reasoning," in G. Day and D. Reibstein (eds.), *Wharton on Competitive Strategy*,  New York: John Wiley, 1997, 151-176

Meyer, R.J., and W. Hutchinson, "Dynamic Decision Making: Learning from the Past and Planning for the Future",  In S. Hoich and H. Kunreuther, (Eds), *Wharton on Decision Making* . New York; John Wiley, pp. 37-62; 2001

Meyer, Robert, "Why we Under Prepare for Hazards", in Ronald J. Daniels, Donald F. Kettl, and Howard Kunreuther (eds), *On Risk and Disaster: Lessons from Hurricane Katrina*, University of Pennsylvania Press, pp. 153-174

Meyer, R.J., Zhao, Shengui, and Han, Jin, "The Rationality of Consumer Decisions to Adopt and Utilize Product-Attribute Enhancements: Why Are We Lured by Product Features We Never Use", in Rami Zwick and

Amnon Rappoprt (eds.), *Experimental Business Research, Volume III,*
*Springer, pp. 1-34.*

4.    **Technical Reports and Monographs**

Louviere, J., R. Meyer, F. Stetzer, and L. Beavers, "An Experiment to Drive
Predictive Models of Public Response to Policy Manipulations in Public Bus
Transportation." Technical Report Number 35, The Institute of Urban and
Regional Research, the University of Iowa, Iowa City, December, 1974.

Koutsopoulos, K. and R. Meyer, "Mass Transit Decision Making Market
Segmentation." Technical Report Number 69, The Institute of Urban and
Regional Research, the University of Iowa, Iowa City, December, 1974.

Louviere, J., M. Piccolo, R. Meyer, and W. Duston, "Theory and Empirical
Results in Real-World Studies of Human Judgment: Three Shopping
Behavior Examples." Technical Report Number 1, Center for Behavioral
Studies, the Institute for Policy Research, the University of Wyoming, March,
1977.

Meyer, R., I. Levin, and J. Louviere, "Methods for Analyzing Travel Behavior in
Simulated Choice Environments: A Review." Discussion Paper Number 31,
Department of Geography, University of Iowa, 1980.

Meyer, R., and J. Louviere, "Theory and Methods in the Behavioral Analysis of
Migration Intentions: An Application to Post-Retirement, Housing Decision,"
Working Paper 35-80-81, Graduate School of Industrial Administration,
Carnegie-Mellon University.

Meyer, R. and T. Eagle, "A Parsimonious Multinomial Choice Model
Recognizing Alternative Independence and Context-Dependent Utility
Functions," Working Paper 26-80-81, Graduate School of Industrial
Administration, Carnegie-Mellon University, 1981.

Meyer, R., J. Louviere, and T. Eagle, "The Effect of Attribute Variance and
Choice Model Parameter Estimates," Graduate School of Management,
University of California, Los Angeles, October 1982.

Currim, I. S., R. Meyer, and N. Le, "A Concpet-Learning System for the Inference
of Production Models of Consumer Choice," Graduate School of
Management, University of California, Los Angeles, February 1986.

Le, N., R. Meyer, and I. Currim, "CLS: Disaggregate Tree-Structured Modeling
of Consumer Choice Data, User's Manual," Graduate School of Management,

**McKenney  Att.  H**
**Page   30 of 43**

University of California, Los Angeles, February 1986.

Meyer, R. J., and Currim, I., "Recovering Contingent Processes in Consumer Judgement: A Comparison of Revealed and Direct Assessment Methodologies," Marketing Department, Wharton School of Business, July 1992.

Meyer, R. J., and J.D. Cripps, "Inferring Complex Likelihoods from Serial Observation of Data: Biases in Learning and Choice", Department of Marketing, Wharton school of Business, 1996

Kunreuther, Howard, Van de Bulte, C., and R. Meyer, "Risk Analysis for Extreme Events: Economic Incentives for Reducing Future Losses", *NIST Monograph GCR 04-871*, National Institute of Standards Technology, Washington, 2004.

Meyer, R. J., and H. Kunreuther, "Learning from Experience about Natural-Hazards", Working Paper, *Center for Risk and Decision Processes*, 2005.

**B.  Papers Presented at Professional Meetings**

"Decision Making Market Segmentation — An Approach to Mass Transit Marketing," with K. Koutsopoulos, Western Social Science Association, April, 1976.

"An Experimental Analysis of Student Apartment Selection Decisions Under Uncertainty," Special Session on Human Judgment and Spatial Behavior, Great Plains-Rocky Mountain Division of the Association of American Geographers, October, 1976.

"A Psychometric Meeting Approach to the Study of Primary Health Care Decision Making," with K. Koutsopoulos and D. Henley, Association of American Geographers, April, 1977.

"Functional Analysis of Mode Choice," with I. Levin, and J. Louviere, Transportation Research Board, January, 1978.

"Issues in Modeling Travel Behavior in Simulated Choice Environments: A Review," with I. Levin, D. Henley, and J. Louviere, Special Session on Mathematical Travel Modeling, Association of American Geographers, April, 1978.

"Modeling Individual Responses to Non-Discrete Conservation Alternatives: A Laramie, Wyoming, Case Study," with J. Louviere, Association of American

11

Geographers, November, 1988.

"A Time-Based Theory of Locational Preference Formation," Association of
American Geographers, April, 1980.

"Utility, Uncertainty, and Spatial Adaptation: A Behavioral Theory of Destination
Choice Set Formation," Transportation Research Board, January, 1980.

"Combining Simulation and Revealed Preference Methods in Analyzing Travel
Behavior," with I. Levin and D. Henley, Transportation Research Board,
January, 1980.

"A Behavioral Analysis of Retirement Migration Decisions," with I. Levin,
J. Louviere, G. Rushton, and F. Pampel, Nova Behavioral Conference on
Aging, January, 1980.

"Stochastic Destination Choice Within Evoked Sets of Alternatives," Association
of American Geographers, April, 1980.

"Consumer Information Search and Choice Behavior: Two Models and Empirical
Tests," Interdisciplinary Conference on Choice Theory, April, 1980.

"Forecasting Migration Search and Choice Behavior: Two Models and Empirical
Tests," Interdisciplinary Conference on Choice Theory, April, 1980.

"Theory and Methods in the Behavioral Analysis of Migration Intentions: An
Application to Post-Retirement Housing Decisions," with J. Louviere,
Regional Science Association, November, 1980.

"Laboratory Simulation vs. Revealed Preference Methods for Estimating Travel
Demand Models: An Empirical Comparison," with I. Levin, J. Stoner, J.
Louviere, and D. Henley, Transportation Research Board, January, 1981.

"Multiattribute Weight Shifting: An Approach to Modeling Context and
Dominance Effects in Individual Choice Behavioral," with J. Louviere,
Colloquium on the Effect of Item Similarity on Choice Probabilities, Duke
University, June, 1981.

"A Dynamic Multi-Attribute Choice Model of Consumer Response to Product
Innovations," Conference on Analytic Approaches to Product and Marketing
Planning, Vanderbilt University, October, 1981.

"A Cognitive Theory of Evaluation," with A. Mitchell, and T. Smith, Association
of Consumer Research, October, 1981.

McKenney  Att.  H
Page   32 of 43

"Problems of Error Correlation and Intransferability in Stochastic Choice Modeling: Some Recent Developments," Meetings of the Institute of British Geographers, January, 1982.

"The Effect of Attribute Variance as Choice Model Parameter Estimates," Association for Consumer Research, October, 1981.

"A Dynamic Analysis of Consumer Attribute Trade-Offs," with A. Sathi, First Marketing Science Conference, University of Southern California, March, 1983.

"The Effect of Choice Context on Parameter Variation in Multinomial Logit Models: A Review," Psychometric Society, June 1983.

"Market Tests of a Disaggregate Stochastic Model of Consumer Preference Dynamics," ORSA/TIMS, November, 1983.

"A Disaggregate Stochastic Model of Consumer Preference Dynamics," Regional Science Association, November, 1983.

"The Role of Mathematical Models in Marketing Theory: An Example from the Study of Multiattribute Learning," AMA Marketing Theory Conference, February, 1984.

"Context Dependencies in Discrete Choice Models: Transferability Under Set Size and Positioning Variations," with E. Johnson, Marketing Science Conference, March, 1984.

"The Application of Probabilistic Choice Models to the Analysis of UPC Scanner Data: Issues in Aggregation and Choice Set Specification," Marketing Science Conference, March, 1984.

"Learning in Multiattribute Utility Analysis," Association for Consumer Research, October, 1984.

"On the Representation and Measurement of Consumer Choice Under Limited Information," AMA Marketing Theory Conference, February, 1985.

"The Use of Computational Learning Algorithms to Infer the Form of Consumer Heuristic Choice Functions," with I. Currim and N. Le, Marketing Science Conference, March, 1985.

"The Evolution of Attitude Structures," AMA Attitude Theory Conference, May,

13

1985.

"Choice Set Configuration Effects on the Transferability of Probabilistic Choice
Models," with E. Johnson, Association for Consumer Research, October,
1986.

"An Algorithmic Approach to the Induction of Hierarchical Choice
Processes," with I. Currim, Association for Consumer Research, October,
1986.

"Inferring Production-System Models of Consumer Choice Based on Scanner
Data," with I. Currim, ORSA/TIMS, November, 1985.

"CLS: Production-System Models for Disaggregate Consumer Demand
Analysis," with I. Currim, AMA New Product Development and Testing
Workshop, March, 1986.

"When Choice Models Fail: Compensatory Models in Efficient Sets," with E.
Johnson, Marketing Science Conference, March, 1986.

"Generalized Multiattribute Utility Models as Theories of Brand Loyalty,"
Association for Consumer Research, October, 1986.

"Purchase Timing and Volume Decisions in a Dynamic Price Environment,"
ORSA/TIMS, October, 1986.

"A Normative and Descriptive Analysis of Sequential Buying Under Price
Uncertainty," with J. Assuncao, Marketing Science Conference, June, 1987.

"Inferring Production-System Models of Decision Making Through Induction and
Direct Elicitation: An Empirical Comparison of Methods," with I. Currim,
Association for Consumer Research, October, 1987.

"The Optimality of Consumer Decisions of What, When, and How Much to Buy,"
with J. Assuncao, Association for Consumer Research, October, 1987.

"A Formal Description Theory of Consumer Temporal Buying Decisions," with
J. Assuncao, TIMS/ORSA, April, 1988.

"An Analysis of Consumer Multiattribute Judgments under Weight Uncertainty,"
with B. Kahn, Marketing Science Conference, March, 1989.

"Are 'New and Improved' Products Worth the Price?  Consumer Multiattribute
Judgments Under Attribute Weight Uncertainty," Association for Consumer

14

Research, October, 1989.

"Biases in Consumer Learning of Multinomial Distributions," with J. Cripps, Marketing Science Conference, March 1990.

"Heuristics and Biases in Sequential Decision Making," BANF/University of Alberta, Invitational Symposium on Choice Theory, May 1990.

"Optimality in Consumer Response to Promotions," AMA Doctoral Consortium, Gainesville, FL., August 1990.

"Ambiguity and Multiattribute Utility Assessment," ORSA/TIMS, November 1990.

"How well have we done?  Benchmarks for Brand Choice Models," with M. Kalwani and D. Morrison, Marketing Science Conference, March 1991.

"Heuristics and Biases in Durable Replacement Decisions," with J. Cripps, Marketing Science Conference, Wilmington, DE, March 1991.

"The Integration of Uncertain Gains and Losses in Multiattribute Decision Making," *Association for Consumer Research*, Chicago, IL, October 1991.

"The Optimal of Durable Replacement Purchases," with J. Cripps, Conference on Behavioral Decision Research in Management, Berkely, CA, May 1992.

"Recovering Contingent Process in Consumer Judgment:  A Comparison of Methods," with I. Currim, Marketing Science Conference, London, July 1992.

"Intuitive Dynamic Pricing Under Demand Uncertainty," with J. Walsh and R. Tyagi, *Marketing Science Conference*, St. Louis, Mo., March 1993.

"Optimality in Intuitive Sequential Decision Making," Duke Invitational Symposium on Choice Theory, July 1993.

"Optimal Stopping and Deciding When to Decide," *Association for Consumer Research Meetings*, Boston, October 1994.

"Modeling Learning in Stochastic Games", Duke Research Camp on the Time Course of Preferences, Durham, NC, 1995.

"Naive Automata Play a Game of Preemptive Innovation," *Marketing Science Conference*, Gainesville, FL, 1996.

McKenney  Att.  H
Page   35 of 43

"Biases in Strategic Reasoning", *Charleston Conference on Managerial Decision Making,* May 1997

"On the Psychology of Repair", *Association for Consumer Research*, Denver, CO, October, 1997

"Empirical Learning with Automated Agents", *INFORMS*, Dallas, TX, October, 1997

"Process-Tracing Data as a Cross-Validation tool in Discrete-Choice Analysis", paper presented at the HEC Choice Theory Conference, France, July 1998

"Heuristics and Biases in Intuitive Maintenance Decisions", *Society for Consumer Research*, St. Petersburg, FL, February 1999.

"Heuristics and Biases in Judgments About Extreme-Value Distributions", *Marketing Science Conference*, Syracuse, NY, May 1999

"A Theory of Intuitive Maintenance", *Behavioral Decision Research in Management*, Miami, FL, June 1999.

"Training the Multilingual Judge: The Effect of Learning on Response-Mode Biases in Multiattribute Decision Making", With J. Irwin, *Association for Consumer Research*, Columbus, OH, October 1999

"Limits to Learning in Complex Decision Making Environments", *Asian Conference on Experimental Business Research*, Hong Kong, December 1999

The Rational Fairness of Prices", *Association for Consumer Research,* Salt Lake City, October 2000.

"Failures to Learn in Complex Decision Making Environments", *Marketing Science Conference,* Los Angeles, June 2000.

"Learning Biases in High-Stakes Settings: The Case of Earthquake Mitigation", *Workshop on High-Stakes Decision Making, Invitational Choice Symposium,* Pacific Grove, CA, May 2001.

"Failures to Learn in Complex Decision Making Environments", *American Marketing Association Doctoral Consortium,* Miami, Florida, June 2001.

"The Psychology of Price Shocks", with N. Janakiraman and A. Morales and

Rational Fairness of Prices", *Association for Consumer Research,* Austin, Texas, October 2001.

"Consumer Price Neglect", with D. Banks and J. W. Hutchinson, *Marketing Science Conference,* Edmonton, Alberta, June 2002.

"The Psychology of Consumer Time Budgeting", with Narayan Janakiraman, and Stephen Hoch, *Marketing Science Conference*, College Park, MD, June 2003

"Why You Can't Teach Old Consumers New Tricks: An Experimental Analysis of Consumer Utilization of Innovative Product Attributes", with Shengui Zhao and Jin Han, *Marketing Science Conference*, College Park, MD, June 2003

"Biases in Managerial Inferences about Customer Value from Purchase Histories: Intuitive Solutions to the Mailing-List Problem", with David Schweidel and Peter Fader, *Marketing Science Conference*, College Park, MD, June 2003

"Observing Unobserved Heterogeneity: Using Process Data to Enhance Choice Models", with Eric Johnson and Bruce Hardie, *Marketing Science Conference*, College Park, MD, June.2003

"Are Consumers Really Suboptimal Searchers? The Effect of Learning and Task Format on the Optimality of Stopping Decisions in Sequential Search Tasks", with Wes Hutchinson, *Association for Consumer Research,* Toronto, October 2003

"Observing Unobserved Heterogeneity: Using Process Data to Enhance Choice Models", with Eric Johnson and Bruce Hardie, *Association for Consumer Research*, TorOnto, October 2003.

"The Rationality of Consumer Decisions to Adopt and Utilize Product-Attribute Enhancements: Why Are We Lured by Product Features We Never Use", with J. Han and J. Zhao, *Second International Conference on Experimental Business Research.* Hong Kong , December 2003.

"Toward formal Behavioral Theories of Dynamic Decision Tasks", 2004 Invitational Choice Symposium, Estes Park, CO, June 2004

"The Enhancement Biases in Consumer Forecasts of Utility for Novel Product Attributes", with S. Zhao. *Association for Consumer Research*, San Antonio, October 2005

McKenney  Att.  H
Page   37 of 43

"Biases in Predicting Preferences for Wholes from Product Fragments". With S. Zhao, *Association for Consumer Research*, October 2005

"Heuristics and Biases in Consumer Reactions to Next-Generation Products", First Conference on Bridging Operations and Marketing, Lisbon, Portugal, December 2005.

"Myopia in the Hurricane Belt: Why Consumers and Managers Fail to Learn from Experience". *Marketing Science Conference, Pittsburgh, May*

## C. Invited Colloquia at Universities

Department of Geography, University of California, Santa Barbara, May 1980
Graduate School of Business, University of Washington, July 1981
Graduate School of Management, University of Rochester, 1982
Department of Geography, University of California, Santa Barbara, November 1983
Fuqua School of Business, Duke University, February 1984
College of Business Administration, University of Florida, March 1986
Johnson Graduate School of Management, Cornell University, February 1987
College of Business Administration, Pennsylvania State University, May 1989
Graduate School of Business, University of Arizona, January 1990
Graduate School of Business, University of California, Irvine, May 1990
Olin School of Business, Washington University, February 1991
Johnson Graduate School of Management, Cornell University, November 1991
University of Florida Winter Research Retreat, February 1992
Phelps Lecture Series, University of Michigan, April 1992
Department of Regional Science, University of Pennsylvania, November 1992
Faculty of Business, University of Alberta, November 1992
Sloan School of Business, MIT, February 1993
Simon Graduate School of Business Administration, University of Rochester, February 1994
Stanford University Summer Research Camp, August 1994
Duke University Research Camp, September 1995
Graduate School of Industrial Administration, Carnegie-Mellon University, 1996
Australian Graduate School of Management, University of New South Wales, 1996
Faculty of Economics, University of Sydney, 1996, 1998
Yale Marketing Camp, December 1998
Graduate School of Business, Stanford University, May 1999
Haas School of Business, University of California, Berkeley, May 1999
College of Business, University of Miami, April 1999
Graduate School of Business, Columbia University, 2002
Singapore Management University, 2002, 2003
Tsukuba University, Japan, December 2006

McKenney Att. H
Page 38 of 43

Penn State University, February 2007

## IV.   PROFESSIONAL ACTIVITIES

### A..  Editorial Activities

1.   Editorial Positions

Co-Editor, *Marketing Letters*, July 1994 – August 2000
Associate Editor, *Journal of Consumer Research*,  October 1994 - July 1996
Area Editor, *Marketing Science*, November 1988 - March 1995
Advisory Board, *Monographs in Consumer Research*, 1997-

2.   Editorial Review Boards

*Journal of Consumer Research*, 1982 - present

JCR Outstanding Reviewer Award, 1988, 2003

*Journal of Consumer Psychology*, 1993 - present
*Journal of Retailing*, 1985 - 2004
    *Advisory Editor, Special Issue on Applications of Scanner Data*, 1990-91
*Marketing Letters*, 1988 - 1994
*Marketing Science*, 1994 – present

3.   Ad-hoc Reviewing

*ACR Proceedings*, 1981 - present
*AMA Proceedings*, 1981 - present
*Environment and Planning*, 1989 - 1990
*Geographical Analysis*, 1981 - present
*Journal of Marketing*, 1983 - present
*Journal of Marketing Research*, 1983 - present
*Journal of Mathematical Psychology*, 1984 - 1989
*National Science Foundation Grant Proposals*, 1987 - present
*Management Science*, 1985 - present
*Transportation Research*, 1982 - 1985

### B.  Professional Conference Activities

1.  Conference Organization Experience

Association for Consumer Research Conference Board, 1987, 1992, 1993, 1994,
    1995

McKenney  Att.  H
Page   39 of 43

Advisory Committee, TIMS Marketing Science Conference, 1988
Organizer, special plenary session on Recent Developments in Behavioral
Modeling, TIMS Marketing Science Conference, 1988
Organizer, session on Behavioral Models of Choice Dynamics, TIMS/ORSA
   Conference, 1988
Organizer, special session on Modeling Ambiguity Effects, Association for
   Consumer Research, 1989.
Organizing Committee and Track Chair, Banf Invitational Symposium on Choice
   Theory, May 1991
Organizer, special session on Recent Developments in Modeling Judgment Under
   Uncertainty, Association for Consumer Research, 1991.
Organizing Committee and Track Chair, Duke Invitational Symposium on Choice
   Arrangements Chair, TIMS/ORSA National Spring Meetings, 1986
   Theory, July 1993.
Co-Chair, 1995 AMA Doctoral Consortium
Organizing Committee and Track Chair, Columbia Invitational Symposium on
   Choice Theory, 1996
Co-Chair, 1999 Association for Consumer Research Meetings
Co-Chair, 2007 Choice Theory Conference

2.  Other Participation

Discussant, 1980 Regional Science Meetings
Discussant, 1984 AMA Marketing Theory Conference
Discussant, 1984 Marketing Educators' Conference
Discussant, 1988 Marketing Science Conference
Discussant 1988 Association for Consumer Research Meetings
Discussant, 1988 Wharton Competitive Student Conference
Panelist, 1989 Columbia-Wharton Marketing Seminar
Panelist, 1989 Columbia Summer Marketing Workshop
Discussant, 1993 Association for Consumer Research Meetings
Plenary Session Discussant, 1994 Marketing Science Conference
Discussant, 1994 Association for Consumer Research Meetings
Discussant, 1995 Association for Consumer Research Meetings

C.  **Consulting Experience**

Quaker Oats Co., Chicago, IL, 1979
Eastman Kodak Corporation, 1981
Bourns, Inc., 1983
Homevest Real Estate, 1987
Rabbit Systems, Inc., 1987
Kraft Frozen Foods Division, Philadelphia, 1990-1993
Sky-Alland Research, Inc., Lowell, Md., 1993-1994

McKenney  Att.  H
Page  40 of 43

BMW of North America, Inc. 1994–
Wawa Corporation, 1997-1999
Coors Brewing, 2000-2001

## V.    UNIVERSITY SERVICE

### A.  Committee Membership

1.    Chairs of Doctoral Committees

Joao Assuncao, UCLA Marketing, 1990
John Cripps, UCLA Marketing, 1991
Yong Shi, Wharton Marketing, 1994
Darryl Banks, Wharton Marketing, 1998
Wilfred Amaldoss, Wharton Marketing, 1998
Narayan Janakiraman, Marketing, 2005
Shengui Zhao, 2006
Jeffrey Larson, 2007

2.   Doctoral Dissertation Committees

Scott Mackenzie, UCLA Marketing, 1982-1983
Mita Sujan, UCLA Marketing, 1982-1983
Joseph Orsini, UCLA Marketing, 1982-1985
Judith Zaichowsky, UCLA Marketing, 1982-1983
Iris Furstenberg, UCLA Psychology, 1982-1983
Cynthia Yelvington, UCLA Psychology, 1982-1983
Debra Marlino, UCLA Marketing, 1984-1985
Konraad Lecot, UCLA Computer Science, 1985-present
Linda Leon, UCLA Management Science, 1987-1989
Linda Price, Columbia Marketing, 1988
Chitrabhanu Bhattocharya, Wharton Marketing, 1992
Sharmila Chaterjee, Wharton Marketing, 1992
Sankar Sen, Wharton Marketing, 1992
Mohanbir Sawhney, Wharton Marketing, 1992
Robin Siegal, Wharton Decision Sciences, 1994
Kim Taylor, Wharton Decision Sciences, 1994
Rajeev Tyagi, Wharton Marketing, 1995
Marjorie Adams, Wharton Marketing 1995
Nancy Buchan, Wharton Marketing 1996
Sam Hui, Wharton Marketing 2006

McKenney  Att.  H
Page   41 of 43

3.  School/University Committees

UCLA/AGSM Research Paper Committee, 1985-1987, Chair 1986-1987
Elected Member of UCLA/AGSM Staffing Committee, 1983-1984, 1987-1988
UCLA Campus Privilege and Tenure Committee, 1987-1988
Wharton Research Committee, 1990-1991
Wharton MBA Executive Committee, 1992-93.
Wharton Management Quintenial Review Committee, 1993-1994
Wharton Doctoral Executive Committee, 1994-1996
Wharton Advisory Committee on Academic Personnel, 1997-1999

## VI.    AWARDS AND GRANTS

### A.  Research Awards

2001 John D.C. Little Award for best paper in an INFORMS
Journal, 2000

2001 Frank Bass Award for best article based on a doctoral dissertation

1994 Frank Bass Award for best article based on a doctoral dissertation

Finalist, 1994 O'Dell Award for best article in *Journal of Marketing Research*, judged after five years

### A.  GRANTS

Co-Principle Investigator (with P. Kleindorfer and H. Kunreuther), NIST Grant to
study individual mitigation decisions, 2002 (2 years), Funding: $100,000

Principle investigator, SMU/Wharton Research Grants, 2002-4 (3 years).
Funding: $33,000/year

Research Grants, Huntsman Center for Research on Technological Competition,
1992 – 1994 (Total Funding: $15,000).

Principle Investigator, "Experimental Analysis of Consumer Buying Dynamics,"
National Science Foundation, 1989 (1 Year), Finding: $54,000

Eight UCLA Faculty Research Grants, 1982-1989

McKenney  Att.  H
Page   42 of 43

Associate Investigator (Principal Investigator: Dr. Irwin Levin), "Behavioral Processes Underlying Transportation Model Choice," U.S.D.O.T, July to November, 1979

Associate Investigator (Principal Investigator: Dr. Gerard Rushton), "Elderly Migration," Institute on Aging, August 1979 to present

Associate Investigator (Principal Investigators: Dr. L. Turner and Dr. J. Louviere), "Housing Decision by the Elderly," Administration on Aging, October 1979

UCLA Chancellor's Career Development Grant, 1984

USDOT/UMTA Fellowship 1978

McKenney  Att. H
Page   43 of 43

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY FALONEY, | : | CIVIL ACTION |
| JAMES M. AND ANITRA WHITT, | : | |
| on behalf of themselves and | : | |
| all others similarly situated, | : | No.: 07 CV 1455 JP |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| WACHOVIA BANK, N.A. | : | |
| Defendant | : | JURY TRIAL DEMANDED |
| | : | |
| | : | |

**DECLARATION OF BARBARA BLAKE, FORMER INVESTIGATOR, STATE OF IOWA, OFFICE OF THE ATTORNEY GENERAL SUBMITTED BY PLAINTIFFS IN SUPPORT OF THEIR MOTION FOR CERTIFICATION OF THIS ACTION AS A CLASS ACTION**

Howard I. Langer
Judah I. Labovitz
John Grogan
Irv Ackelsberg
Edward Diver
LANGER & GROGAN, P.C.
1717 Arch Street
Suite 4130
Philadelphia, PA 19103
215-320-5660

Attorneys for Plaintiff and the Class

## DECLARATION OF BARBARA A. BLAKE

### Education, Training and Experience

1. I graduated from Iowa State University in May of 1991 with a bachelor of arts in political science.

2. From August of 1990 until October of 2006, I was an investigator in the Consumer Protection Division of the Office of the Iowa Attorney General. As part of my duties, I was assigned to handling complaints and investigating telemarketing frauds that resulted in both civil litigation and criminal prosecutions.

3. Over that 16 year period, I attended many conferences, training seminars and workshops conducted by the National Association of Attorneys General and the National Association of Consumer Protection Investigators (NACPI). In 1996, I was a featured speaker at NACPI's annual conference regarding the investigation of telemarketing fraud. In 1997, I was the recipient of NACPI's Cal Leitch award, which is presented to one investigator each year in recognition of their work. I have also attended financial fraud training conducted by the Internal Revenue Service and the National White Collar Crime Center.

4. I have worked with many other regulators and law enforcement agencies investigating telemarketing fraud, including the Federal Bureau of Investigation, the United States Attorney's Office, the United States Postal Inspection Service, the Internal Revenue Service, the United States Secret Service, Immigration and Customs Enforcement, the Federal Trade Commission and other state attorneys general offices. I have participated in the execution of search warrants and have

McKenney Att. I
Page 2 of 14

reviewed documents obtained in searches of fraudulent telemarketing entities.

5. During the years I was a telemarketing fraud investigator, I interviewed or interacted with all of the players involved or effected by telemarketing fraud, including consumer victims and their families, employees and owners of fraudulent telemarketing operations, attorneys specializing in the defense of individuals involved in fraudulent telemarketing, law enforcement personnel at the local, state and federal level, the state and federal judiciary and third party businesses including banks, couriers and credit card companies and their security/fraud departments.

6. The Iowa Attorney General's Office made combating telemarketing fraud a major priority, and developed a highly successful method of undercover investigation and prosecution of telemarketing fraud that was held out as a model for other state and federal law enforcement agencies.  I participated in the development and implementation of that program.  In 1995, our model was copied by the Federal Bureau of Investigation (FBI) and was implemented nationwide by the FBI, The U.S. Postal Service and the Secret Service.  The program was designed to identify and prosecute those engaged in telemarketing fraud—particularly frauds targeting the elderly.  Prior to the development of that program, most fraudulent telemarketers escaped detection and/or prosecution because their targeted victims were often vulnerable and/or elderly and were no match for sophisticated out-of-state telemarketers.  I worked with others in the Attorney General's Office and with federal law enforcement on a daily basis combating what had become a very serious

2

McKenney  Att.  I
Page  3 of 14

nationwide telemarketing problem. That effort culminated in "Operation Senior Sentinel," and on December 7, 1995, over 400 individuals were arrested nationwide for perpetrating telemarketing fraud – 10 were criminal cases brought by the Iowa Attorney General's Office. Eventually, more than 40 individuals were extradited to Iowa and criminally prosecuted for telemarketing crimes. All were convicted or pled guilty, and most were sent to prison.

7. In 1997, I participated in a joint federal/state civil and criminal effort known as Operation Senior Sentinel II. Many of the cases that were part of that effort were civil in nature. In both Senior Sentinel I and II, victims lost money to the perpetrator primarily by sending money via wire, sending checks using an overnight courier or by credit card.

8. In 2002 and 2003, the attorney general's office began receiving complaints from consumers who were victimized by bank account withdrawals via wire in relation to a supposed telemarketing call or sale. As a result of my work in investigation and handling of these complaints, I gained considerable experience relating to how the Automated Clearing House Network worked from both the originating depository financial institution side, the receiving depository Financial Institution side and from the consumer's end. I learned how to research consumer debits and the different players involved in each withdrawal. This became very important to our work because more and more of the perpetrators were located outside the United States, thus our jurisdiction was limited. Law enforcement resources began to focus

3

on entities located within the United States who were assisting or facilitating the telemarketers in successfully perpetrating fraud. These were entities such as banks, list brokers, and payment processors. As law enforcement and NACHA began taking action, there was a gradual shift from wire transfers (ACH debits) out of consumer accounts to remotely created checks (also known as demand drafts or bank drafts) used as the means to withdraw monies. In both contexts, I dealt with officials at the Federal Reserve, the Board of Governors, local banks, NACHA and the like in an effort to understand how these instruments worked so that we could better combat the problem.

9. In connection with my investigation of telemarketing fraud, I have testified as a fact witness for the Iowa Attorney General's Office and the United States Attorney's Offices in southern California and in Des Moines, Iowa. I have also testified as an expert witness in the criminal prosecution of a telemarketing fraud case in Iowa. In addition to the document review, I have had first hand experience in handling consumer complaints pertaining to Suntasia and Universal at the Iowa Attorney General's Office. These complaints alleged unauthorized withdrawals from consumer bank accounts. As a result of concerns about Universal's operations, the Iowa Attorney General entered into an Assurance of Voluntary Compliance with Brian MacGregor, Universal's principal, prohibiting him from doing business in Iowa.

10. I have been asked by Plaintiffs' attorneys in this matter to review documents

McKenney Att. I
Page 5 of 14

compiled by the Federal Trade Commission in their enforcement actions against

Suntasia Properties, Inc., et al., *Federal Trade Commission. v. FTN Promotions,*

*Inc.*, Civ. No. 8:07:1279 (M.D. Fla. 2007). (Hereinafter "Suntasia"); and Universal

Premium Services, Inc., et al., *Federal Trade Commission v. Universal Premium*

*Services,* et al, No. 2:06-cv-00849, (C.D. Ca. 2006). (Hereinafter "Universal"); as

well as telemarketing scripts used by GSI Grant Services, Advantage America and

Your Choice, Inc., all of which are government grant schemes.

### Opinions and Conclusions

11. Based on my training, experience and the review of the above-referenced materials,

I conclude that the sales tactics of Suntasia, Universal Premium Services, GSI Grant

Services, Advantage America and Your Choice and related entities bear common

hallmarks of fraudulent telemarketing operations.    I base that conclusion on the

following:

a.      Despite what may seem like a complex set of entities, schemes and
products, the schemes at issue are telemarketing schemes with a single overriding
fraudulent purpose:  to obtain the consumer's banking information by
misrepresentation and/or deception and then charge that bank account.

b.      I have reviewed the Declaration of Professor Robert Meyer submitted in
this action and I agree with his description of the common structure of the sales
tactics used by the entities under review.  His conclusions comport with my
experience as an investigator.

c.      The telemarketers under review employed a variety of corporate and
product names to deceive consumers and law enforcement.

d.      The telemarketers under review are indifferent to consumer complaints,
large return rates and they make affirmative efforts to make cancellation or
customer service difficult.

5

e.    The telemarketers under review take sophisticated steps to avoid law enforcement detection.

12. Because of the fraudulent nature of these telemarketing enterprises, it is highly unlikely that any significant number of consumers would have provided any of these telemarketers with their bank account information if they had known the pertinent and necessary facts about the nature of the transaction, or of the goods or services involved.

### A Common Scheme Not to Sell But to Obtain Bank Information

13. From my review of the scripts and other documents, it is clear to me that the telemarketing entities under review were engaged in common forms of fraudulent telemarketing.  Despite slight variations in products and scripts, all were engaged in a highly successful but deceptive method of obtaining confidential banking information from consumers.  The common purpose of all of the "sales presentations" was not to sell a product or service of worthwhile value to the consumer – the overriding purpose of the telemarketer was to overcome the consumer's legitimate concerns by deception and then obtain the consumer's bank account number.  That number was then used to withdraw funds from the consumer's account.

14. The products and services offered – discount travel clubs, buying clubs of various kinds and government grants among others –were basically irrelevant to the overriding purpose of the scheme, which was to obtain account information and tap that account.

6

### Review of Dr. Meyer's Declaration

15. I have reviewed the Declaration of Dr. Meyer. My training and experience is different than that of Dr. Meyer, but I am in agreement with his conclusions. For example, Dr. Meyer speaks of a "common architecture" in the scripts. That common architecture results from fraudulent telemarketers finding a deceptive pitch that works as discussed above. While some changes may be made to the script in terms of products or services offered, the basic deceptive pitch drives the fraudulent operations and remains the same, because the core deception is what works to elicit bank account information from consumers.

16. Dr. Meyer remarks in his Declaration about the very high success rate in the "upsells" in certain of the scams. I agree with the reasons Dr. Meyer gives for that success, and would add that the success rate derives from the fact that it is much easier to obtain consumer consent if the telemarketer already has the consumers' bank account information. With that information, perpetrators of fraud will undoubtedly have a high rate of "sales."

17. Dr. Meyer expresses opinions regarding the effectiveness in building consumer trust and implying a relationship with a consumer's bank, an affiliated merchant or by pretending to have pre-existing knowledge of the consumer. Consumers are repeatedly informed by regulators and the media not to give out confidential banking information and many heed those warnings. For that reason, building consumer trust and/or implying a pre-existing relationship with the consumer is

7

critical to the success of the fraudulent scheme. Having no intention to build any consumer trust or goodwill with its own "customers," the fraudulent telemarketers are left with trying to imply an affiliation with an entity who has built that trust—the consumer's bank, an affiliated merchant, or in the case of the government grants schemes by falsely representing that the consumer had been pre-selected as eligible for a government grant.

18. My own experience has been that these types of schemes usually inflict further harm on consumers in the form of over-draft charges because the withdrawals by the payment processors cause overdrafts of accounts. A large number of victims of these schemes are low income consumers living paycheck to paycheck or on social security such that a debit resulting from the telemarketing scams is sufficient to deplete the account leaving insufficient funds to cover rent and utilities. These overdraft fees will often cause additional checks to bounce and yet more overdraft fees from banks and merchants. This indifference to the harm being caused to consumers by the telemarketer is further evidence that the telemarketers have no intention of building consumer trust or goodwill with its own "customers."

### Constantly Changing Names

19. Another hallmark of fraudulent telemarketers which is exhibited by these entities is the practice of frequently changing the names of their product or services and the names of their business entities. The purpose of doing that is to confuse and escape from disgruntled consumers demanding refunds, to avoid prosecution by law

8

McKenney Att. I
Page 9 of 14

enforcement, and to preserve their ill-gotten gains. The complexity of entities
engaged in fraudulent telemarketing is simply part of the scam to avoid detection

20. However, for example, in the Suntasia and Universal schemes what may at first
appear to be a large number of products and entities involved in this matter, is in
reality only a limited number of entities controlled by a limited number of
individuals, with the same or similar products or services being offered despite the
use of different names. For example, as is made clear in the Receiver's Report,
although Suntasia offered its products under a variety of names, its basic scheme
centered on only two different basic products and two upsells related to each basic
product. Similarly, the Temporary Receiver appointed in the Universal case made
similar findings regarding those entities. The government grant entities are
notorious for the variety of names they employ most managing to use the word
"government" in their name to further deceive consumers. The government grant
schemes themselves, whatever their names, are substantially identical.

### Indifference to Consumer Complaints and Return Rates

21. Indifference to customer complaints or customer satisfaction is another hallmark of
a fraudulent telemarketing business that does not intend to be around in the future or
that has no need for satisfied customers.

22. Return rates from these entities approached 50% or more. These rates of return for
remotely created checks can only be characterized as astounding. Legitimate
organizations simply do not have return rates that high or that level of customer

9

dissatisfaction. The volume and boxes of complaints referenced in the report of the temporary receiver in the Universal case also suggests a very high level of consumer dissatisfaction and unwillingness on the part of the business to strive for satisfied consumers or to foster any business relationship with consumers. In Suntasia, the FTC made similar discoveries. This is further indication of fraud.

23. Telemarketers engaged in fraud know that their victims will want to cancel transactions and demand refunds. As a result, they set up obstacles to cancellation that are not found in legitimate businesses.

24. For example, in the Suntasia scheme, information regarding cancellation is rarely provided in the sales or verification initial call. Cancellation information is in a packet easily mistaken for junk mail, which in some cases is not received at all and in many cases thrown away. The time allowed for cancellation is misleading or misrepresented because the consumer is led to believe the time runs from the date of receipt of the "free trial" and in reality the time for cancellation begins to run from the date of the call, making the actual time to cancel very short. The packet of material may not even be read until after the date of cancellation. Many consumers may be unable to read or understand the requirements or conditions to receive vouchers or rebates. This confusion is deliberately created. In both the Suntasia and Universal schemes in the upsales, cancellation requires calling a different phone numbers for each of three programs, even though those programs were sold by one entity during one sales call. Consumers would not expect to have to call three

10

different numbers to cancel and there appears to be no legitimate purpose for the requirement other than to discourage cancellation.

25. In my experience, consumers who continue to allow fraudulent operators to make automatic withdrawals – monthly or otherwise -- from their bank accounts cannot be assumed to be satisfied customers. In fact, in my experience, no inference of satisfaction should be drawn from customers in this situation who are repeatedly charged, may not know they are being charged or may have simply given up in attempts to obtain refunds or stop the withdrawals.

26. In one case I investigated at the AG's office involving membership sales that were upsold, we sent surveys to consumers the company touted as individuals who must be satisfied because at least 12-18 months of withdrawals were made on their bank account. As a result of these ongoing withdrawals, the company argued that these consumers were "satisfied' consumers. The surveys revealed answers from consumers such as "what company are you talking about?" or "I am not familiar with that company, you must have the wrong person" and "who is charging my account?" Overwhelmingly, the survey revealed that just because consumers had been debited for many months in a row, it did not mean they were satisfied customers.

### Avoiding Law Enforcement

27. Critical to the success of a fraudulent telemarketing operation is the need to avoid detection by law enforcement for as long as possible, or at the very least, to stay off

11

the priority list of busy law enforcement agencies. The goal is to take in as much money as possible before being forced to shut down by authorities or by an avalanche of consumer complaints and law enforcement inquiries. As a result, fraudulent telemarketers frequently change the names of their entities, products or services. So-called, compliance departments operating within fraudulent telemarketing entities provide the appearance of legitimacy, but are far more focused on keeping regulators at bay than on ensuring actual compliance with state or federal consumer protection statutes.

28. Tactics for dealing with regulators include resolution of complaints (unresolved complaints can move a file of a fraudulent entity to the top of the pile at an AG's office), the appearance of cooperation with civil investigative demands or subpoenas and/or the practice of discontinuing doing business in a state where the fraudulent nature of the business has been exposed and the risk of regulatory action is high. From my review of documents filed in the FTC's actions and from my experience in dealing with both Universal and Suntasia, it is apparent that both entities developed practices designed to avoid detection of their schemes. In addition, some fraudulent entities when repeatedly contacted about their business practices and/or consumer complaints will either formally or informally stop doing business in that particular state. On or about May of 2004, while at the Attorney General's Office, during my investigation of payment processors facilitating fraudulent telemarketers, one payment processor, Universal Payment Solutions,

12

McKenney Att. I
Page 13 of 14

d/b/a Netchex voluntarily agreed to stop processing any Iowa transactions. At this

time, Universal Payment Solutions d/b/a Netchex was owned and operated by the

same, or substantially the same individuals as Payment Processing Center, the entity

subject to the lawsuit in this matter. In addition, the Iowa Attorney General's Office

did not receive any Iowa complaints related to PPC, which leads me to believe that

their may have been an effort underway by PPC principals to minimize the exposure

of their business practices in Iowa.

Dated this 27ᵗʰ day of December. 2007

_Barbara A Blake_
BARBARA A. BLAKE

13