UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,

v.                             CASE No. 8:07-CV-1279-T-30TGW

FTN PROMOTIONS, INC., etc.,
et. al.,

        Defendants.

_____

REPORT AND RECOMMENDATION

        A report and recommendation has been entered recently finding that the corporate defendants had been involved in a massive deceptive telemarketing scheme, and recommending that a preliminary injunction be entered against them while permitting a limited telemarketing operation under the close supervision of the receiver.   This report and recommendation addresses the opposition of three individual defendants – Donald L. Booth, Jeffrey P. Wolf and Alfred H. Wolf – to being covered by the preliminary injunction and asset freeze.   The Federal Trade Commission ("FTC") has made a sufficient showing that the three individuals were involved in, and

profited from, the telemarketing scheme, so that they should be included in the preliminary injunction and the asset freeze.  Accordingly, I recommend that their objections be rejected.

## I.

The details of this case have been set out at some length in the previous report and recommendation and therefore will not be iterated here. It is enough to say that the FTC alleged in this suit that numerous defendants, including Donald L. Booth, Jeffrey P. Wolf, and Alfred H. Wolf, violated Section 5(a) of the FTC Act and numerous provisions of the Telemarketing Sales Rule ("TSR") (Doc. 1).  The plaintiff requested, among other things, the entry of a temporary restraining order and a preliminary injunction to prevent further consumer injury (id., p. 30).

Booth and both Wolfs each filed (through the same counsel) an opposition to the FTC's motion for preliminary injunction (Docs. 76, 77, 79). Moreover, they presented oral argument that a preliminary injunction should not be entered against them.

At a subsequent hearing, counsel for the three defendants conceded, at least for the purpose of the motion for preliminary injunction,

that the FTC had made a sufficient showing against the corporate defendants

to warrant preliminary injunctive relief (see Doc. 168, p. 19 n. 9).  Thus, the

issue raised by the three defendants' opposition memoranda is reduced to

whether the FTC has sufficiently demonstrated their involvement in the

telemarketing scheme to warrant preliminary relief against each of the three

individuals.

## II.

In order to establish individual liability, the FTC must first prove

a corporate violation of §5 of the FTC Act.  Federal Trade Commission v.

World Media Brokers, 415 F.3d 758, 763 (7th Cir. 2005).  As indicated, that

is no longer an issue at this stage with respect to Booth, Jeffrey Wolf and

Alfred Wolf.

Once corporate liability is established, the FTC must demonstrate

in general for individual liability that (1) an individual participated directly in

the deceptive acts or practices or had authority to control them, and (2) that

the individual had some knowledge of the corporation's improper practices.

Federal Trade Commission v. GEM Merchandising Corp., 87 F.3d 466, 470

(11th Cir. 1996).  An individual's authority over a company can include active

participation in a company's affairs and setting corporate policy, including assuming duties of a corporate officer.  Federal Trade Commission v. World Media Brokers, supra, 415 F.3d at 764; Federal Trade Commission v. Amy Travel Service, Inc., 875 F.2d 564, 573 (7th Cir. 1989), cert. denied, 493 U.S. 954 (1989).  Moreover, an individual's "participation in business affairs is probative of knowledge."   Federal Trade Commission v. Amy Travel Services, Inc., supra, 875 F.2d at 574.  The knowledge component does not require proof of a subjective intent to defraud; it may be satisfied by a showing of "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'"  Id.

It is appropriate to add that these principles have been developed by federal courts in judicial decisions.  The defendants' arguments, however, seem to treat them as elements of a statutory cause of action that should be narrowly construed.  They are, to the contrary, judicially developed principles that should be flexibly applied as circumstances warrant.

III.

The three defendants in their memoranda object to being included in a preliminary injunction.  To the extent that the objection relates to being a named individual who is enjoined from certain conduct, that objection at this point is not meaningful, if, in fact, it is not moot.  Any further telemarketing operations by the defendants will be carried out under the oversight of the receiver with monitoring by the FTC.  Consequently, there is no reason to think that there will be new deceptive practices that would expose the defendants to being held in contempt.  In addition, since each of the three defendants is asserting that he was not involved in telemarketing, it is hard to see why they would object to being enjoined from such activities.

Unlike the preliminary injunction, it is understandable that the defendants would object to a freeze of their assets.  That objection certainly presents a meaningful issue (although no objection has been made by any of the three concerning the amount of living expenses that have been released to them).  Contrary to the objections, a continued asset freeze with respect to these three individuals is justified to augment funds needed to provide restitution to victims of the defendants' deceptive telemarketing scheme, or to permit disgorgement of ill-gotten profits.  Of course, the reasons why a

freeze of the assets of these three individuals is warranted also support a preliminary injunction against them.

A.  With respect to Donald Booth, the FTC has demonstrated a likelihood of success in establishing that Booth had the authority to control Strategia's acts and practices, that he participated in such practices, and that he had knowledge about the various corporations' misleading sales tactics (Doc. 7, p. 49; Doc. 98, pp. 9-12).[1]  He is the in-house general counsel for Strategia and Guardian.[2] His division is "responsible for approving product development and scripting" (Plt. Vol. III, Ex. 6, Att. B, p. 9).  It also (id.):

> is responsible for keeping Suntasia in compliance with local, state and federal regulations.  This department closely monitors human resource issues, prepares and reviews contracts and oversees "do not call" registrations, bonding issues, confidentiality and data security.

Furthermore, Strategia designated Booth as having "management responsibilities" and being a key person within the company (see Plt. Vol. I, Ex. 2, Att. J, p. 9 (telemarketing registration application for state of Colorado)

---

[1]For ease of reference, the telemarketing companies will be referred to as "Strategia," even though an activity may have been conducted under a different name.

[2]Booth is also the secretary for Bay Pines Travel, Inc. (Doc. 76-2, p. 1).

(management responsibilities); Plt. Vol. II, Ex. 2, Att. KK (listed under "key personnel" on webpage)).

Arguably, Booth's position as general counsel, by itself, is sufficient to warrant an asset freeze in order to permit restitution to victims or disgorgement of ill-gotten profits. Regardless, the evidence reflects that, in addition to occupying a high-level position with the telemarketing companies, he actively participated in the telemarketing operations.

The FTC has shown that Booth was deeply involved in the telemarketing scripts. Booth asserts that his review of the scripts was an "incidental duty" and that he "would occasionally review the telemarketing scripts with the script writers" (Doc. 76-2, p. 3). He further states that he "only consulted with the script writers in order to inform them of the required legal structure of the scripts" (id. n. 3). He contends that it was the script writers that drafted the scripts and that he "could not instruct the script writers as to the drafting of same" and "did not have final authority with regard to the text of the scripts" (id., p. 3). The evidence shows that Booth had much greater involvement with the scripts than he admits.

For example, in an e-mail dated January 5, 2007, Booth wrote to Bryon Wolf and Elvis Arrowood regarding some scripts that "[in] my opinion ... meet standards in legal requirements," and provides attachments of the various scripts in the e-mail (Plt. Vol. VII, Ex. 63, Att. NN, pp. 117-31). Further, in an e-mail dated February 28, 2007, Booth stated to Bryon Wolf and Roy A. Eliasson that the legal department needs to sign off on all of the scripts prior to them being used on the sales floor (id., Att. NN, pp. 179-80). Moreover, Bryon Wolf sent an e-mail on March 8, 2007, to Arrowood, with a copy to Booth, in which he requests that Arrowood review Variety's script with Booth to  get a "Legal Review" stamp of approval due to some issues that Variety's service network had with the scripts[3] (id., Att. NN, p. 179).

Booth's handling of the scripts is further supported by a declaration of a former telemarketer, Frank Rosario, who worked for Strategia from February 2005 until March 2006.  According to Rosario, "if a director, manager, or TSR made changes to a script or came up with a new script, those changes were supposed to be approved by Booth" (Plt. Vol. III, Ex. 7, p. 2).

---

[3]The issues pertained to the script not providing a date or approximate date that the consumer would be charged and not providing the consumer with the phone number for cancellation (Plt. Vol. VII, Ex. 63, Att. NN, pp. 181-82).

As explained in the prior report and recommendation, the scripts contained misleading statements and omissions in violation of the FTC Act and the TSR.  See Federal Trade Commission v. Amy Travel Service, Inc., supra, 875 F.2d at 575 ("the blessing of an attorney [does] not make the telemarketing scripts truthful").

Booth's active involvement with the scripts is further demonstrated through his dealings with various agencies regarding the scripts. For example, in an e-mail dated February 27, 2007, Geoff Darling, Chief Investigator of the Financial Fraud Section from Oregon's Department of Justice, wrote that he spoke with Booth regarding a telemarketing script (Plt. Vol. II, Ex. 2, Att. ZZZ).  According to the e-mail, after Darling started picking apart the script, Booth "abruptly interrupted [him] ... and said something like, '[i]t looks like it's going to be a waste of time to try and deal with you.  We won't register there" (id.).  In October 2006, Booth agreed to stop telemarketing activities in Ohio after an Assistant Attorney General alerted him to serious violations in Strategia's scripts that resulted in a denial of their telemarketing application (id., Att. XXX).  Another letter was sent to

Booth from Ohio's Attorney General in March 2007, which outlined numerous problems with the scripts submitted with their application for telephone solicitor registration  (id., Att. YYY).

Since the FTC does not need to demonstrate an intent to defraud, Federal Trade Commission v. Amy Travel Service, Inc., supra, 875 F.2d at 574, Booth is properly held responsible for the misleading scripts whether he had such an intent, or was simply guilty of bad lawyering.  Moreover, it is wholly unpersuasive for Booth, the general counsel, to assert that he was an innocent pawn who was merely doing what he was told and had no authority to bring the scripts into compliance with the law.

In addition, Booth took an active role in the telemarketing scheme by diverting the attention of law enforcement and consumer protection agencies away from Strategia's deceptive practices.  In this respect, Booth gave immediate refunds to those consumers who complained to law enforcement, while those who attempted to get refunds from Strategia's customer service department were often unsuccessful (Plt. Vol. I, Ex. 2, p. 34; Plt. Vol. II, Ex. 2, Att. CCC (spreadsheet of consumer complaints reflecting

that almost 1000 consumers complained of their accounts being debited after cancelling or attempting to cancel enrollment)).   Contrary to Booth's argument, the furnishing of refunds was not some act of beneficence; rather, it is more reasonably interpreted as an effort to keep law enforcement and consumer protection agencies at bay.

Further, Booth sent letters to the Better Business Bureau in which he misrepresented the nature of Strategia's business in order to decrease the number of complaints that showed up under Strategia's (then Suntasia's) name (Plt. Vol. III, Ex. 6, Atts. F-H).   In one such letter, Booth requested that complaints be attached to the owner's of the individual products rather than Suntasia, because "Suntasia, the marketer, has very little to do with billing/credit issues or refund disputes/delivery issues.   Those matters are turned over to the product providers and they are ... responded to by those entities" (id., Att. G).   Booth knew full well that Strategia (Suntasia) and its product-providers were inter-related companies (Plt. Vol. III, Ex. 6, p. 5; Plt. Vol. III, Ex. 7, pp. 15, 17; Plt. Vol. VII,  Ex. 63, Atts. CC, NN).

These examples do not exhaust Booth's involvement in the telemarketing scheme.  They are sufficient, however, to establish his direct participation in that scheme.

With respect to the element of knowledge, the FTC has presented ample evidence that Booth was aware of Strategia's deceptive practices.  In his position as in-house counsel for Strategia and Guardian, Booth had intimate knowledge of the management structure of the Strategia entities, the contents of the telemarketing scripts, and the nature of the numerous complaints lodged against the defendant companies.  Thus, his knowledge of the deceptive practices is obvious.  There is no need to belabor the point.

For these reasons, the FTC has demonstrated that it is likely to succeed on its claims against Booth.  Consequently, he should continue to be covered by the asset freeze, as well as by the preliminary injunction.

B.  As to Jeffrey Wolf, the FTC has demonstrated a likelihood of success on its claim that Wolf should be held responsible because he was the sole officer of a company that was in a common enterprise with Strategia to deceive consumers.  Jeffrey Wolf is the incorporator and sole officer of JPW

Consultants, LLC ("JPW"), as well as the brother of Bryon Wolf. Jeffrey Wolf operated the company from his residence (see Plt. Vol. I, Ex. 2, Att. E, p. 3; Att. R). JPW performed under a service agreement with Strategia pursuant to which Strategia marketed JPW's products (Doc. 54-2, p. 11).

JPW's products have been, or are, Distinct Advantage, Freedom Gold, Variety, Credit Life and Freedom Ring (id., pp. 11-12; Doc. 98, p. 13 n. 37). These are the primary products sold in the telemarketing operation. The sale of these products brought in many millions of dollars, since they would constitute a large part of the estimated gross sales of about $450,000,000 during the period from May 1999 to July 23, 2007 (see Doc. 54-2, pp. 4-5). The amount of the sales is made even more remarkable by the receiver's assessment that the products are of questionable value (id., pp. 14-17). The products' doubtful value is reflected in the fact that from June 1, 2006, through July 23, 2007, the returns through the banking system were at the rate of about 44.3% of gross sales (id., p. 4).

The amount of money resulting from the telemarketing sales and the amount of money lost by cancelled sales plainly would have gotten Jeffrey

Wolf's attention.  Moreover, since, contrary to the TRO, he failed to produce his company's records to the receiver by the time the memoranda on this issue were submitted, it is appropriate to infer that he was well aware of the tremendous amount of sales, and returns, of his products.  Consequently, Jeffrey Wolf's suggestion that he did not know what was going on with respect to the sales of his products is totally unpersuasive.  In other words, in light of the tremendous volume of sales and returns, as well as the questionable quality of the products, it is reasonable to infer that Jeffrey Wolf knew, or at least should have known, of the deceptive telemarketing practices that were being employed.

Furthermore, it is not as if Jeffrey Wolf was supplying his products to some arms-length purchaser; he was providing the products to his brother's company.  It is also reasonable to infer, absent some credible showing to the contrary, that the two brothers discussed the telemarketing tactics.

Notably, at the hearing on August 24, 2007, counsel for Jeffrey Wolf and JPW essentially abandoned at this stage any contention that JPW

was not liable, by stating that they were no longer asking that the TRO be dissolved as to JPW, but were opposing a preliminary injunction and asset freeze against Jeffrey Wolf.  It is hard to understand how, in what appears to be a one-man operation, the company could be liable but the one man not be responsible.

The FTC makes a further showing to strengthen its contention that Jeffrey Wolf should be subject to a preliminary injunction and an asset freeze.  Thus, the FTC has provided evidence that Strategia sends out all fulfillment packages for JPW's products, and all customer service numbers regarding JPW's products ring in the same room at Strategia (Doc. 7, p. 39; Plt. Vol. I, Ex. 2, pp. 11-14; Plt. Vol. III, Ex. 6, p. 5; Plt. Vol. III,  Ex. 7, pp. 15, 17).  Additionally, the addresses provided to consumers for JPW's products are all mail drops located in proximity to Strategia's Largo location (Doc. 7, p. 39).  Consequently, it was Strategia's customer service representatives who handled questions regarding JPW's products.

Moreover, in some instances, Jeffrey Wolf permitted Strategia to sign the mail drop rental agreements on behalf of JPW and to pick up

JPW's mail (Plt. Vol. I, Ex. 2, Att. CC, pp. 1-2; Att. DD).  For example, a mail service application for the Freedom Gold product has Strategia employees empowered to receive mail on behalf of JPW (Plt. Vol. I, Ex. 2, Att. CC, p. 2). Jeffrey Wolf also allowed Booth to open mail drops for the Variety and Credit Life products, and the applications were opened in the name of Guardian with Bryon Wolf and Eliasson listed as corporate officers (id., pp. 5, 10).  No mention of JPW was made on these applications.

In addition, Suntasia monitors JPW's do-not call list (Doc. 98, p. 13, n. 36; Plt. Vol. VII, Ex. 63, Att. NN, pp. 79-80).  The FTC has also pointed to evidence that Suntasia manages JPW's billing (Doc. 98, p. 13, n. 36; Plt. Vol. VII, Ex. 63, Att. NN, pp. 81-83).

The evidence at this point clearly supports a finding that JPW is part of a common enterprise with the other telemarketing defendants.  Since Jeffrey Wolf is the owner of an integral part of the common enterprise, he is properly held responsible for the consequences of that enterprise's deceptive practices.

Furthermore, the FTC persuasively argues that Jeffrey Wolf acted as a straw-man for his brother Bryon to make it appear that the products being sold were from arms-length vendors (Doc. 98, p. 12).   Such an appearance would likely mislead law enforcement or consumer protection agencies that were examining the validity of the defendants' operations.   Jeffrey Wolf's participation in this deception further supports holding him responsible for the telemarketing scheme.

From all that appears, Jeffrey Wolf profited substantially, if not enormously, from the money that was raised by the deceptive telemarketing practices.   An asset freeze, as well as a preliminary injunction, against him is warranted for the foregoing reasons in order to preserve funds that are subject to restitution or disgorgement.[4]

C.   As to Alfred Wolf, the FTC is not seeking a total freeze of his assets.   Thus, in addition to providing a monthly allowance of $10,800, the FTC has released from the freeze all of Alfred Wolf's investment property

---

[4]It is appropriate to note that, even if Jeffrey Wolf had not been involved in wrongdoing, his receipt of profits from the telemarketing scheme would be enough to support a freeze of his assets.   Commodity Futures Trading Commission v. Kimberlynn Creek Ranch, Inc., 276 F.3d 187 (4th Cir. 2002).

accounts (Doc. 98, p. 17 n. 46).  However, the remainder of his assets should continue to be subject to the freeze since the FTC has established a likelihood of success on its claim that Alfred Wolf should be held individually liable for his participation in the telemarketing scheme.

Alfred Wolf is the father of Bryon and Jeffrey Wolf.  He made two loans to Strategia (then Suntasia) in 2003 in the amount of $1,120,000 in exchange for a 15% ownership in Suntasia, FTN Promotions and Guardian (Doc. 79-2, p. 1).[5]  In consideration of the loans, Alfred Wolf became a member of the Board of Directors of Suntasia and received a salary of $3,000 per week from FTN Promotions (id., p. 2).[6]  Notably, Alfred Wolf received employee benefits, including health insurance.

In 2005, Alfred Wolf was paid $800,000 from FTN's shareholder distributions (id.).  In 2007, in connection with a stock sale of a 26% interest in Strategia and related entities to a third party, Wolf received $3,000,000 (id.,

_____

[5]Wolf's first loan to the companies was for $1,000,000, from which he received a 10% ownership in the companies, and the second loan was for $120,000, from which he received a 5% ownership (Doc. 79-2, p. 1).

[6]The salary was in lieu of interest on the loans (Doc. 79-2, p. 2).  In 2006, Alfred Wolf received a salary of $156,000 (id.).

p. 3).  Following the stock sale, Wolf was appointed a manager of Strategia.

He currently retains an 11% ownership interest in Strategia.  In addition,

Alfred Wolf is vice president of defendant Bay Pines Travel (id., p. 5).[7]

       The FTC asserts that Alfred Wolf should be held personally

liable for Strategia's fraudulent actions because he sat on Strategia's Board of

Directors, was a manager of Strategia, was a vice president of Bay Pines

Travel, and drew a yearly six-figure salary (Doc. 98, pp. 13-14).  The FTC

also relies upon the fact that Alfred Wolf "signed under penalty of perjury a

series of state telemarketing applications that included Suntasia's deceptive

telemarketing scripts" (id., p. 14).  In addition, FTC points to the handsome

profits that Alfred Wolf has made from Strategia's telemarketing operations

(id, p. 13).

       Alfred Wolf argues that he had no operational responsibilities or

active involvement in Strategia (Doc. 79, p. 4).  As just shown, this assertion

is not supported by the evidence.  Furthermore, Alfred Wolf's seat on

---

[7]Wolf asserts that the FTC has admitted that Bay Pines Travel was not involved in the scheme (Doc. 79, p. 2 n. 1).  FTC strenuously objects to this assertion, stating that they merely acquiesced to the receiver's suggestion that Bay Pines be permitted to continue operations that are unconnected to the scheme (Doc. 98, p. 14 n. 39).

Strategia's board of directors demonstrates that he had a role in governing the operation. And since he is the father of Bryon Wolf, it is reasonable to infer that he had increased influence in the corporations' affairs.

Moreover, the FTC has demonstrated that Alfred Wolf knew, or should have known, of Strategia's deceptive practices. As indicated, the knowledge element is satisfied by evidence of "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" Federal Trade Commission v. Amy Travel Service, Inc., supra.

To begin with, it is reasonable to infer that someone who has invested $1,120,000 in the telemarketing companies would keep a close eye on the companies' operations in order to protect his money, particularly where, as here, he was in a good position to do so. Alfred Wolf obviously had well-developed financial acumen and awareness in order to be in a position to invest a sum of money that large. It seems implausible that, having

invested that amount of money, Alfred Wolf stopped paying attention to what the companies were doing.

In all events, there is evidence indicating that Alfred Wolf had actual knowledge of the deceptive practices reflected in the telemarketing scripts. The state telemarketing applications that Alfred Wolf signed had scripts attached to them, and Wolf's signature attested to the truth and accuracy of both the applications and the scripts (see Doc. 98, p. 14 n. 40). Therefore, Wolf had a duty to ascertain that those scripts were truthful, and that they were actually being used by the phone solicitors. In fact, the application to Oregon was later withdrawn after a state investigator raised questions about the contents of the script (id., p. 11 n. 30; Plt. Vol. I, Ex. 2, p. 40; Plt. Vol. II, Ex. 2, Att. ZZZ). Consequently, Alfred Wolf cannot now reasonably assert a lack of knowledge of the sales tactics being used in the scripts.

In sum, the FTC has provided sufficient evidence to establish a likelihood of success on its claim that Alfred Wolf had the requisite authority and knowledge to be held individually liable for the defendants' unlawful

activities.  Moreover, it has demonstrated that Alfred Wolf has profited greatly

from those activities.  Thus, Alfred Wolf has been receiving an annual salary

from FTN Promotions of $156,000 since 2003, for an amount most likely

exceeding $500,000.  In addition, Wolf received a distribution of $800,000 on

one occasion, plus $3,000,000 from the proceeds of a sale of Strategia stock.

Under these circumstances, except as previously indicated, Alfred Wolf's

assets should continue to be subject to an asset freeze in order to facilitate

restitution to victims and disgorgement of ill-gotten profits.[8]   He also should

be subject to the preliminary injunction.

IV.

For the foregoing reasons, I recommend that the opposition to the

preliminary injunction and asset freeze asserted by Donald L. Booth,

---

[8]As noted with respect to Jeffrey Wolf, even if Alfred Wolf's direct participation
were disregarded, his receipt of profits from the telemarketing scheme would support the
partial freeze of his assets.  Commodity Futures Trading Commission v. Kimberlynn Creek
Ranch, Inc., supra.

Jeffrey P. Wolf and Alfred H. Wolf (Docs. 76, 77, 79) be rejected.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JANUARY 30, 2008


## NOTICE TO PARTIES


Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).