UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.                                    Case No: 8:07-cv-1279-T-30TGW

FTN PROMOTIONS, INC., GUARDIAN
MARKETING SERVICES, CORP.,
STRATEGIA MARKETING, LLC, CO-
COMPLIANCE, LLC, JPW
CONSULTANTS, INC., TRAVEL
AGENTS DIRECT, LLC, BAY PINES
TRAVEL, INC., SUNTASIA
PROPERTIES, INC., BRYON W. WOLF,
ROY A. ELIASSON, ALFRED H.
WOLF, DONALD L. BOOTH, JEFFREY
P. WOLF and JOHN LOUIS SMITH, II ,

    Defendants.

## ORDER OF CONTEMPT

THIS CAUSE came before the Court for an evidentiary hearing on September 16, 2013, and September 20, 2013, on the Motion for Order to Show Cause (Dkt. #321) filed by the Federal Trade Commission. The Court heard the testimony of the witnesses, reviewed the documentary evidence, and considered the briefs and proposed findings of fact submitted by the parties. The Court concludes that the Motion for Contempt should be granted.

On December 30, 2008, this Court entered a Stipulated Order for Permanent Injunction and Final Judgment Against Defendants FTN Promotions, Inc., Guardian

Marketing Services, Corp., Strategia Marketing, LLC, Co-Compliance, LLC, Bay Pines Travel, Inc., Suntasia Properties, Inc., Bryon W. Wolf, and Roy A. Eliasson (Dkt. #284). That Order permanently restrained and enjoined the Defendants from:

A. Misrepresenting, either orally or in writing, expressly or by implication, any Material fact, including but not limited to:

1. An affiliation with the Consumer's bank or other third party with whom the Consumer has conducted business;

2. The purpose for which a Consumer's Billing Information will be used;

3. Whether the Consumer's Billing Information is already possessed;

4. That a product or service is offered on a "free," "free trial," or "no obligation" basis, or words of similar import, denoting or implying the absence of any obligation on the part of the recipient of the offer to affirmatively act in order to avoid charges if, in fact, a charge will be assessed pursuant to the offer unless the Consumer takes affirmative action to cancel;

5. The length of any trial or review period that Consumers receive before being charged or billed;

6. That the trial or review period will not begin to run until Consumers receive information material in the mail;

7. The amount that a Consumer will be charged or billed;

8. That a Consumer will not be charged or billed;

9. Through, among other things, mailings, e-mails, billings, credit card charges, or checking account debits, that a Consumer purchased or agreed to purchase a product or service, or that a transaction has been authorized by a Consumer;

10. That a Consumer will not be charged or billed without the Consumer's authorization; and

11. The Material terms and conditions of any policies and practices regarding cancellations and refunds, including, but not limited to, that: (i) Consumers will be able to easily cancel prior to the assessment of any charges; (ii) Consumers' requests to cancel will be honored; (iii) Consumers are entitled to keep and to use any free gifts offered as an inducement for accepting a trial offer; even if they subsequently cancel; and (iv) Consumers will be able to obtain prompt refunds of any fees paid; and

B. Assisting Others who violate any provision of Paragraph A of this Section.

II.

REQUIRED DISCLOSURES

IT IS FURTHER ORDERED that in connection with the advertising, promoting, offering for sale, or sale of any product or service, Stipulating Defendants and their officers, agents, servants, employees, and all other Persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby permanently restrained and enjoined from failing to Clearly and Conspicuously disclose, before Consumers are asked to reveal Billing Information or consent to any purchase: all fees and costs; all Material conditions, limitations, or restrictions applicable to the purchase or receipt of the product or service that is the subject of the offer (including any promotion associated with "free" products or services, or products or services available on a trial basis); and all Material terms and conditions of any offer with a Negative Option Feature, including but not limited to:

A. The dollar amount of the first payment and when it will be charged, withdrawn, or become due; the dates or frequency (e.g., monthly, quarterly) of all subsequent charges or payment(s); and the dollar amount or range of costs of all subsequent charges or payments;

\* \* \* \*

Stipulated Permanent Injunction, Dkt. #284, pp. 8-10.

Following the entry of the Permanent Injunction on December 30, 2008, Defendants Wolf and Eliasson started a new business, Membership Services, LLC (MSLLC).

Defendant Wolf is CEO and president and Eliasson is vice-president of MSLLC. Wolf owns 61% and Eliasson 24% of Member Rewards, LLC, the owner of MSLLC. Wolf and Eliasson actively direct and control the acts and practices of MSLLC.

MSLLC is a continuity program with negative option features operating as an electronic shopping mall. A continuity plan with negative option features includes a plan in which a seller ships products unless the consumer notifies the seller not to ship the products, and automatic renewal plans in which a seller automatically charges a consumer unless the consumer cancels before the renewal. Permanent Injunction (Dkt. #284), pp. 5-6, ¶ 10. MSLLC requires one to be a member in order to buy merchandise. It is MSLLC's advertising and promotional efforts to lure members into its program that is the crux of this case.

MSLLC solicits members both on-line and through telephone marketing. The practices used in each approach violate the Permanent Injunction, but since the words and practices in each are so similar, it is sufficient to describe only the on-line methods.

MSLLC targets persons seeking pay day loans. Wolf explained that persons in the economic situation of looking for pay day loans were most likely to be in the "under banked" portion of the population that would be interested in his shopping catalog. MSLLC would buy "leads" from pay day loan third parties. In the internet world, these leads are furnished and accepted almost instantaneously. A consumer searching on-line for a pay day loan would be required to fill out certain limited information by a pay day loan company, including bank account information. The consumer would complete the

information, click "send," and while still at the computer, receive a response, not from the pay day loan company, but from MSLLC.

Consumers were told they had been "approved." The screen contained the bold headline: "Congratulations! You have been approved," near the phrases "$2,500" and "Dollar" in large print. These phrases appeared near images of gold coins, dollar bills, or a bag piled high with dollars. The screen would also contain headings like "account status: approved," under which the consumer's previously entered personal information would be displayed. All of this was accomplished because the consumer's initial entry was redirected from the original pay day loan company to MSLLC without the consumer's knowledge. The clear implication was that the consumer's application for a pay day loan had been approved.

While Defendants' website advised loan applicants that they had been "approved," it did not state that the applicants had failed to qualify for a cash advance or a pay day loan. In fact, Defendants did not provide cash advances or pay day loans. Instead, MSLLC offers "credit" useable solely at its electronic shopping mall. And Defendants did not disclose their program's material terms promptly, clearly, or conspicuously.

In addition to the headlines showing that the pay day loan applicant had been "approved," and the pictures of dollar bills and sacks of cash, some screens said the applicant was extended a 75% credit. Nowhere in the matching size print was it disclosed that the applicant would be joining a negative option feature membership service that required an initial fee and a monthly maintenance fee, or that there was a 25% down payment required. All of these terms appeared in a small gray window in which only three

5

lines of small print were visible at a time. An applicant was required to scroll down many times to see all of the terms and conditions. And the screen failed to disclose that the program did not, in fact, provide any pay day loans.

The experience of the FTC's undercover investigator, Ronald Lewis, provides a good example of how Defendants' business operated. He went on-line and clicked on a site offering to match him with a pay day loan. This was not the Defendants' website, but that of a third party. When he clicked on his request for a pay day loan, he got the Defendants' pop-up screen stating, "Congratulations! You're preapproved!" The investigator declined this offer by selecting "no" from a menu of options. In spite of clicking on "no," the investigator was still debited $49.95 from the bank account that he had identified on the original pay day loan application.

Defendants argued that all of the necessary terms and conditions of their program were contained in the smaller print at the bottom of the screen. Investigator Lewis said that he clicked on the Terms and Conditions portions in the smaller print at the bottom of the screen and had to scroll through eleven (11) different screens to get to the end of the Terms and Conditions. To find the Membership Agreement, one had to click on a hyperlink. Putting this information in much smaller print in a shaded box with less contrast, and on different screens, violates the "clear and conspicuous" requirement of the Permanent Injunction which requires:

> a.   in print communications, the message shall be in a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background against which it appears;
>
> . . .

6

>    c.    . . . In any communication disseminated by means of an interactive electronic medium such as software, Internet, or on-line services, a disclosure must be unavoidable and presented prior to the consumer incurring any financial obligation. . . . Any visual message shall be of size and shade, with a degree of contrast to the background against which it appears and shall appear on the screen for a duration and in a location sufficiently noticeable for an ordinary consumer to read and comprehend it; and
>
>    d.    regardless of the medium used to disseminate it, the message shall be in understandable language and syntax. Nothing contrary to, inconsistent with, or in mitigation of the message shall be used in any communication.

Permanent Injunction, Dkt. #284, pp. 6-7.

MSLLC, which had applicants' bank account information from their initial pay day loan application, charged applicants' bank accounts for the initial membership fee, almost always without the applicants' knowledge. If the applicant did not catch the charge, the account would continue to be charged on a monthly basis. And MSLLC resisted requests for refunds. A former MSLLC employee, Stephanie Puckett, testified that it was the company's common practice to claim that consumers had agreed to join the program, even when consumers denied doing so and the Defendants' own records substantiated those denials. The cancellation rates were extremely high, so high that at least two banks refused to continue doing business with MSLLC.

The vast majority of Defendants' revenue was from these on-line charges to consumers bank accounts. According to Defendants' independent accountant, Michael Berndgen, less than one percent of MSLLC's net revenue came from funded down payments from consumers. That is, less than one percent of the revenues came from

consumers making the 25% down payment with the apparent intention of shopping with Defendants' business.

From June 2009 to June 2013, MSLLC attempted to debit 606,321 consumers' bank accounts. Approximately 175,000 attempts were successful. The failed attempts were for a variety of reasons, including that many customers had insufficient funds in their accounts to pay the debit. The common result was an NSF charge to the consumer's account.

Defendants received over $18,000,000 from consumers after attempting to debit at least $62,000,000 from their accounts. The net revenue was approximately $14,750,000. Additionally, FTC's expert economist, Dr. Sandler, calculated that the banks assessed the consumers approximately $8,100,000 in NSF fees.

In sum, Wolf and Eliasson violated the Permanent Injunction in many respects. "Members" were enrolled in the program without ever seeing the membership agreement. Consumers had to find and click on small, hyper-linked text to view it. Consumers were not asked to enroll in Defendants' fee-based program by pressing a button labelled "purchase program." Instead, this button bore the label "access account." Consumers were not told that the site did not give cash advances, pay day loans, or a general line of credit. Consumers were not told of the 25% down payment requirement in "clear and conspicuous" terms. Instead, the screen said the consumer was given a 75% credit and the consumer was required to do the math and go to the fine print to realize a cash down payment was required.

# **CONCLUSION**

The FTC has shown by clear and convincing evidence that Defendants BRYON W. WOLF and RAY A. ELIASSON violated the Permanent Injunction. The Permanent Injunction binds MSLLC because it acted in concert with its officers and was on notice of the Permanent Injunction by operation of law.

The Defendants violated the Permanent Injunction by:

1. misrepresenting their offer as a cash advance, loan, or general line of credit;

2. failing to clearly and properly disclose that they were promoting a program and offering credit usable solely at their electronic shopping mall;

3. failing to clearly and conspicuously disclose all material program terms to consumers before asking them for their consent to be debited;

4. failing to get consumers' express, informed consent before debiting them; and

5. falsely advising consumers that they agreed to buy the program.

The Court will grant a sanction in the form of a money judgment in the amount of the net revenues of $14,750,000. Disgorgement of gross receipts has been granted in other cases, but the Court determines that disgorgement of net revenues is the appropriate sanction in this case. *See McGregor v. Chierico*, 206 F. 3d 1378 (11th Cir. 2000). The FTC also seeks a sanction in the form of fees assessed by the banks due to Defendants' NSF (non-sufficient funds) debits. The Court concludes that the amounts presented by the FTC on this element were not sufficiently definite in order to include this as a portion of the sanction.

It is therefore ORDERED AND ADJUDGED that:

1. Defendants BRYON W. WOLF, ROY A. ELIASSON, and MEMBERSHIP SERVICES, LLC are hereby held in CIVIL CONTEMPT of this Court for violating the Permanent Injunction entered herein on December 30, 2008.

2. Plaintiff FEDERAL TRADE COMMISSION is awarded a Judgment against the Defendants, jointly and severally, in the amount of $14,750,000.

3. The Clerk is directed to enter Judgment in favor of the FEDERAL TRADE COMMISSION and against the named Defendants in that amount.

4. The Clerk is directed to close this file.

**DONE** and **ORDERED** in Tampa, Florida, this 13th day of January, 2014.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Odd\2007\07-cv-1279 Order of Contempt.docx